UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PACASO INC., et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>CITY OF ST. HELENA, et al.,<br><br>    Defendants. | Case No. 21-cv-02493-WHO<br><br>**ORDER GRANTING ANTI-SLAPP MOTION TO STRIKE FIFTH CAUSE OF ACTION**<br><br>Re: Dkt. No. 18 |

    Plaintiffs Pacaso Inc. and PAC 6 CA 2021 LLC (collectively "Pacaso"), who claim that they have created a new and more accessible pathway for second home ownership by allowing co-owners to buy partial interests in real property, are suing the City of St. Helena, City Attorney Ethan Walsh, Mayor Geoff Ellsworth, and Planning and Building Director Maya DeRosa (collectively "defendants") for blocking it and its homeowners from enjoying home ownership in St. Helena and attempting to enforce a zoning ordinance that prohibits the creation of a timeshare project. Defendants move to strike Pacaso's fifth cause of action for intentional interference with prospective economic advantage, which is based on a March 16, 2021 letter that City Attorney Walsh sent to all real estate agents in St. Helena concerning the City's timeshare and short-term rental ordinances and the potential violation of those ordinances by persons selling fractional interests in residential properties.

    Defendants have met their burden under step one of the analysis under California's anti-SLAPP statute, Cal. Code Civ. Proc. § 425.16, by showing that the statements in the letter were made in connection with an issue under consideration by a legislative body and are protected under section 425.16(e)(2) of the anti-SLAPP statute. Under step two, Pacaso cannot show a reasonable probability that it will prevail on its claim because defendants have demonstrated that

Walsh sent the letter in the course of discharging his duties to evaluate and prevent violations of the City's ordinances, an act that is privileged under California Civil Code section 47(a)'s official duty privilege. For these reasons, the motion to strike the fifth cause of action is GRANTED. Pursuant to section 425.16(c) of the anti-SLAPP statute, defendants are entitled to attorney's fees in the amount of $20,126.50.

## BACKGROUND

Pacaso (formerly known as Niner Homes) launched in 2020, seeking to "open the second home market, which has traditionally only been accessible to affluent and predominately white buyers," by simplifying and streamlining the co-ownership process that makes second home ownership possible at a more accessible price point. Complaint ("Compl.") [Dkt. No. 1] ¶¶ 15, 24, 26, 30. Pacaso creates a property-specific LLC for each home, which owns deeded title to the real property and then "organizes and vets a maximum of eight co-owners, who hold co-ownership interests in the LLC and co-own the home in increments ranging from 12.5% to 50%." *Id.* ¶ 27. "At closing, the co-owners enjoy 100% ownership in the property, and Pacaso's only role remains to serve, at the discretion of the homeowners, as program manager overseeing the LLC and employing local businesses to care for the home." *Id.* ¶ 28. Pacaso homeowners can "sell their interest at any point after the first year of ownership by listing the property on the Multiple Listing Service ('MLS') with a local real estate agent, and they are strictly prohibited from renting out the property at any point to anyone." *Id.* ¶ 68.

Pacaso currently owns and/or manages five single-family homes in the City of St. Helena in Napa County. *Id.* ¶¶ 17. 25. It contends that Pacaso homeowners "are part and parcel of the underlying economic ecosystem of St. Helena" unlike "absentee second homeowners" because "Pacaso homeowners use and occupy their home year-round," and "Pacaso itself employs between 8-10 local businesses per property, including real estate agents, property managers, landscapers, pool cleaners, home cleaners, laundry services, handymen, local artists, and more." *Id.* ¶ 5.

The City first communicated with Pacaso in May 2020. *Id.* ¶ 79. On May 15, 2020, Maya DeRosa, the City's Planning and Building Director, sent a "Notice of Potential Violation" to a Pacaso homeowner, Jay Jeffers, giving notice that if the home located at 1005 Valley View Street

2

was "used as a timeshare or short term rental," such use would be impermissible pursuant to the City Municipal Code. *Id.*; Declaration of Maya DeRosa in Support of Defendants' Motion to Strike ("DeRosa Decl.") [Dkt. No. 18-4], Ex. A (May 15, 2020 Letter). On May 19, 2020, Austin Allison (of then-named Niner Homes) responded on behalf of the homeowner to explain "why Pacaso's operations do not violate such ordinances and that the homeowner's use of his property was entirely consistent with such laws." Compl. ¶ 80; DeRosa Decl., Ex. B (May 19, 2020 Response). Allison clarified that "Mr. Jeffers actually owns two homes in Saint Helena," and that he is "selling a portion of his home on Valley View because he no longer desires to own 100% of the home[.]" May 19, 2020 Response at 1.

De Rosa replied on May 22, 2020, saying that she appreciated Allison's statement "that your company, Niner Homes, only serves owner-occupants and that you 'explicitly prohibit short term rentals and time-sharing uses' that the City's Municipal Code seeks to prevent." DeRosa Decl. Ex. C (May 22, 2020 Letter); *see* Compl. ¶¶ 81–82. DeRosa explained, "The City's concerns regarding both properties stem from apparent unpermitted short-term rentals of Mr. Jeffers' properties in the past, which is in part the reason for the City's initial notice of potential violation." May 22, 2020 Letter at 1. Because the May 22, 2020 letter "dropped any reference to a violation of the City's time-share ordinance," Pacaso alleges that it interpreted it as a "presumed green-light to move forward with its operations from this standpoint." Compl. ¶ 82.

On July 14, 2020, reacting to "concerns" from neighbors about a listing for a Pacaso home, then-acting City Attorney Karen Ueda prepared a report to the City Council "regarding timeshare uses and fractional ownership of residence in the City." *Id.* ¶ 8 and Ex. A ("July 2020 Report"). The City of St. Helena has a timeshare ordinance, codified in Section 17.112.130, which states: "The creation of a time-share project as a means of ownership of any single-family, two-family or multiple-family dwelling or any apartment house shall be prohibited within the city." *Id.* ¶ 37; *see* Declaration of Ethan Walsh in Support of Defendants' Motion to Strike ("Walsh Decl.") [Dkt. No. 18-2], Ex. B (copies of the City's local ordinances pertaining to timeshares and short-term rentals).

The July 2020 Report found that timeshares are "somewhat similar to short-term rentals and fractional ownership hotels but differ from both in important ways." July 2020 Report at 324.

It addressed the "challenges and limitations to regulating partial ownership in single-family residences," finding that the "most fundamental challenge to amending the Zoning Code to regulate fractional or partial ownership in single-family residences is that by law zoning regulations must focus on the use of land," and "may not target individuals." *Id.* at 325. That is, "zoning based solely on ownership, as opposed to the use of land, is impermissible." *Id.* at 326. The July 2020 Report concluded with the following "recommended action":

> Receive this report, discuss, and provide direction to staff if desired. City staff is seeking guidance and clarification from the City Council concerning the specific problem(s) a Zoning Code amendment could help resolve, but with the limitations noted above for regulating timeshares and partial ownership.

*Id.*

Ueda presented her July 2020 Report findings to the City Council, reiterating that "whether a residence is owned by a non-permanent city resident, for example, who may use that residence as a second home, isn't an issue that can be regulated by the zoning code. And so, *we can't regulate based on the identity of the owner or of a tenant*." Compl. ¶ 10 (citing Recording of July 14, 2020 City Council Meeting ("July 2020 Meeting") at 3:20:58 –3:21:13, available at https://sthelena.civicweb.net/document/42347?splitscreen=true&media=true&timestamp=11860).[1] Pacaso quotes from the July 2020 Meeting, describing it as an "[e]xtensive discussion . . . about the limitations and impropriety of the City attempting to regulate partial ownership of single-family homes[.]" *Id.* ¶ 11. Despite those findings, Pacaso alleges, "[d]efendants decided to change course in early 2021, threatening that unless Pacaso immediately ceased its efforts to market a home in St. Helena to prospective home buyers, it would contact all real estate agents in the area to 'educate' them on the 'illegality' of Pacaso's ownership model." *Id.* ¶ 12.

---

[1] Pacaso's counsel submits a transcript of the July 2020 City Council meeting prepared by its legal staff and offers to submit a certified transcribed copy if required. *See* Declaration of Ashley Phillips in Support of Plaintiffs' Opposition ("Phillips Decl.") [Dkt. No. 22], Ex. 3. Defendants objects to the transcript for lack of relevance (FRE 401–403), lack of personal knowledge/foundation (FRE 602), impermissible hearsay (FRE 801–802), and under the best evidence rule (FRE 1002). *See* Evidentiary Objections to the Declaration of Ashley Phillips ("Evidentiary Objections") [Dkt. No. 23-2] 3. Because Pacaso has submitted the URL link to the July 14, 2021 City Council meeting, I need not rely on the transcript that it prepared for purposes of resolving this motion.

4

On January 25, 2021, a real estate agent for Pacaso received a letter from DeRosa regarding four Pacaso property listings. *Id.* ¶ 87. DeRosa's letter stated: "The City is proactively sending this letter to communicate that there are local regulations in place pertaining to timeshares and short term rentals and we request that this letter be forwarded to both the buyer and the buyer's agent to ensure that no zoning violations occur following these transactions." DeRosa Decl., Ex. E (January 2021 Letter at 1). Pacaso responded on January 26, 2021 to confirm that "Pacaso is not a time-share, nor does the service allow time sharing use, and that Pacaso prohibits short-term rentals." Compl. ¶ 90; *see* DeRosa Decl., Ex. G (January 2021 Response).

City Attorney Walsh, who replaced Ueda, raised the issue about the timeshare ordinance at the City Council's February 9, 2021 meeting. Compl. ¶ 91. Pacaso alleges that Walsh's update to the City Council "confirms that he and the City had not reached a different conclusion regarding the time-share ordinance since the conclusion reached in its July 2020 Report," and that instead he "conceded that he and the City were still 'looking at' and 'delving further into that issue' (the applicability of the zoning ordinance), confirming that they had not yet determined what to do regarding co-ownership structures like Pacaso's and whether such structures could be regulated under the time-share ordinance." *Id.* In Pacaso's view, Walsh's statement that he and the City were "looking into both what we can do under our current regulations and potentially looking at some changes to the existing regulations" confirms the need to amend the City's timeshare ordinance in order for it to apply to co-ownership structures like Pacaso.[2]

The next day, on February 10, 2021, Walsh sent a letter to Pacaso stating that the City "disagrees" that "Pacaso is not operating a timeshare in St. Helena." Compl. ¶ 92. In that letter, Walsh stated: "Based on the evidence that the City has received of the nature of Pacaso's and its buyers' intended use of residential properties in St. Helena, Pacaso appears to be operating,

---

[2] Pacaso's counsel submits a transcript of the February 9, 2021 City Council meeting prepared by its legal staff and offers to submit a certified transcribed copy if required. *See* Phillips Decl., Ex. 4; February 9, 2021 City Council Meeting at 14:11–14:42 at https://www.youtube.com/watch?v=XUTsUdZ5wA8&t=759s&ab_channel=CityofSt.Helena. Defendants object on the same grounds noted above. *See* Evidentiary Objections at 4. Because Pacaso has submitted the URL link to the February 9, 2021 City Council meeting, I need not rely on the transcript that it prepared for purposes of resolving this motion.

facilitating, and selling timeshares under state law and the City's code. (*See* St. Helena Municipal Code § 17.112.130.) Simply calling them co-ownership arrangements does not change that fact." Walsh Decl., Ex. D (February 2021 Letter at 1). Pacaso contends that Walsh did not provide or describe the "evidence" and instead improperly placed the burden on Pacaso, inviting it to convince the City that it was not subject to the time-share ordinance: "If Pacaso convinces the City that Pacaso's—and its buyers'—intended use of residential property in the City does not constitute a timeshare under state law and regulations or the City's code, the City will not apply the timeshare-prohibition." Compl. ¶ 93 (quoting February 2021 Letter at 1). Walsh gave Pacaso until February 19, 2021 to respond, stating: "Otherwise, the City will be forced to consider appropriate legal action to enforce its restrictions on timeshares, and also consider appropriate action to educate brokers and the public about the illegal nature of Pacaso's timeshares." February 2021 Letter at 2.

With no response from Pacaso[3], on March 16, 2021, Walsh sent a letter to all listing agents and brokers in the City of St. Helena, stating:

> The City is proactively sending this letter to all real-estate offices in the City to provide notice of local regulations pertaining to timeshares and short-term rentals that affect all residential properties in St. Helena, including several properties that are currently listed for sale. The City's regulations encourage the *long-term* residential character of the City's residential neighborhoods, which is vital to the welfare of the community.
> . . .
> The objective of this letter then is to ensure that no zoning violation occurs as a result of a transaction in which you or your clients might be involved.

Walsh Decl., Ex. E (March 2021 Letter at 1) (internal quotation marks omitted) (emphasis in original). The letter goes on to summarize the City's timeshare and short-term rental regulations, adding that the timeshare ordinances applies "to a timeshare whether the use is called a

---

[3] Pacaso contends that defendants incorrectly state that Pacaso failed to respond. Pacaso submits an email that their legal counsel sent to Walsh on February 17, 2021 stating that it would respond in due course. The email reads: "We are in receipt of your letter dated February 10, 202[1]. We have retained outside counsel who will response to the substance of the letter in two weeks." Phillips Decl., Ex. 5 at 1. Pacaso responded to Walsh on March 17, 2021, after Walsh's March 16, 2021 letter to the City's real estate agents. *See* Walsh Decl., Ex. F (March 17, 2021 Pacaso Letter).

'timeshare,' 'fractional-ownership,' 'co-ownership' 'vacation club,' or anything else." *Id.* at 2.

Pacaso contends that this "threatening" letter "chill[ed], under threat of fines and other penalties, any desire of the agents' part to be involved in a sale of ownership interests in Pacaso properties in St. Helena." Compl. ¶ 94. Although the March 2021 Letter did not mention Pacaso, Pacaso contends that Walsh "plainly link[ed] his notice of purported zoning violations to listings for interests in Pacaso homes." *Id.* ¶ 95. It describes the March 2021 Letter as "the manifestation of" Walsh's threat "to educate brokers and the public about the illegal nature of Pacaso's timeshare" from his February 2021 Letter to Pacaso. *Id.* ¶ 96.

Pacaso alleges that Walsh was not acting within the scope of his official discretion when he sent the February 2021 Letter or the March 2021 Letter and that Mayor Ellsworth had the power to prevent and should have prevented Walsh from sending the two letters "but failed to intervene in order to stop the impermissible application of the time-share ordinance against Pacaso." *Id.* ¶¶ 97–98. Pacaso claims that the March 2021 letter to the real estate agents, brokers, and potential buyers in St. Helena "have caused [it] substantial harm" because defendants' "misinformation campaign undermines Pacaso's existing relationships with real estate agents working on its behalf, interferes with Pacaso's business relationships and arrangements, tarnishes Pacaso's reputation and goodwill in the community, and impairs Pacaso from future development (including future business partners and key stakeholders in the St. Helena community) by calling into question the legality of Pacaso's operations." *Id.* ¶ 100. "These threats have scared real estate agents and chilled their efforts to buy and sell ownership interests in Pacaso properties. Likewise, Defendants' threats have deterred prospective buyers from purchasing Pacaso properties." *Id.* ¶ 101.

Pacaso asserts the fifth cause of action for intentional interference with prospective economic advantage against the City and Walsh based on the March 2021 Letter, alleging that "[t]he City's and its employees' efforts to discourage real estate agents, brokers and potential home buyers from working or transacting with Pacaso constitutes a clear, intentional interference with Pacaso's business relationships with St. Helena residents, real estate agents and brokers in St. Helena." Compl. ¶ 193. Pacaso's four other claims, asserted against either the City or all

7

1    defendants, seek declaratory judgment that Section 17.112.130, the City's timeshare ordinance,
2    does not apply to Pacaso; that, as applied to Pacaso, is unconstitutionally vague and ambiguous
3    and exceeds the City's zoning authority and police power; and for violation of Pacaso's due
4    process rights based on selective and arbitrary enforcement. *Id.* ¶¶ 140–91.

## LEGAL STANDARD

California Code of Civil Procedure 425.16 "was enacted to allow early dismissal of meritless first amendment cases aimed at chilling expression through costly, time-consuming litigation." *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 839 (9th Cir. 2001). These lawsuits are also known as "Strategic Lawsuits Against Public Participation," or "SLAPPs." *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 261 (9th Cir. 2013). Under section 425.16 a party may file an "anti-SLAPP motion" to strike "a cause of action based on an act in furtherance of [the] right to petition or free speech." *Metabolife*, 264 F.3d at 840 (internal quotations omitted).

In ruling on an anti-SLAPP motion, a court engages in a two-step process. *Equilon Enterprises v. Consumer Cause, Inc.*, 29 Cal.4th 53, 67 (2002). Under step one, the court assesses whether the moving party has made "a prima facie showing that the lawsuit arises from an act in furtherance of its First Amendment right to free speech." *Nat'l Abortion Federation v. Center for Medical Progress*, Case No. 15-cv-03522-WHO, 2015 WL 5071977, at *3 (N.D. Cal. Aug. 27, 2015).

> At the first step, the moving defendant bears the burden of identifying all allegations of protected activity, and the claims for relief supported by them. When relief is sought based on allegations of both protected and unprotected activity, the unprotected activity is disregarded at this stage. If the court determines that relief is sought based on allegations arising from activity protected by the statute, the second step is reached.

*Baral v. Schnitt*, 1 Cal. 5th 376, 398 (2016).

If the moving party can establish step one, the burden shifts to the non-moving party which must then show a reasonable probability that it will prevail on its claim. *Makaeff*, 715 F.3d at 261. "For a plaintiff to establish a probability of prevailing on a claim, he must satisfy a standard comparable to that used on a motion for judgment as a matter of law." *Price v. Stossel*, 620 F.3d 992, 1000 (9th Cir. 2010). This standard requires that a claim be dismissed if the plaintiff presents

an insufficient legal basis, or if no reasonable jury would find in its favor. *Metabolife*, 264 F.3d at 840; *see also Price*, 620 F.3d at 1000 (an anti-SLAPP motion will be granted if the plaintiff "presents an insufficient legal basis for the claims or when no evidence of sufficient substantiality exists to support a judgment for the plaintiff") (internal quotations omitted).

## DISCUSSION

### I. STEP ONE: PROTECTED ACTIVITY

A defendant satisfies the first step of the analysis by demonstrating that the "conduct by which plaintiff claims to have been injured falls within one of the four categories described in subdivision (e) [of section 425.16] . . . and that the plaintiff's claims in fact arise from that conduct." *Rand Res., LLC v. City of Carson*, 6 Cal.5th 610, 620 (2019) (internal quotation marks and citations omitted). The four categories in subdivision (e) describe conduct "in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue." Cal. Civ. Proc. Code § 425.16(e). Defendants contend that Pacaso's fifth cause of action arises from two of those categories: communications "made in connection with an issue under consideration or review by a legislative body, executive, or judicial body, or any other official proceeding authorized by law" (*Id.* § 425.16(e)(2)) and "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (*Id.* § 425.16(e)(4)).

Defendants rely on *City of Costa Mesa v. D'Alessio Invs., LLC*, 214 Cal. App. 4th 358 (2013). and *Maranatha Corr., LLC v. Dep't of Corr. & Rehab.*, 158 Cal. App. 4th 1075 (2008) for their subsection (e)(2) argument. An analysis of whether a cause of action arises from communication protected by subsection (e)(2) may "be broken down into three components: (a) was there an 'issue under consideration or review by a legislative, executive, or judicial body'; (b) were the [defendants'] statements made 'in connection with' this issue; and (c) [does] the cause[] of action pleaded by [Pacaso] 'aris[e] from' the [defendants'] statements?" *Costa Mesa*, 214 Cal. App. 4th at 372–73 (quoting Cal. Civ. Proc. Code § 425.16(e)(2)).

In *Costa Mesa*, a city brought claims against a commercial landlord to abate a public

nuisance and refused to issue him any new business licenses until the landlord complied. *Id.* at 365. The landlord filed a cross-complaint alleging that city employees slandered him and interfered with his business by making negative statements about him to prospective tenants and contractors. *Id.* at 366. The court found that the landlord's causes of action arose from "oral statements 'made in connection with an issue under consideration or review by a[n] . . . executive . . . body' under section 425.16, subdivision (e)(2)" and therefore was a protected activity. *Id.* at 372 (quoting Cal. Civ. Proc. Code § 425.16(e)(2)).

In *Maranatha*, a private firm sued the California Department of Corrections and Rehabilitation ("CDCR"), a state executive branch department, based on alleged defamatory statements made by the CDCR in a publicized letter (and subsequent oral comments made by an employee) explaining the reasons it was terminating its contract with the firm (*i.e.*, the firm misappropriated funds). 158 Cal. App. 4th at 1080–82. Under the first step of the anti-SLAPP analysis, the court found that "Maranatha's right to retain revenue from inmate telephone calls at the Victor Valley MCCF was undoubtedly an 'issue under consideration'" by the CDCR. *Id.* at 1085. "Indeed, the CDCR and Maranatha argued over the issue for years and their disagreement was referenced in an amendment to the contract. The conflict finally came to a head when Woodford terminated the contract on the ground that Maranatha had failed to account for and wrongfully withheld the ITRF." *Id.* The court rejected the private firm's argument that a matter is "under consideration or review" only when formal or official proceedings have initiated. *Id.* Such an argument "disregards the plain language of section 425.16(e)(2), which protects 'any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, *or* any other official proceeding authorized by law.'" *Id.* (quoting Cal. Civ. Proc. Code § 425.16(e)(2)) (emphasis added). The argument "would change the 'or' to an 'and' in derogation of settled principles of statutory construction and in disregard of the legislative mandate that section 425.16 be construed 'broadly.'" *Id.*

Like *Costa Mesa* and *Maranatha*, the statements in the March 2021 Letter were made in connection with an issue under consideration by a legislative body—the scope of the City's timeshare and short-term rental ordinances and potential violation of those ordinances by persons

10

selling fractional interests in residential properties. Pacaso's fifth cause of action arises from these statements; it alleges that the March 2021 Letter itself "intimidated and threatened real estate agents and brokers from engaging and transacting with Pacaso." Compl. ¶ 194; *see Costa Mesa*, 214 Cal. App. 4th at 375 ("D'Alessio is suing for relief based on the oral statements, not challenging the underlying acts (the refusal of the City and its employees to issue licenses).").

Pacaso's attempt to distinguish *Costa Mesa* and *Maranatha* is unpersuasive. That the parties in *Maranatha* considered the issue "for years" does not mean that defendants' consideration of the issue here for at least nine months makes it any less of a protected activity. *Maranatha*, 158 Cal. App. 4th at 1085. Similarly, that *Costa Mesa* involved two entities, "both an executive body (the City government) and a judicial body (the trial court)," that were "considering and reviewing the issue of whether illegal activity was occurring," does not make the one entity involved here any less deserving of protection from the anti-SLAPP statute. *Costa Mesa*, 214 Cal. App. 4th at 373.

The citations Pacaso offers in its opposition brief are distinguishable. In *Diamond Resorts U.S. Collection Dev., LLC v. Pandora Mktg., LLC*, 500 F. Supp. 3d 1104, 1108 (C.D. Cal. 2020), *appeal dismissed sub nom.,* 2021 WL 2209114 (9th Cir. Mar. 15, 2021), a plaintiff timeshare company sued a defendant "timeshare exit" company, which advertised itself as helping timeshare owners cancel or terminate their timeshare contracts, for tortious interference. The defendant "timeshare exit" company argued that the pre-litigation demand letters they sent out, demanding the timeshare company to cease and desist from communicating with their timeshare owners, arose from activity protected under section (e)(2) of the anti-SLAPP statute. The court rejected that argument because defendants "sent hundreds of exit letters," yet failed to state that "any letter resulted in subsequent litigation." *Id.* at 1113. Instead, as the plaintiff alleged, defendants "never intended to represent [timeshare] owners in any actual litigation." *Id.*

The court in *A.F. Brown Elec. Contractor, Inc. v. Rhino Elec. Supply, Inc.*, 137 Cal. App. 4th 1118, 1129 (2006), an action arising in part from a contractor's service of stop notices on a school district, found that there was "no 'official proceeding' in progress" at time of the stop notices, and that the stop notices required the district to withhold funds due to the general

11

1  contractor but "did not request the district to commence any type of proceeding, or to make any type of administrative or adjudicatory decision." *A.F. Brown* therefore concluded that the stop notices did not involve an "official proceeding" or serious consideration of litigation for clause (1) and (2) of section 425.16, subdivision (e) to apply. *Id.*

In *City of Industry v. City of Fillmore*, 198 Cal. App. 4th 191, 217 (2011), the court held that the fraud and conspiracy claims did not arise from administrative proceedings to determine the proper allocation of local sales tax revenues, a purported protected activity. Rather, it found that the claims were rooted in "a retailer's submission of sales tax returns to the [State Board of Equalization ("SBE")] in the ordinary course of business and the SBE's transmission of local sales tax revenues to local jurisdictions based on the returns," both of which "do[] not involve either a 'proceeding' or 'an issue under consideration or review' by an official body within the meaning of clauses (1) and (2) of section 425.16, subdivision (e)." *Id.*

Pacaso's citations either involved the lack of potential consideration by *judicial* bodies (*i.e.*, litigation was not contemplated) or claims that did not arise from the asserted protected activity. Neither issue is present here. Pacaso's fifth cause of action for intentional interference directly arises from the disputed March 2021 Letter. Statements in the March 2021 Letter were made in connection with an issue under consideration by a legislative body. Defendants have met their burden under step one of establishing that the fifth cause of action arises from protected activity within the meaning of section 425.16(e)(2).[4]

## II.     STEP TWO: PROBABILITY OF PREVAILING ON THE CLAIM

Once defendants demonstrate that the claims against them arise out of protected activity, the burden shifts to the plaintiff to demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated. *Baral*, 1 Cal.5th at 384. The inquiry "is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment." *Id.* at 384–85.

---

[4] Given that defendants' argument under section 425.16(e)(2) succeeds, I need not address whether the alleged conduct is protected under section 425.16(e)(4).

1    Defendants argue that Pacaso cannot make this showing because they are immune from
2    suit for sending the March 2021 Letter. *See Rohde v. Wolf*, 154 Cal. App. 4th 28, 38 (2007)
3    (finding that a statutory privilege is "relevant to the second step in the anti-SLAPP analysis in that
4    it may present a substantive defense the plaintiff must overcome to demonstrate a probability of
5    prevailing"). They contend that California Government Code section 820.2, the official duty
6    privilege of California Civil Code section 47(a), the official proceeding privilege of Civil Code
7    section 47(b), and the common interest privilege of Civil Code section 47(c) immunize them from
8    liability for issuing the March 2021 Letter. Of the four statutory immunities raised by defendants,
9    I find that the official duty privilege of section 47(a) is applicable to the March 2021 Letter and
10   immunizes defendants from Pacaso's fifth cause of action.[5]

### A.   Official Duty Privilege under Civil Code section 47(a)

Section 47 (a) "confers privileged status upon any statement made by a public official in the course of discharging his [or her] official duties." *Royer v. Steinberg*, 90 Cal. App. 3d 490, 500 (1979); Cal. Civ. Code § 47(a). The privilege "protects any statement by a public official, so long as it is made (a) while exercising policy-making functions, and (b) within the scope of his [or her] official duties." *Maranatha*, 158 Cal. App. 4th at 1087 (citing *Royer*, 90 Cal. App. 3d at 501).

Defendants argue that the statements contained in the March 2021 Letter are privileged pursuant to section 47(a) because Walsh sent the letter in the course of discharging his duties as the city attorney to evaluate and prevent violations of the City's zoning ordinances, which involved a policy-making aspect and the exercise of discretion. *See* Walsh Decl. ¶¶ 2, 8–11.

---

[5] Immunity is not available under Government Code section 820.2 because Pacaso expressly pleads that it is seeking only "mandatory and prohibitory injunctions to cure Defendants' tortious conduct and to prevent future, recurring harms" and that it "does not seek monetary or other damages based on their intentional interference with Pacaso's economic interests." Compl. ¶ 201 n.16; *see La All. for Hum. Rts. v. City of Los Angeles*, No. LACV2002291DOCKESX, 2021 WL 1890782, at *7 (C.D. Cal. May 11, 2021) (finding Government Code section 814, which governs claims for immunities under sections 815.2 and 820.2 "specifically denotes that '[n]othing in this part affects liability based on contract or the right to obtain relief other than money or damages against a public entity or public employee'") (quoting Cal. Gov't Code § 814). Because I find immunity applies under the official duty privilege of Civil Code section 47(a), I need not address the other privileges under sections 47(b) and 47(c).

United States District Court
Northern District of California

Pacaso contends that the privilege does not apply because the March 2021 Letter merely implements a policy decision that was previously made (that Pacaso was violating the City's ordinances) and thus was "operational" and not an exercise of a policy-making function.

Statements made by city attorneys related to their policy-making function are protected under section 47(a). *Tutor-Saliba Corp. v. Herrera*, 136 Cal. App. 4th 604, 607 (2006) provides an illustrative example. There, a construction company ("Tutor") sued San Francisco City Attorney Dennis J. Herrera for defamation for statements he made about the potential merits of fraud litigation he had initiated against the company on behalf of the city. The California Court of Appeal affirmed the trial court's ruling striking the defamation action under the anti-SLAPP statute because the alleged defamatory statements fell under the official duty privilege of section 47(a). *Id.* at 617. It found:

> Under these circumstances, Herrera, as city attorney, had the authority, if not the duty, to express his professional opinion about the justification for, and potential merits of, the protracted and expensive litigation he had initiated on behalf of the city,[footnote omitted] as well as to make a public statement that he disagreed with the mayor's proposed unilateral action that would bring the case to a halt. While the language of his remarks was florid and certainly cast Tutor in an unfavorable light, the comments all concerned the claims being asserted in the federal action, and Herrera's professional opinion, as the municipal attorney entrusted with plenary power over that litigation, that the matter was well worth pursuing.

*Id.* at 615. It concluded that "the alleged defamatory statements Herrera made concerning Tutor's business practices related to the policy making he must necessarily perform as city attorney, and were within the scope of his duties." *Id.*

*Tutor-Saliba* cited two other analogous cases involving state and county attorneys. *Kilgore v. Younger*, 30 Cal. 3d 770 (1982) involved former state Attorney General Evelle Younger, who had commissioned a study of organized crime in California. The report named 92 persons suspected of involvement in organized crime, including plaintiff Kilgore, who was identified as being engaged in an illegal bookmaking operation. *Id.* at 774–775. The report was made public by Younger at a press conference during which he distributed copies to the media and proclaimed that he "adopted" its findings. *Id.* at 775. Kilgore sued for defamation and related torts. The California Supreme Court found that the official duty privilege of section 47(a) is "absolute" and

14

applied to public statements made by high-ranking governmental officers in the discharge of their official duties. *Id.* at 778.

In *Ingram v. Flippo*, 74 Cal. App. 4th 1280 (1999), Monterey County District Attorney Dean Flippo was sued for declaratory and injunctive relief by a local school member after issuing a press release charging the school board with minor violations of California's Brown Act, Government Code. section 54950 *et seq*. Although Flippo denied any intention to prosecute for the minor violations described in the press release, the court nonetheless found that the privilege applied: "[T]he District Attorney issued a press release summarizing the results of an investigation of a complaint of alleged violations of the Brown Act. The District Attorney's ultimate decision neither to prosecute nor to file a civil action at the time does not, in our view, affect the application of the privilege in these circumstances." *Id.* at 1294.

*Tutor-Saliba* went on to distinguish these types of circumstances from the two cases Pacaso relies on here—*McQuirk v. Donnelley*, 189 F.3d 793 (9th Cir. 1999) and *Neary v. Regents of the Univ. of Cal.*, 185 Cal. App. 3d 1136 (1986). In *McQuirk*, a former employee of the Glenn County Sheriff's Office applied for a job with a police department in Washington and sued the Glenn County Sheriff for allegedly defamatory statements made about him to the police department. *McQuirk*, 189 F.3d at 795. It is "[n]ot surprising[]" that "the court concluded that answering requests for employment references," statements made five years after the employee had retired from the Glenn County Sheriff's Office, "is part of the ministerial, or operational, duties of any employer, and certainly did not relate to the policy-making, law enforcement functions of a county sheriff." *Tutor-Saliba*, 136 Cal. App. 4th at 616 (citing *McQuirk*, 189 F.3d at 799–801). Similarly, *Neary* involved a vice chancellor at the University of California who released a veterinarian's report investigating dead cattle at the plaintiff's ranch, and the release of the report itself "was ministerial and divorced from any policy-making role the vice chancellor might have had." *Id.*; *see Neary*, 185 Cal. App. 3d at 1142.

Here, Walsh's statements were related to the policy-making he must necessarily perform as city attorney and were within the scope of his duties (like the city, county, and state attorneys involved in *Tutor-Saliba*, *Kilgore*, and *Ingram*). They were not merely ministerial or operational

15

(in contrast to the county sheriff and vice chancellor involved in *McQuirk* and *Neary*). Walsh declares that his official duties include "the assessment and prevention of potential violations of the municipal code, including zoning ordinances, which is within the scope of the discretion that is vested in [him] as the City's chief legal officer." Walsh Decl. ¶ 2. Pursuant to these duties and "in consultation with the City Manager, and to prevent what [he] believed, in good faith and after deliberation, to be a potential zoning violation, [he] informed the Realtors of the City's timeshare and short-term-rental regulations" through the March 2021 Letter. *Id.* ¶ 11. To repeat, Walsh sent the March 2021 Letter in the course of discharging his duties as the city attorney to evaluate and prevent violations of the City's zoning ordinances, which involved a policy-making aspect and the exercise of discretion.

Pacaso argues that the act of sending the March 2021 Letter was ministerial because it could have been accomplished by someone other than Walsh, given his testimony that "the March 16, 2021 letter was initially drafted to be sent on behalf of the City Manager." Walsh Decl. ¶ 11. The argument is unpersuasive. Walsh attests that he prepared the letter "in consultation with the City Manager and Ms. DeRosa" and that the letter informing realtors of the City's regulations and potential zoning violation was sent "[p]ursuant to [his] job duties," which includes "assess[ing] and prevent[ing] zoning violations" "in consultation with the City Manager" who is "authorized to enforce the City's Code." *Id.* Walsh's consultation with other city officials does not remove him from the cloak of the official duty privilege. Pacaso fails to cite any case that has held otherwise.

Pacaso cites the terms of Walsh's contract with the City, which states that all of his responsibilities are "as directed" or "as requested" by the City but does not mention any "policy making" or "discretion." *See* Phillips Decl., Exs. 1 and 2. Defendants object to Pacaso's submission of Walsh's contract with the City on lack of relevance and lack of foundation grounds. That evidence does not undermine the conclusion above. The record demonstrates that Walsh was doing what the St. Helena City Council directed him and his predecessor Ueda to do—look into the City's timeshare ordinance and investigate fractional uses in residential neighborhoods.[6]

---

[6] Pacaso also contends that another partner at Walsh's law firm, Best Best & Krieger, concluded that Pacaso was not subject to a time share ordinance in the City of Indian Wells. *See* Phillips

Accordingly, Pacaso cannot prevail on the fifth cause of action because it is based on conduct and statements protected by the official duty privilege of section 47(a).

### III. LIMITED DISCOVERY IS NOT WARRANTED

Pacaso contends that it should be permitted to take discovery to test the factual assertions made by defendants in support of their claimed immunities and privileges before I entertain a possible dismissal of the fifth cause of action. It argues that it is entitled to discovery on whether the decision to send the March 2021 Letter was "policymaking" within the section 47(a) privilege.

A similar request for discovery was rejected in *Tutor-Saliba*. When faced with the court's skepticism concerning the need for any discovery, plaintiffs' counsel contended it was "entitled to [discovery] which can help establish that these privileges do not apply" and that "if the court determined that Herrera was acting in his official capacity, [it] 'should be able to explore' this question further." 136 Cal. App. 4th at 618. The *Tutor-Saliba* court found that "the trial court was well within its discretion in denying discovery" because "Tutor's last minute attempt to argue that discovery was needed to 'explore' the factual basis for Herrera's privilege claim was much too little, and came much too late." *Id.* The request was "too late" because it was only raised at the hearing and "too little" because "no attempt was made by counsel to explain what specific discovery was needed, and why it was needed" other than "general comments that they should be able to explore and conduct discovery on what 'exactly [Herrera's] duties are and whether his decision to speak at [the public event] fell within those official duties.'" *Id.* at 619.

Although Pacaso's request is not "too late" because it raised this issue in its briefing, it is "too little" to warrant discovery. The examples of necessary discovery that Pacaso provides in its opposition brief are overly board. When asked at the hearing what other facts it expected to uncover in discovery that would negate the privilege, Pacaso provided a similarly general response. In these circumstances, I find that discovery is not warranted.

---

Decl., Exs. 7–9 (copies of the City of Indian Wells' municipal code and letters sent between Pacaso and the City of Indian Wells in April 2021). It argues that Walsh's decision with respect to the City of St. Helena cannot be reconciled with the opposite conclusion reached on behalf of Indian Wells. It fails, however, to demonstrate how the circumstances involving another municipality and another lawyer is relevant to the matter at hand with Walsh and the City of St. Helena. Pacaso's counsel did not argue this point at the hearing.

17

## IV. FEES

Subject to limited exceptions that do not apply here, "a prevailing defendant on a special motion to strike shall be entitled to recover his or her attorney's fees and costs." Cal. Civ. Proc. Code § 425.16(c)(1). "Because the award of attorney's fees under this provision is mandatory, 'the trial court must, upon defendant's motion for a fee award, rule on the merits of the SLAPP motion' even if the matter was dismissed before reaching said merits." *Elem Indian Colony of Pomo Indians of the Sulphur Bank Rancheria v. Ceiba Legal, LLP*, 230 F. Supp. 3d 1146, 1152 (N.D. Cal. 2017) (quoting *Pfeiffer Venice Props. v. Bernard*, 101 Cal. App. 4th 211, 215 (2002)); *see Ketchum v. Moses*, 24 Cal.4th 1122, 1131 (2001) (holding "any SLAPP defendant who brings a successful motion to strike is entitled to mandatory attorney fees.").

Defendants contend that they have incurred attorneys' fees and costs in the amount of $20,126.50. In support of their request, they submit a declaration that provides the hours spent by counsel (a partner, two litigation associates, and a paralegal), along with their hourly rates (which have been reduced in connection with this matter). *See* Supplemental Declaration of Damian M. Moos in Support of Motion to Strike [Dkt. No. 36].

Pacaso does not contest this amount or the reasonableness of defense counsel's hourly rates.[7] Instead, it argues that the request is premature and that attorneys' fees cannot be awarded until it has a chance to amend the Complaint. *See Verizon Delaware, Inc. v. Covad Communications Co.*, 377 F.3d 1081, 1091 (9th Cir. 2004) (holding that granting an anti-SLAPP motion without leave to amend "would directly collide with Fed. R. Civ. P. 15(a)'s policy favoring liberal amendment"). When asked at the hearing what facts it could allege in an amended complaint to save its fifth cause of action, Pacaso's counsel came up short. While amendment is usually freely given, in light of my determination that the fifth cause of action is based on privileged protected activity, amendment would be futile.

Having reviewed defendants' submission, I find that the amount of time spent researching

---

[7] At the July 6, 2021 Case Management Conference, I ordered defendants to submit a supplemental declaration describing the fees actually incurred in litigating the motion. *See* Minute Entry [Dkt. No. 35]. I allowed Pacaso to respond to the declaration by July 10, 2021. No response was filed.

and preparing the motion, briefs, and declaration is reasonable, as are the billing rates for defense counsel. Defendants' request for fees is GRANTED.

**CONCLUSION**

Defendants have met their burden under step one of the anti-SLAPP analysis by showing that the fifth cause of action arises from protected activity. They have also demonstrated that Pacaso cannot prevail on the fifth cause of action because the claim is based on conduct and statements privileged under section 47(a)'s official duty privilege. For these reasons, the motion to strike the fifth cause of action is GRANTED. Pacaso is ORDERED to pay $20,126.50 to defendants for fees and costs incurred in connection with the anti-SLAPP motion.

**IT IS SO ORDERED.**

Dated: July 15, 2021



William H. Orrick
United States District Judge

19