LANCE A. ETCHEVERRY (SBN 199916)
Lance.Etcheverry@skadden.com
ABRAHAM A. TABAIE (SBN 318397)
Abraham.Tabaie@skadden.com
CAROLINE VAN NESS (SBN 281675)
Caroline.VanNess@skadden.com
ASHLEY PHILLIPS (SBN 318397)
Ashley.Phillips@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
525 University Avenue, Suite 1400
Palo Alto, CA 94301
Telephone:    (650) 470-4500
Facsimile:    (650) 470-4570

*Attorneys for Pacaso*
PACASO INC., PAC 6 CA 2021 LLC, PAC 5
CA 2021 LLC, PAC 2 CA 2021 LLC, NAPA
120 LLC

JASON M. SKAGGS (SBN 202190)
Jason@skaggsfaucette.com
SKAGGS FAUCETTE LLP
530 Lytton Ave Fl 2
Palo Alto, CA 94301
Telephone:    (650) 617-3226
Facsimile:    (650) 644-0200

*Attorneys for Pacaso Homeowners*
SIMON BULL and THE BULL FAMILY
TRUST, TONY ATHANS, MARY
ATHANS, and THE ANTONY JOHN
ATHANS REVOCABLE TRUST & MARY
LIAPIS ATHANS REVOCABLE TRUST,
CHAD AMMON, JONATHAN YOUNG,
and AMMON-YOUNG REVOCABLE
TRUST, DATED 8/12/16, TAYLOR
LOPEZ, CHELSEA LOPEZ, and WILLIAM
TREVOR GILLESPIE

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

PACASO INC., PAC 6 CA 2021 LLC, PAC
5 CA 2021 LLC, PAC 2 CA 2021 LLC,
Napa 120 LLC, SIMON BULL and THE
BULL FAMILY TRUST, TONY ATHANS,
MARY ATHANS and THE ANTONY
JOHN ATHANS REVOCABLE TRUST &
MARY LIAPIS ATHANS REVOCABLE
TRUST, CHAD AMMON, JONATHAN
YOUNG and AMMON-YOUNG
REVOCABLE TRUST, DATED 8/12/16,
TAYLOR LOPEZ, CHELSEA LOPEZ, and
WILLIAM TREVOR GILLESPIE,

Plaintiffs,

v.

THE CITY OF ST. HELENA; PLANNING
& BUILDING DIRECTOR MAYA
DEROSA; MAYOR GEOFF
ELLSWORTH; CITY ATTORNEY
ETHAN WALSH; and DOES 1-5.

Defendants

Case No.: 3:21-cv-02493-WHO

**FIRST AMENDED COMPLAINT FOR:**

**(1) DECLARATORY JUDGMENT:
EXEMPTION FROM CHAPTER 17.138
"TIME SHARE USES" AND SECTIONS
17.138.060 TO TITLE 17, ZONING, OF THE
ST. HELENA MUNICIPAL CODE, AND
DELETING SECTION 17.112.130 FROM
THE MUNICIPAL CODE ("CHAPTER
17.138");**

**(2) DECLARATORY JUDGMENT:
INAPPLICABILITY OF CHAPTER 17.138;**

**(3) SELECTIVE ENFORCEMENT;**

**(4) INVALID USE OF MUNICIPAL
AUTHORITY;**

**(5) PREEMPTION;**

**(6) DUE PROCESS VIOLATION;**

**(7) UNCONSTITUTIONALLY
OVERBROAD; and**

**(8) VIOLATION OF THE RIGHT OF
PRIVACY.**

<u>**JURY TRIAL DEMANDED**</u>

1   Plaintiffs Pacaso Inc., a Delaware corporation, and PAC 6 CA 2021 LLC, PAC 5 CA 2021

2   LLC, PAC 2 CA 2021 LLC and Napa 120 LLC (collectively, "Pacaso"), and (1) Simon Bull and

3   the Bull Family Trust, (2) Tony Athans, Mary Athans and the Antony John Athans Revocable

4   Trust & Mary Liapis Athans Revocable Trust, (3) Chad Ammon, Jonathan Young and Ammon-

5   Young Revocable Trust, dated 8/12/16, (4) Taylor and Chelsea Lopez and (5) William Trevor

6   Gillespie (collectively, the "Pacaso Homeowners"), for their First Amended Complaint against the

7   City of St. Helena (the "City" or "St. Helena"); Maya DeRosa ("DeRosa"), in her capacity as

8   Planning & Building Director of St. Helena; Geoff Ellsworth ("Ellsworth"), in his capacity as

9   Mayor of St. Helena; Ethan Walsh ("City Attorney Walsh"), in his capacity as City Attorney of St.

10  Helena; and Does 1 through 5 (collectively, the "Defendants"), allege based on personal

11  knowledge and on information and belief as follows:

12                                    **INTRODUCTION**

13         1.      This case arises out of Defendants' calculated and intellectually dishonest campaign

14  against Pacaso and its homeowners to violate their protected rights to share ownership of a single-

15  family home with others.  Acting under the false pretense of enforcing the City's time-share

16  ordinance, previously codified in Section 17.112.130 of the St. Helena Municipal Code ("Section

17  17.112.130"), and now just recently codified in the newly enacted Chapter 17.138 "Time Share

18  Uses" and Sections 17.138.060 of Title 17, Zoning, of the St. Helena Municipal Code ("Chapter

19  17.138"), Defendants have sought to preclude Pacaso and its homeowners from enjoying the

20  benefits of secondary home ownership in St. Helena—a privilege that St. Helena seeks to reserve

21  only for those in the upper echelon of financial status (i.e., those who can afford to purchase and

22  own primary and second homes in St. Helena on their own, despite the astronomical housing prices

23  in the area).  Sadly, this is just the latest chapter in a long history of improper attempts by the City

24  to exclude outsiders from the community.  With Defendants now entrenched in this unprincipled

25  position, Pacaso has no choice but to seek judicial intervention to guarantee the legally and

26  constitutionally protected rights of its homeowners to enjoy the benefits of owning property in the

27  beautiful surrounds of St. Helena.

28         2.      Defendants' crusade against Pacaso is based on manufactured, incorrect theories

                                              1

1    about both the scope of Section 17.112.130 and Chapter 17.138, as well as Pacaso's business

2    model.  Both these ordinances purport to prohibit time-shares.  But Pacaso homes are not time-

3    shares, and what St. Helena appears to really want to prohibit is *Pacaso itself*.

4         3.       Pacaso has introduced a new pathway for second home ownership that provides

5    individuals who have traditionally been excluded from the second home market an opportunity to

6    turn their dreams into reality.  Pacaso eliminates several significant barriers to second home

7    ownership, including exorbitant costs, inevitable maintenance hassles and even the perceived guilt

8    of having the home sit vacant.  Pacaso prides itself in serving a diverse clientele, underscoring the

9    power of ownership to unlock new opportunities for traditionally underrepresented communities.

10   Its owner group is organically diverse:  around half of Pacaso homeowners in St. Helena are non-

11   white or identify as LGBTQ+.

12        4.       Pacaso's homeowners are not renters or investors.  They ***co-own*** the home with up

13   to seven other homeowners.  Pacaso's co-homeownership structure has no resemblance to

14   commercial or quasi-commercial use.  Pacaso homeowners are true homeowners who make a

15   significant financial investment in their home—and they are in it for the long haul.  They are

16   directly invested in the home and its surrounding neighborhood and community, and own for their

17   personal use and enjoyment, not for profit.  Pacaso homeowners cannot sell their ownership stake

18   during the first year of ownership, and they are strictly prohibited from renting out the property at

19   any point to anyone.

20        5.       Unlike absentee second home owners, Pacaso homeowners occupy their home and

21   support local businesses year-round, including those disproportionately impacted by COVID-19,

22   such as wineries, restaurants and retail shops.  What is more, Pacaso itself employs between 8 to 10

23   local businesses per property, including real estate agents, property managers, landscapers, pool

24   cleaners, home cleaners, laundry services, handymen, local artists and more.  Indeed, as of

25   October 2021, 67% of all residential properties in St. Helena did not take the owner occupant

26   exemption, which means the owners patronize local businesses only a fraction of the year.  In

27   contrast, Pacaso homeowners use and occupy their home year-round, just like a primary residence.

28   And in many respects, Pacaso homeowners contribute more to the City of St. Helena than other

1  homeowners—they volunteer in the community, open businesses in St. Helena and work in the

2  City, employ and support local St. Helena residents, support and attend local churches, donate time

3  and money to local establishments in St. Helena (like liberal arts organizations, churches and

4  schools), support local businesses and restaurants, stay involved in community issues and local

5  governance, befriend St. Helena residents and neighbors and even host them at to their Pacaso

6  home, babysit grandchildren who live in St. Helena, spend time with family in the City, pay

7  property taxes, stay involved in local political matters and even testify before the City Council and

8  Planning Commission, and take seriously the City's rules and regulations.  *See infra* ¶¶ 142-153.

9  Pacaso homeowners, as invested homeowners, are active members of the community of St. Helena

10  and are motivated to better the community.  In sum, Pacaso's homeowners are part and parcel of

11  the underlying social fabric and economic ecosystem of St. Helena.

12         6.     Pacaso is—and has always been—fully compliant with, and committed to

13  upholding, the laws and values of St. Helena.  Despite the obvious opportunities to develop a

14  fruitful partnership, Defendants have rejected any attempt to embrace Pacaso and its homeowners

15  as the equal community members they are.  Instead, they have taken aim at Pacaso, seemingly at

16  the behest of a few vocal St. Helena residents with improper bias against outsiders.

17         7.     On July 14, 2020, reacting to "concerns" from neighbors about a listing for a Pacaso

18  home, then-acting City Attorney Kara Ueda prepared a report to the St. Helena City Council (the

19  "July 2020 Report," attached as Ex. A hereto).  Desperate for a way to regulate and control Pacaso

20  and its homeowners, the City Council directed City Attorney Ueda to evaluate the scope of Section

21  17.112.130 and whether it applied to Pacaso.

22         8.     The answer was plainly "no."  The City Attorney's July 2020 Report concluded that

23  "a timeshare use differs from a fractional or partial ownership of a property."  July 2020 Report at

24  1.  Not only that, any attempted regulation of this type of ownership would run afoul of a basic

25  premise of the limits on zoning authority: "[B]y law zoning regulations must focus on the *use* of

26  land."  *Id.* at 3 (emphasis added).  The July 2020 Report acknowledged that this "fundamental

27  challenge" **could not** be cured by amendment to Section 17.112.130, because "zoning based solely

28  on ownership, as opposed to the use of land, is impermissible."  *Id.* at 4.

9.      On July 14, 2020, City Attorney Ueda presented the findings of the July 2020 Report to the City Council and reiterated that the zoning code cannot regulate based on the identity of the homeowners: "Whether a residence is owned by a non-permanent city resident, for example, who may use that residence as a second home, isn't an issue that can be regulated by the zoning code.  And so, *we can't regulate based on the identity of the owner or of a tenant*."[1]  July 14, 2020, Meeting at 3:20-21.

10.      Extensive discussion ensued at that meeting about the limitations and impropriety of the City attempting to regulate partial ownership of single-family homes as reflected in numerous statements by City Council members including the Vice Mayor, including:

- Section 17.112.130 "was improperly written or inaccurately written" such that it does not cover partial ownership of a single-family home like a Pacaso home. (July 14, 2010, Meeting at 3:30.)

- "My concern is that *we're overreaching what we can do legally* though [] from what I understand, *we can't control how people own this*. They're able to do it, and so I don't want us to go down the path of spending a lot of money *trying to find our own way around what we can legally do*.  And I think that *there's other ways to regulate that we have like in our ordinance* such as if there are loud noises, if that's the issue, if there's loud partying after a certain amount of hours.  That's the kind of thing that I'd be more interested in looking at than regulating who gets to own the property if *this is something that by law can happen*." (July 14, 2020, Meeting at 3:30-31.)

- "*What you want and what's legal are entirely different matters*.  I think *this is driven by case law and civil rights law* and cases, you know, I could see the other side of this issue that *we're not in the business of regulating families and how people come together to buy properties*." (July 14, 2020, Meeting at 3:31-32.)

- "*[W]e don't want to go down a path where we're going to get sued* because that doesn't make any sense either, and then we need to focus on the issue, the noise and the nuisance and be a little bit more robust on that part of it. . . .  *I know the case law is sort of against us on this*." (July 14, 2020, Meeting at 3:32.)

11.      In the face of these damning admissions—and without any changes in law or fact since July 2020—Defendants decided to change course in early 2021, threatening that unless Pacaso immediately ceased its efforts to market a home in St. Helena to prospective home buyers, it would contact all real estate agents in the area to "educate" them on the "illegality" of Pacaso's ownership model.  Despite admissions on the public record from Defendant Walsh that the City

---

[1]      Recording of July 14, 2020, City Council Meeting ("July 14, 2020, Meeting"), https://sthelena.civicweb.net/document/42347?splitscreen=true&media=true&timestamp=11860.

FIRST AMENDED COMPLAINT                                    CASE NO. 3:21-cv-02493-WHO

1   had not yet been able to reconcile its newfound position with the clear guidance from former City

2   Attorney Ueda, Defendants nonetheless followed through on their threat in an effort to chill real

3   estate activity surrounding the Pacaso home—sending a letter to all real estate agents in the area

4   that threatened sanctions if agents were to sell what the City claimed was a purported "timeshare"

5   property that was then currently listed on the MLS (i.e., the Pacaso property).  Defendants' plan

6   worked to perfection, as Pacaso was contacted by numerous real estate agents and potential buyers,

7   concerned about possible retribution from the City if they proceed with attempts to buy or sell the

8   Pacaso property in St. Helena.

9       12.    Pacaso and PAC 6 CA 2021 LLC then filed the current action in an effort to stop the

10  City's unlawful enforcement that was at odds with the City Attorney's own position on Section

11  17.112.130, and that was violative of Pacaso's rights.

12      13.    However, during the pendency of this action and before reaching resolution on its

13  claims, Defendants drafted, proposed and have just recently adopted a new time-share ordinance,

14  codified at Chapter 17.138, and deleted Section 17.112.130 from the St. Helena Municipal Code.

15  This new ordinance (Chapter 17.138) was a recognition that Section 17.112.130 was not a viable

16  way to regulate Pacaso, and that Defendants' enforcement against Pacaso had been unlawful.

17      14.    The enactment of Chapter 17.138—which explicitly targets Pacaso and its

18  homeowners—is Defendants' latest attempt to interfere with Pacaso's operations and homeowner

19  activity.  It confirms that Defendants are motivated by an improper purpose.

20      15.    Chapter 17.138 was the City's latest "solution" to the tiny number of vocal

21  detractors who have strong feelings about Pacaso, and was a rushed overreaction that neglects the

22  realities of Pacaso's business, captures hundreds of homes in its dragnet and creates massive

23  confusion and uncertainty for current and aspiring St. Helena homeowners.  Just like the previous

24  time-share ordinance, the enactment of Chapter 17.138 and the City's application of it against

25  Pacaso and its homeowners are nothing more than a pretext to erect barriers and deny

26  homeownership to new diverse residents, and to control *who* owns and occupies a particular

27  residence and *how* people come together to buy—not use—properties.

28      16.    Chapter 17.138 is an overbroad and sweeping ordinance that regulates and prohibits

5

FIRST AMENDED COMPLAINT                                    CASE NO. 3:21-cv-02493-WHO

1    living arrangements that the City has no business interfering with, and leaves citizens guessing as

2    to what kind of arrangements are or are not permissible under the ordinance, with no clarity as to

3    how to determine this.  Under the new ordinance, an extended family that co-owns a house and

4    uses a Google spreadsheet allotting times in which various family members are intending to use the

5    house could be prohibited as a "time-share use" based on the language of the ordinance.  Likewise,

6    Chapter 17.138 potentially prohibits siblings who have allotted times in which they can each enjoy

7    using the home; friends who share a home but who stagger the periods of the year that they enjoy

8    that home; or domestic partners, or divorced or separated spouses, who wish to alternate usage of a

9    home at different times of year for their own personal reasons that are not the concern of the City.

10   The City should not be permitted to regulate how people come together to own and use property; to

11   invade intimately private engagements and arrangements among friends, family members, co-

12   workers, spouses and separated or divorced spouses; and to restrict individuals' ability to make

13   intimate personal decisions about their living arrangements.

14        17.     Chapter 17.138 not only prohibits time-share uses, but also broadly prohibits the

15   "advertise[ment]" or "dissemina[tion] in any way and through any medium" of any time-share use

16   in the City.  Section 17.138.060(A).  This provision on its face appears to extend to individuals

17   merely conversing with a friend about a time-share use or listing in St. Helena, reposting a time-

18   share listing on their social media page, sending a link of the listing via email to another friend or

19   posting Tweets or Facebook posts expressing an opinion about a known time-share use in the City.

20   Such a broad prohibition on *all* speech about time-share uses in the City—including non-

21   commercial and political speech—has a chilling effect on free speech and is therefore

22   unconstitutional.

23        18.     The cloud of threatened criminal prosecution and massive, indefinite and

24   cumulative fines for violations of Chapter 17.138 makes the ordinance even more unlawful and

25   wrongly punitive.

26        19.     Such a broad, sweeping ordinance that goes far beyond regulating mere "use" of

27   buildings, structures or land, and instead targets individuals who can reside in certain properties,

28   and even regulates the content people can post or discuss, must be stricken.

FIRST AMENDED COMPLAINT                            CASE NO. 3:21-cv-02493-WHO

**THE PARTIES**

20.     Pacaso is a corporation formed under the laws of Delaware, doing business as "Pacaso," and headquartered in San Francisco, California.  Pacaso, which previously operated under the brand name "Niner Homes," first started operations in 2020.  It launched as Pacaso in October 2020.  At the inception of this action, Pacaso owned and/or managed at least five single-family homes in the City of St. Helena, but now owns and/or manages four single-family homes in the City of St. Helena, located at (1) 1242 Madrona Ave., St. Helena, CA 94574; (2) 1629 Hillview Pl., St. Helena, CA 94574; (3) 1005 Valley View, St. Helena, CA 94574; and (4) 1509 Riesling Way, St. Helena, CA 94574.

21.     PAC 6 CA 2021 LLC, a California limited liability company, is the property-specific LLC that owns deeded title to 1242 Madrona Ave., a single-family residence located in St. Helena.

22.     PAC 5 CA 2021 LLC, a California limited liability company, is the property-specific LLC that owns deeded title to 1629 Hillview Pl., a single-family residence located in St. Helena.

23.     PAC 2 CA 2021 LLC, a California limited liability company, is the property-specific LLC that owns deeded title to 1509 Riesling Way, a single-family residence located in St. Helena.

24.     Napa 120 LLC, a California limited liability company, is the property-specific LLC that owns deeded title to 1005 Valley View, a single-family residence located in St. Helena.

25.     Simon Bull and the Bull Family Trust own an interest in the property located at 1242 Madrona Avenue, St. Helena, CA 94574, through their membership of PAC 6 CA 2021 LLC, a California limited liability company.  Simon Bull's primary residence is in Carmel, California. He has owned his share in his Pacaso home since February 2020, and has frequently stayed at his Pacaso home.

26.     Tony Athans, Mary Athans and the Antony John Athans Revocable Trust & Mary Liapis Athans Revocable Trust own an interest in the property located at 1005 Valley View St., St. Helena, CA 94574, through their membership of Napa 120 LLC, a California limited liability

FIRST AMENDED COMPLAINT                                    CASE NO. 3:21-cv-02493-WHO

1   company.  The primary residence of Mary and Tony Athans is in Lincolnwood, Illinois.  They have

2   owned their share in their Pacaso home since October 2020, and have frequently stayed at their

3   Pacaso home.

4        27.     Chad Ammon, Jonathan Young and Ammon-Young Revocable Trust, dated

5   8/12/16, own an interest in the property located at 1629 Hillview Place, St. Helena, CA 94574,

6   through their membership of PAC 5 CA 2021 LLC, a California limited liability company.  The

7   primary residence of Jonathan Young and Chad Ammon is in Orinda, California.  They have

8   owned their share in their Pacaso home since July 2021, and have frequently stayed at their Pacaso

9   home.

10        28.     Taylor and Chelsea Lopez own an interest in the property located at 1629 Hillview

11   Place, St. Helena, CA 94574 through their membership of PAC 5 CA 2021 LLC, a California

12   limited liability company.  The primary residence of Taylor and Chelsea Lopez is in Houston,

13   Texas.  They have owned their share in their Pacaso home since August 2021, and have frequently

14   stayed at their Pacaso home.

15        29.     William Trevor Gillespie owns an interest in the property located at 1629 Hillview

16   Place, St. Helena, CA 94574, through his membership of PAC 5 CA 2021 LLC, a California

17   limited liability company.  His primary residence is in San Jose, California.  He has owned his

18   share in his Pacaso home since September 2021, and has frequently stayed at his Pacaso home.

19        30.     The City of St. Helena is a municipality in Napa County, California, and is part of

20   the North Bay Region of the San Francisco Bay Area.  St. Helena is a General Law City and

21   operates a Council-City Manager style of government and derives its power from the California

22   Constitution and laws enacted by the State legislature.

23        31.     Defendant Maya DeRosa is the Planning & Building Director of St. Helena.  In this

24   role, she is responsible for reviewing, revising and implementing St. Helena's General Plan and

25   zoning ordinances, including the time-share ordinance.  She provides regular staff support for the

26   City Council and Planning Commission.  As the Planning & Building Director, DeRosa has "the

27   authority and powers necessary to gain compliance with the provisions of [the St. Helena

28   Municipal] code and applicable state codes," and is "considered to be [an] enforcement official[]"

FIRST AMENDED COMPLAINT                                    CASE NO. 3:21-cv-02493-WHO

with such authorities and powers.  St. Helena Municipal Code Section 1.12.040.  DeRosa has operated as the "designated point of contact for the City" with regard to enforcement efforts against Pacaso and its homeowners.  *See infra* ¶ 95.  As such, Defendant DeRosa had final policy-making authority concerning the review, implementation, recommendation, adoption and enforcement of the time-share ordinance against Pacaso and its homeowners, and, acting under the color of law, ratified, failed to prevent and/or carried out such enforcement efforts against Pacaso and its homeowners, which caused Pacaso and its homeowners to suffer constitutional violations under the United States Constitution and California Constitution, on behalf of the City.

32.     Defendant Geoff Ellsworth is the Mayor of St. Helena.  The City Attorney acts under the Mayor and City Council's direction.  Defendant Ellsworth served as City Council member from November 2016 until he was elected Mayor in November 2018.  The Mayor presides over City Council meetings, signs official documents and officiates at ceremonies and events.  The Mayor is elected at-large to serve a two-year term as presiding officer at City Council meetings and as the official head of the City for legislative purposes.  Ellsworth had final policy-making authority concerning the recommendation, adoption and enforcement of the time-share ordinance against Pacaso and its homeowners.  Ellsworth, acting under the color of law and in a position of superiority to City Attorney Walsh, failed to prevent or take action to correct the enforcement efforts against Pacaso carried out by City Attorney Walsh, despite his power and authority to do so.  Ellsworth was aware that his failure to prevent or take corrective actions would deprive Pacaso and its homeowners of its rights under the United States Constitution and California Constitution, on behalf of the City.

33.     Defendant Ethan Walsh is the City Attorney of St. Helena.  As City Attorney, Mr. Walsh is responsible for providing legal advice to the City Council and staff in carrying out their duties in the operations of the City government.  Mr. Walsh is responsible for bringing about suits on behalf of the City.  City Attorney Walsh had final policy-making authority concerning the implementation, recommendation, adoption and enforcement of the time-share ordinance, and, acting under the color of law, ratified and/or carried out such enforcement efforts against Pacaso

FIRST AMENDED COMPLAINT                                                    CASE NO. 3:21-cv-02493-WHO

1  and its homeowners, which caused Pacaso and its homeowners to suffer constitutional violations

2  under the United States Constitution and California Constitution, on behalf of the City.

3       34.    Doe Defendants #1–5 may include St. Helena City Council members, including

4  Vice Mayor Paul Dohring, Anna Chouteau, Lester Gardy and Eric Hall.  Although certain of their

5  names are known, the basis for liability against the Doe Defendants has yet to be determined,

6  because the full extent of their involvement in the ongoing violations of Pacaso's rights will only

7  be uncovered through discovery.  These members have collectively represented the City Council

8  since November 2020, with Vice Mayor Dohring and Anna Chouteau serving since 2018.  The

9  City Council is the legislative and policy-making body of the City of St. Helena.  City Council

10  members, including Ellsworth, are responsible for reviewing public policy and adopting policies

11  responsive to the community.  Acting as a whole, but bearing individual responsibility, these

12  members are responsible for setting the direction of City policy and for adopting ordinances,

13  resolutions and other orders as necessary for governing the City.  Given the lack of transparency

14  around the City Council's involvement and Defendants' decision to depart from the July 2020

15  Report, to start enforcing Section 17.112.130 against Pacaso, and then to amend the City's time-

16  share ordinance during the pendency of this action in a further attempt to bring Pacaso under its

17  scheme, Pacaso is ignorant of the true names of the Does who are also directly responsible for the

18  conduct giving rise to the causes of action herein.  Pacaso will later seek to amend the complaint to

19  include the true names of the defendants once ascertained through discovery.

20  **JURISDICTION AND VENUE**

21       35.    As this case involves questions that arise under the U.S. Constitution and the laws of

22  the United States, the jurisdiction of this court is invoked pursuant to 28 U.S.C. § 1331. This action

23  is authorized by 42 U.S.C. § 1983.  The Court has jurisdiction to issue relief pursuant to the

24  Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.  This court has jurisdiction to hear Plaintiffs'

25  pendent state claim through the doctrine of supplemental jurisdiction set forth at 28 U.S.C. § 1367.

26       36.    This district is the proper venue and jurisdiction to the location of some or all of the

27  Defendants, and the location where the injury occurred, under 28 U.S.C. § 1391(b).

28

FIRST AMENDED COMPLAINT                                  CASE NO. 3:21-cv-02493-WHO

**GENERAL ALLEGATIONS**

**I.      Pacaso Seeks To Democratize Second Home Ownership In St. Helena**

37.     Pacaso (formerly known as Niner Homes) launched in October of 2020, introducing a new pathway for second home ownership.

38.     Pacaso currently either partially owns and/or manages four single-family homes in the City of St. Helena.

39.     Pacaso lowers the barriers to the second home market by simplifying and streamlining the co-ownership process by reducing costs and making ownership possible at a more accessible price point.  Pacaso organizes the ownership group, manages the legal process and provides a management service to streamline the home ownership process for the co-owners.

40.     Pacaso further facilitates broader access to the second home market by allowing co-owners to buy partial interests in real property.  Pacaso creates a property-specific LLC for each home, which owns deeded title to the real property.  Then Pacaso organizes and vets a maximum of eight co-owners, who hold co-ownership interests in the LLC and co-own the home in increments ranging from 12.5% to 50%.

41.     The co-owners can purchase their desired ownership interest based on their expected occupancy needs and financial means, and even in certain circumstances their desire to participate in the LLC with co-owners of their choosing.  At closing, the co-owners enjoy 100% ownership in the property, and Pacaso's only role remains to serve, at the discretion of the homeowners, as program manager overseeing the LLC and employing local businesses to care for the home.

42.     The concept of co-ownership through an LLC is far from new.  In St. Helena, property ownership through LLCs or other vehicles that facilitate multiple owner arrangements is very common.  But Pacaso simplifies the process in a novel way that makes the experience accessible to people who lack the resources or time to own and manage a whole second home.  As a result, Pacaso has made second home ownership available to a broader set of people, including those in traditionally diverse and underrepresented communities.

11

43.     In short, Pacaso's model seeks to enrich the lives of new and diverse second home owners and open the second home market, which has traditionally been accessible only to affluent and predominantly white buyers.  Pacaso specializes in top second home destinations and is currently focused on 25 markets across 10 states.

44.     This is especially true in St. Helena.  In St. Helena, second home ownership has typically been possible only for elite and predominantly white buyers, particularly on St. Helena's affluent west side.  In contrast, Pacaso's owner group is organically diverse: approximately half of Pacaso homeowners in St. Helena and approximately 25% of Pacaso's total owner group are non-white or identify as LGBTQ+.

## II.     Pacaso Shifts Demand Away From The More Limited<br>Supply Of Affordable Homes And Ensures Second Homes Are Fully Utilized

45.     The workforce housing challenges in St. Helena are acute, and much of this shortage can be attributed to second home buyers purchasing moderately priced whole homes.

46.     Since 2018, only .5% of single-family homes sold in St. Helena were sold below $500,000.

47.     Pacaso's approach helps relieve competition for more affordable homes by giving second home buyers a better option.  Instead of competing for a whole home valued at $525,000, for example, Pacaso offers second home buyers an option to be co-owners of a $4–5 million property for the same price.  Just one Pacaso home can remove up to eight buyers from local competition.

48.     Second homes are notorious for sitting empty much of the year.  In contrast, Pacaso-managed homes are fully utilized, which means that Pacaso homeowners engage in their community and support local businesses year-round.

49.     Just like their neighbors, Pacaso homeowners make large financial investments in their homes and bring an owner mentality, not a vacation mentality, to their use of the property.  Short-term rentals are strictly prohibited, and all owners agree to Pacaso's policies, which prohibit large events or parties.  A Pacaso home in St. Helena is subject to all of the same noise and nuisance ordinances that apply to other single-family residences.

FIRST AMENDED COMPLAINT                                          CASE NO. 3:21-cv-02493-WHO

**III.   In July 2020, The City Attorney And City Council Members Concluded That Section 17.112.130 (The Former Time-Share Ordinance) Does Not Regulate Co-Owned Homes, Conceding That Ordinance Did Not Apply To Pacaso**

**A.   Overview Of Section 17.112.130, The City's Prior Time-Share Project Ban**

50.     Up until April 12, 2022—when a new time-share ordinance was enacted—the City of St. Helena had a time-share ordinance codified in Section 17.112.130, which stated: "The creation of a ***time-share project as a means of ownership*** of any single-family, two-family or multiple-family dwelling or any apartment house shall be prohibited within the city."

51.     Section 17.112.130 set forth a series of definitions—which were circular, vague, and incomplete.  For example, a "Time-sharing project" was defined as "any real property that is subject to a time-share program."  Section 17.112.130(B).[2]

52.     In turn, "[t]ime-share program" was defined to mean "any arrangement for time-share intervals [which is later defined as either a time-share estate or a time-share use] in a time-sharing project whereby the use, occupancy or possession of real property has been made subject to either a time-share estate or time-share use whereby such use, occupancy or possession ***circulates*** among ***purchasers of the time-share intervals***."  *Id.* (emphases added).

53.     Section 17.112.130 defined "[t]ime-share estate" as ownership in a "property devoted to a time-share fee," and "[t]ime-share use" was defined as "any contractual right of exclusive occupancy which does not fall within the definition of a time-share estate, including, without limitation, a vacation license, prepaid hotel reservation, club membership, limited partnership or vacation bond."  *Id.*

**B.   Under Defendants' Own Analysis, Section 17.112.130 Did Not Apply To Pacaso**

54.     Defendants began carrying out an enforcement campaign against Pacaso that was *in direct conflict* with the position that City Attorney Ueda took in a written report and oral presentation to the City Council in July 2020 regarding Section 17.113.130's applicability to

---

[2]     The ordinance also defined "[o]ffering" as "any offer to sell, solicitation, inducement or advertisement, whether by radio, television, newspaper, magazine or by mail, whereby a person is given an opportunity to acquire a time-share interval of a residence within the city," but "offering" was not used anywhere in Section 17.112.130 or its definitions.  Section 17.112.130(B).

FIRST AMENDED COMPLAINT                                   CASE NO. 3:21-cv-02493-WHO

1    Pacaso's home ownership model.[3]

2        55.    The July 2020 Report was undertaken based on purported "concerns raised by both

3    City residents and Council members after some residents discovered a real estate listing for a

4    fractional or partial ownership interest in a residential home in town."  July 2020 Report at 1.[4]

5        56.    As City Attorney Ueda and Maya DeRosa herself concluded, "timeshare use differs

6    from a fractional or partial ownership of a property."  July 2020 Report at 1.

7        57.    Indeed, after laying out the "fairly circuitous definition"—as the City Attorney

8    described it—"to determine if a project is a prohibited timeshare or not," the City Attorney

9    conceded the differences between a time-share and a fractional ownership:

10               What emerges from these various definitions is that a timeshare, as
                 defined in the City's Zoning Code, *is not identical to a fractional or*
11               *partial ownership*; but, rather, a timeshare involves an ownership
                 arrangement where the owners have purchased an allotted amount of
12               time to use the property (a timeshare interval).  The Code also notes
                 that timesharing projects have the same character as commercial
13               hotels and other transient uses.

14   July 2020 Report at 2 (emphasis added).

15       58.    The City Attorney further admitted that its time-share ordinance cannot regulate

16   "based solely on ownership"—which is exactly what the City's challenges to Pacaso attempted to

17   do: "[Z]oning based solely on ownership, as opposed to the use of land, is impermissible.

18

19   [3]      DeRosa, in her capacity as Planning & Building Director of St. Helena and acting under the
     color of law, *approved* the report and participated in the July 14, 2020, meeting at which its
20   findings were presented, which both concluded that the time-share ban does not apply to a co-
     ownership models like Pacaso's, and that Pacaso's operations do not violate the ordinance.
21   Ellsworth, in his capacity as Mayor of St. Helena and acting under the color of law, and the City
     Council, also participated in the July 14, 2020, meeting.  *See* July 14, 2020, Meeting at 3:29; *see*
22   *also* Regular City Council Meeting, August 11, 2020, at 39,
     https://sthelena.civicweb.net/document/43063/Regular%20City%20Council%20-%2011%20Aug%
23   202020.pdf?handle=838240E8400F467DA80B707D222A9EA8.  As such, Ellsworth was made
     aware of the July 2020 report and the issues surrounding application of the time-share ordinance
24   against fractional or partial co-ownership structures.

25   [4]      In the July 14, 2020, meeting regarding its findings, the discussion referenced "this
     particular piece of property"—i.e., the Pacaso home that was the subject of Defendants' earlier
26   correspondence.  July 14, 2020, Meeting at 3:35.  That this "piece of property" is a Pacaso property
     is confirmed by the fact that a City Council member stated that this property came to the attention
27   of the City by way of a complaint from neighbors, as indicated in the City's May 22, 2020 Letter.
     Further, City Attorney Ueda later confirmed during the discussion that the structure of the
28   "particular piece of property that we're talking about" was through a corporation (which is the
     exact structure of a Pacaso home).

                                          14

1   Timeshare regulations should, thus, focus on the type and use of the property and its related

2   impacts, such as specific intervals of exclusive occupancy that render the use more akin to a

3   transient commercial use." July 2020 Report at 4.

4         59.    The July 2020 Report identified that this (zoning based on ownership, rather than

5   use) is indeed the goal of enforcement efforts against Pacaso, stating that the analysis stems from

6   "***a concern that non-permanent City residents*** are purchasing property in St. Helena as a second

7   home(s) either for themselves or their guests." July Report at 3.  Thus, the City Attorney cautioned

8   against the very path that it decided to pursue:  "[Z]oning regulations may not target individuals.

9   In other words, the City may not adopt a zoning regulation based on the identity of a tenant or

10  where a particular resident permanently resides." *Id.*  (citing *Friends of Davis v. City of Davis*, 83

11  Cal. App. 4th 1004, 1013 (2000)).

12        60.    In fact, the City Council members were unable to state even ***one permissible***

13  ***purpose, goal or non-suspect reason*** to justify application of the previous time-share ordinance

14  against partial co-ownership structures like Pacaso's.  Rather, the primary concern identified at the

15  July 2020 meeting was "different people coming in and out of the unit or house" (July 14, 2020,

16  Meeting at 3:25):

> I think what concerns me about [Pacaso homes] and what the
> neighbors raised was, instead of having one family living next door
> to you, you have maybe six, and you know they'd alternate when
> they arrived and they felt, I think they alluded to it being like a short-
> term rental.  But it certainly maybe isn't what the people think when
> you buy a single-family dwelling in an area that is known for single-
> family homes.  I know over the years the definition of what's a
> family has gotten broadened, but I'm just wondering if there's a way
> to address the concerns of the neighbors if you see one because I'm
> sympathetic to . . . what they're saying.  ***We have multiple people***
> ***next door coming in and out.  It's not really short term rental, but***
> ***what can we do about that?  Anything?***

July 14, 2020, Meeting at 3:24-25.

25        61.    This purported "reason" clearly targets individuals and "the identity of a tenant or

26  where a particular resident permanently resides"—which is strictly impermissible (*see infra* ¶¶ 90,

27  220).  In fact, the City Attorney was forced to admit that this was improper grounds for invoking

28  Section 17.112.130 and inconsistent with the purpose behind the ordinance:

1      If the issue is primarily that there are different people coming in and
2      out of the unit or house, then I'm not entirely sure what can be done
   about that . . . . The direction that it's gone in, in terms of potential
3      regulation, is that ***if there's a concern about impacts that are caused***
   ***from having too many people basically at a particular residence,***
4      ***[then] those impacts can be addressed by current standards in place***
   ***for noise and parking standards and that type of thing***.  So I think
5      it's one thing to talk about people versus you know the potential
   impacts that could result.

6   July 14, 2020, Meeting at 3:25-26.

7      62.  The discussion of the July 2020 Report further confirmed Defendants' intent to

8   improperly target particular types of homeowners.  Notably, City Attorney Ueda confirmed that the

9   City would ideally want to exclude *certain types of owners* based on family or friend relationships

10   from being barred from partial ownership of a residence in St. Helena:

11      I do think the hardest part is really figuring out how to define the
   issue and the scope, right, because if we're getting at multiple
12      ownership of one piece of property, it's really challenging to figure
   out a way to define that that doesn't preclude people who really do
13      need to go buy a piece of property for financial reasons. . . . ***They***
   ***may all be friends or family members, and I don't think that's the***
14      ***type of activity that the City would want to preclude***, and that's the
   challenge that we have in trying to figure out how to define this in a
15      way that would work.

16   July 14, 2020, Meeting at 3:33-34.

17      63.  City Attorney Ueda also stated concerns over the "significant practical challenges to

18   implementing and enforcing the existing timeshare regulations."  July 2020 Report at 3.  This is

19   because it lacks visibility into each residence's ownership structure and "[t]he City does not have

20   an easily available means to scrutinize such agreements or monitor the terms of particular

21   ownership arrangements."  *Id.*  As a result, and by its own admission, the City's outreach to Pacaso

22   is targeted and arbitrary, based solely on a "tip" from a real estate agent.

23      64.  Further, City Attorney Ueda conceded that the "City's code appears to try to . . .

24   regulate timeshare uses as a commercial use."  July 2020 Report at 3.  As explained below, Pacaso

25   homes are strictly residential homes with no commercial purpose (*see infra* ¶¶ 84-86).

26      65.  In providing an example of a joint ownership scenario that *did not* trigger the City's

27   previous time-share prohibition, the City specifically described a scenario where a residence is

28   owned by multiple people who each do not choose to live in the residence, but the "joint or partial

FIRST AMENDED COMPLAINT              CASE NO. 3:21-cv-02493-WHO

ownership of the residence would not be considered a timeshare" because each "member could have equal access to the residence (as opposed to purchasing a limited amount of time)."  July 2020 Report at 4.  This lawful scenario described by the City *is* Pacaso's model and Pacaso's homeowners do not "purchas[e] a limited amount of time" in the residence.  *Id.*

66.     In fact, the distinction between a "time-share" and other types of partial or fractional ownership structures is so obvious that even the National Association of Realtors (one of the most trusted sources for matters relating to residential real estate) explicitly acknowledges these distinct concepts: "Fractional interest ownership, once used primarily with commercial tenants-in-common, has recently blossomed in the vacation home market. Not to be confused with a time-share or a destination club, fractional interest properties can be a sensible and profitable alternative to owning a second home."[5]

67.     The City and City Council even conceded that Defendants were overreaching, and admitted that attempting to apply Section 17.112.130 against Pacaso is wrongful, illegal, unconstitutional and beyond the power of the City.  As one City Council member acknowledged: "***What you want and what's legal are entirely different matters***," and suggested that regulating Pacaso under the time-share ordinance would be against "case law and civil rights."  July 14, 2020, Meeting at 3:31 (emphasis added).

68.     Another City Council member stated her concern "that [Defendants] are overreaching what [they] can do legally," stating that the City is not permitted to "control how people own" property, and that she does not "want [the City] to go down a path spending a lot of money" battling a clearly losing legal argument.  July 14, 2020, Meeting at 3:31.

**C.      Pacaso Was Not A "Time Share Project" Under Section 17.112.130**

69.     The City's July 2020 analysis flows from the simple and indisputable fact that Pacaso's small co-ownership model is starkly different from any "time-share project" purportedly covered by Section 17.112.130 or that is properly the subject of *any* zoning regulation.

---

[5]     *Fractional Interest Ownership*, Nat'l Ass'n of Realtors, Def. of Fractional Interest Ownership, at https://www.nar.realtor/fractional-interest-ownership (last visited May 27, 2022).

FIRST AMENDED COMPLAINT                                        CASE NO. 3:21-cv-02493-WHO

70.     Pacaso creates a property-specific LLC for each home, which owns deeded title to the property.  Then Pacaso organizes and vets a maximum of eight co-owners, who have an ownership interest in the LLC and co-own the home in increments ranging from 12.5% to 50%. The co-owners can purchase their desired ownership interest based on their expected occupancy needs, financial means, and even in certain circumstances their desire to participate in the LLC with co-owners of their choosing.  At closing, the co-owners enjoy 100% ownership in the property, and Pacaso's only role remains as program manager overseeing the LLC.

71.     Pacaso's homeowners do not merely own the "right of exclusive occupancy," (Section 17.112.130(B) (definition of "Time-share use")) or a "use, occupancy or possession" right that "circulates among purchasers . . .  according to a fixed or floating time schedule on a periodic basis for a specific period of time during any given year" (Section 17.112.130(B) (definition of "Time-share program")).  Nor do they participate in an "arrangement for time-share intervals." Section 17.112.130(B) (definition of "Time-share program").

72.     Rather, just like any other residential homeowner, Pacaso homeowners own a real property asset in a single-family home that includes real property interests, rights and obligations. An interest in a time-share project is vastly different from the rights inherent to real property co-ownership, including possession, control, exclusion, and disposition.  Indeed, a Pacaso homeowner, just like any other homeowner, has rights *well* beyond a situation whereby "somebody literally gets a limited amount of time in a particular piece of property to use," which is how a "timeshare" was described by City Attorney Ueda.  July 14, 2020, Meeting at 3:19.

73.     Instead, Pacaso homeowners have inherent and inalienable rights inherent to owning property, which include the right to possession, to control, to use and quiet enjoyment, to privacy and to exclude others, to sell the property, to physically be on the property, to leave the property, to choose who else can be on the property, to build or alter the property, to make improvements or refurbish the property, and to sell or dispose of the property, among many other rights.[6]

---

[6]     Further, an owner of a "time-share" interest, as opposed to an owner of a single-family home, is typically a member of a large commercial development of density, whereby multiple unrelated occupants are using the overall property at the same time, buying not for the purposes of real estate ownership, but for purposes of enjoying or benefiting from the time-share program or amenities.

74.     Pacaso's involvement in management of the home, at the election of the home's co-owners, does not change the nature of the homeowners' interests and rights.  Pacaso supports owners as a program manager, making the homeowners' ownership experience seamless through the LLC and providing property management services, interior design, scheduling service, and concierge services.  In fact, if Pacaso homeowners collectively agree that Pacaso's services are no longer desired, the owners can choose to terminate their relationship with Pacaso and self-manage their property.

75.     Plainly, Pacaso co-owners are not merely purchasing "time-share intervals." Section 17.112.130(B) (definition of "Time-share program").  Pacaso homeowners' ability to stay in the home is not capped.  Subject to availability, a Pacaso co-owner can spend more time in the house, beyond the default time which would be solely attributable to each co-owner's ownership stake.  Co-owners' ability to spend time in the home is fluid and flexible.

76.     Further, Pacaso homeowners are true owners with complete control of their home and expansive rights, rather than merely having a right of "use, occupancy or possession" that is limited to a time schedule. *Compare* Section 17.112.130(B) (definition of "Time-share program"). For example, Pacaso homeowners have the right to store their personal possessions on the property year round.  Pacaso homeowners are also heavily involved in all levels of management and decision-making regarding the property.  They vote on matters such as selecting and replacing the program manager, renovations on the home or other changes to the interior or exterior design, and various other fundamental homeownership matters.  Co-owners can even sell the home outright. Pacaso is merely a service.  Ultimately, Pacaso homeowners have complete control.

77.     It is therefore clear that Pacaso's properties did not fall within the purview of the City's prior time-share ordinance, which on its face did not apply to real property co-ownership structures like Pacaso's.

FIRST AMENDED COMPLAINT                                    CASE NO. 3:21-cv-02493-WHO

**D.     Section 17.112.130's "Findings and Purpose" Confirm that the Ordinance Did Not Apply to Pacaso**

78.     It is further abundantly clear from the "Findings and Purpose" of Section 17.112.130 that Pacaso homes were not a covered "time-share project."  Section 17.112.130 included the following express purposes for the time-share ban:

1.  There is a critical shortage of affordable housing in the city for long-term occupancies (more than six months annually), and the availability of additional residential dwelling units is substantially restricted by the growth management system;

2.  The conversion of residential dwelling units within the city to time-sharing projects eliminates residential dwelling units otherwise available for long-term occupancies (more than six months annually) in the city;

3.  Time-sharing projects have the same character as commercial hotels, motels and other transient occupancy uses due to their transient nature and to the multiple short-term (less than six months annually) occupancies by those participating in time-sharing projects;

4.  Such commercial or quasi-commercial like use is inappropriate in residential areas due to the increased traffic generation and multiple occupancies disturbing the peace and quiet of residential neighborhoods[; and]

5.  The city council finds and determines that this section is necessary to protect the public health, safety and welfare of the citizens of the city.

Section 17.112.130(A).

79.     The City's prior and current attempts to obstruct Pacaso's operations lacks any rational connection to any of the stated purposes behind Section 17.112.130.

80.     Targeting Pacaso does nothing to ensure homes are available for long-term occupancies.  The City lacks all visibility and control into how much time homeowners intend to spend in their homes.  Preventing Pacaso from buying properties does nothing to prevent other prospective buyers from buying the home as a second home that will remain unoccupied for the majority of the year, or that will be rented for periods under six months, or who buy anticipating the ability to use it for short-term rentals, among other non "long-term occupancy" uses.

81.     In fact, Pacaso has the exact opposite effect by redirecting second homeowners who would have otherwise purchased affordable inventory needed by the local workforce to homes at a higher price point.

FIRST AMENDED COMPLAINT                                         CASE NO. 3:21-cv-02493-WHO

82. Pacaso homeowners are long-term oriented (like most homeowners) and have materially different incentives with respect to their conduct, use and treatment of the home as compared to short-term renters. This is because Pacaso homeowners are directly invested in the home, its surrounding neighborhood and community, and the long-term maintenance and success of the property and community at large. Pacaso homeowners are true homeowners who own for their personal use and enjoyment, not for profit. They can sell their interest at any point after the first year of ownership by listing the property on the Multiple Listing Service ("MLS") with a local real estate agent, and they are strictly prohibited from renting out the property at any point to anyone. In fact, Pacaso homeowners are "long-term" occupants under the City's stated "six[-]month" standard (Section 17.112.130(A)), as Pacaso homeowners are strictly prohibited from selling their interest at any point before the *first year* of ownership or from renting out the property at any point to anyone.

83. In contrast, a time-share typically entails merely the right to use a fixed amount of time in a property. A time-share is highly restrictive in terms of resell ability, pricing and control. Time-share interests are usually held in multi-unit buildings or resort properties and use of the property is typically split across a large number of investors. Owners of a time-share interest are unlikely to have any interactions, let alone form a community. Behaviorally (and due to the nature of the properties, the structure of time-share ownership, and nature of the investment), time-share owners resemble short-term renters or hotel guests.

84. Nor is there a rational relation between the City's stated purpose of banning "commercial or quasi-commercial like use" in residential areas, such as that which results from "commercial hotels, motels and other transient occupancy uses," (*see* Section 17.112.130(A)) and any enforcement measures taken against Pacaso. Pacaso is a ***purely residential*** co-homeownership structure that lacks any resemblance to such "commercial or quasi-commercial like use."

85. Pacaso's homes are subject to the same residential occupancy rules as other homes, and homeowners respect the same rules that other owners are expected to follow. Unlike commercial properties, which are required to offer parking for each individual guest room, Pacaso

FIRST AMENDED COMPLAINT                                     CASE NO. 3:21-cv-02493-WHO

1   homes are single-family homes with two parking spaces per dwelling unit, as required by Section

2   17.124.030.

3       86.     Moreover, Pacaso co-owners use their homes in a way that is wholly consistent with

4   other single-family residences.  Their use does not cause "traffic generation and multiple

5   occupancies disturbing the peace and quiet."  Section 17.112.130(A)(4). And, in fact, Pacaso

6   homeowners—by virtue of the policies they adopt when becoming a Pacaso homeowner—cause

7   less "traffic generation" or disturbance of "peace and quiet" than other St. Helena residents.  For

8   example, Pacaso co-owners agree not to have large events or parties; co-owners adhere to a 9:00

9   p.m. to 7:00 a.m. quiet hour policy; co-owners agree not to rent the home to third parties; and

10  Pacaso encourages homeowners to avoid parking on the street unless absolutely necessary.  There

11  is nothing "transient" or "commercial" about the co-owners who choose to share home ownership

12  of property in St. Helena.  In sum, Pacaso homeowners are no different from other homeowners in

13  St. Helena; Pacaso and its co-owners are dedicated to ensuring the peace, safety, and welfare of the

14  citizens of St. Helena and are subject to more rules and policies geared toward promoting peace

15  and quiet and alleviating traffic generation than other St. Helena residents.

16      87.     Indeed, in discussing the July 2020 Report, City Council members confirmed that

17  the primary purpose behind the time-share ordinance is to regulate commercial uses.  For example,

18  one City Council member stated: "First of all, I think our whole timeshare thing probably came

19  into being when Rodney Friedrich brought his hotel forward."  July 14, 2020, Meeting at 3:24.

20  This reference was to a hotel development approved by City Council in 2010, for a **60-room hotel**

21  that would sell shares in the hotel rooms.

22      88.     Further, the then-acting City Attorney stated: "[I]n a nutshell, the prohibition [is] . . .

23  based, in part, on findings that the city council made, that timeshare uses are commercial for quasi-

24  commercial uses that serve to reduce available residential housing and increase traffic and noise

25  impacts."  July 14, 2020, Meeting at 3:18.  Thus, time-share ordinances generally "treat timeshares

26  as commercial uses, often times in buildings that are like **high rise condo-type buildings to other**

27  **fractional ownership hotels**."  July 14, 2020, Meeting at 3:20 (emphasis added).

28

FIRST AMENDED COMPLAINT                              CASE NO. 3:21-cv-02493-WHO

89.     On the other hand, as noted by City Attorney Ueda, "fractional or partial ownership interests may not necessarily trigger any concerns as more commercial uses would because, for example, multiple members of one family could decide to purchase a residence together, they may not stay there all at the same time, but they wouldn't necessarily be having interest like a timeshare either."  July 14, 2020, Meeting at 3:21-22.

90.     Pacaso and its homes do not implicate these "commercial" uses.  As a result, the City Council members were unable to state even ***one purpose, goal or non-suspect reason*** to justify application of the time-share ordinance against partial co-ownership structures like Pacaso's (*see supra* ¶¶ 59-62), and the City Council was forced to admit that the primary concern identified at the July meeting (i.e., "different people coming in and out of the unit or house") is clearly impermissible (*id.*).

91.     Nor do Pacaso homes detract from the City's goal of ensuring availability of "critical shortage of affordable housing in the city."  Pacaso's service reduces competition for housing inventory critically-needed by the local workforce.  Today, St. Helena's median home value of $1.65 million is at odds with its median household income of $90,031; most of those employed in St. Helena cannot afford to live there.  Pacaso offers second home buyers a better option than a whole home, thus redirecting second home buyers away from the low inventory available at that level.

92.     The major disconnects between the stated goals underpinning Section 17.112.130, Pacaso's model, and the City's enforcement efforts under this now-deleted ordinance against Pacaso show that the City's reliance on Section 17.112.130 was nothing more than a pretext to deny homeownership to new, diverse residents.

**IV.     Defendants Communicated To Pacaso The City's Conclusion That Section 17.112.130 Does Not Apply To Pacaso After Having Represented That Pacaso's Operations Were Permitted**

93.     The City first raised the issue of the time-share ban with Pacaso (formerly Niner Homes) in May 2020.  On May 15, 2020, Maya DeRosa, in her capacity as the Planning & Building Director of the City of St. Helena, sent a letter on behalf of the City to a Pacaso homeowner, giving notice that "if" the home located at 1005 Valley View Street were "used as a

23

1  timeshare or short term rental," such use would be impermissible pursuant to the St. Helena

2  Municipal Code ("Municipal Code").  May 15, 2020 Letter.  Those cc'd on the letter included:

3  Elizabeth Olcott with Keller Williams; City Attorney Ueda, City Attorney; and Mark Prestwich,

4  City Manager.  *Id.*

5        94.    On May 19, 2020, Pacaso responded on behalf of the Pacaso homeowner,

6  explaining why Pacaso's operations do not violate such ordinances and that the homeowner's use

7  of his property was entirely consistent with such laws.  May 19, 2020 Letter.

8        95.    On May 22, 2020, Maya DeRosa, cc'ing Mark Prestwich and City Attorney Ueda,

9  replied on behalf of the City thanking Pacaso for providing an explanation of its proposed property

10  ownership structure, its proposed use of the property, and the reasons Pacaso does not fall within a

11  timeshare model.[7]

12        96.    Notably, in the May 22, 2020 letter, DeRosa and the City, tacitly acknowledging

13  that Pacaso is not a "timeshare project," ***dropped any reference*** to a violation of the City's time-

14  share ordinance, giving Pacaso the presumed green-light to move forward with its operations from

15  this standpoint.  Instead, the May 22, 2020 letter challenged only the homeowner's alleged posting

16  of his home on "Luxury Retreats" for short-term rentals without a permit to do so.

17        97.    Pacaso responded on May 26, 2020, confirming that the property would not be used

18  as a short-term rental property in the future and that the homeowners would remove any posting on

19  the "Luxury Retreats" website.  May 26, 2020 Letter.

20        98.    Following this initial exchange with the City, Pacaso moved forward with its

21  operations, investing material resources, time, and efforts, in reliance on the City's representations

22  that Pacaso's operations were permitted.

23        99.    Likewise, many of the Pacaso homeowners, including Plaintiffs, purchased their

24  Pacaso homes in reliance on the City's representations, which permitted their use in the home and

25  set their expectations for its continued legality.

26

27  [7]    Defendant Maya DeRosa instructed the Pacaso homeowner to "direct any future

28  correspondence through [her] on this matter as [she is] the designated point of contact for the
City."  May 22, 2020 Letter at 2.

FIRST AMENDED COMPLAINT            CASE NO. 3:21-cv-02493-WHO

**V.     Despite Its Legal Conclusions That It Cannot
        Regulate Pacaso, Defendants Nevertheless Proceeded To
        Unlawfully And Brazenly Enforce Section 17.112.130 Against Pacaso**

100.    Against the backdrop of Defendants' conclusions that Section 17.112.130 did not apply to fractional co-ownership structures like Pacaso's, Defendants, acting under the color of law, nevertheless sought to enforce Section 17.112.130 ordinance against Pacaso.

101.    The change in position and determination to enforce the ordinance against Pacaso, absent any change in facts or law, was untimely, unfounded, and suspect.

102.    Eight months after DeRosa's May 22, 2020 letter, in January 2021, a real estate agent for Pacaso received a new letter from DeRosa regarding four Pacaso property listings, inaccurately charging that the properties are subject to the City's time-share ordinance.  Jan. 25, 2021 Letter.  DeRosa requested that the letter be forwarded to "the buyer and the buyer's agent" (*id*. at 1), and "any other agents that share these listings" to ensure that no zoning violations occur (*id*. at 2).

103.    In response, Pacaso contacted DeRosa to confirm, again, that Pacaso is not a time-share, nor does the service allow time sharing use, and that Pacaso prohibits short-term rentals.

104.    Next, at a City Council meeting on February 9, 2021, City Attorney Walsh again raised the issue of Section 17.112.130.  City Attorney Walsh's update to the City Council and St. Helena residents confirms that he and the City had not reached a different conclusion regarding the time-share ordinance since the conclusion reached in the July 2020 Report.[8]  Instead, City Attorney Walsh conceded that he and the City were still "looking at" and "delving further into that issue" (the applicability of the zoning ordinance), confirming that they had not yet determined what to do

---

[8]    Ellsworth, in his capacity as Mayor, along with Paul Dohring, in his capacity as Vice Mayor, and Anna Chouteau, Eric Hall and Lester Hardy, in their capacities as City Council members, also attended the February 9 City Council meeting.  *See* February 9, 2021 City Council Meeting Agenda, https://sthelena.civicweb.net/filepro/documents/48295?preview=48296.  Ellsworth, Dohring and Chouteau were made aware of and participated in discussions regarding the July 2020 Report, including the fact that applying the time-share ordinance against partial co-ownership structures like a Pacaso home was impermissible, unconstitutional, and exceeded the scope of the City's zoning authority and police power.  Defendant Ellsworth, and Council Members Dohring and Chouteau were thus on notice that City Attorney Walsh was continuing to consider such impermissible actions, despite the July 2020 Report.  Ellsworth had the power to prevent the City Attorney Walsh from taking such actions, but failed to intervene, as evidenced by the enforcement efforts against Pacaso that followed.

25

1   regarding co-ownership structures like Pacaso's and whether such structures could be regulated

2   under the time-share ordinance.  City Attorney Walsh further stated that he and the City were

3   "looking into both what we can do under our current regulations and potentially looking at some

4   changes to the existing regulations."[9]

5       105.    Nonetheless, and in the face of these statements, the *very next day* on

6   February 10, 2021, City Attorney Walsh sent a letter to Pacaso stating that the City "disagrees" that

7   "Pacaso is not operating a timeshare in St. Helena," and threatening "to enforce its restrictions on

8   timeshares" as well as "action to educate brokers and the public about the ***illegal nature of***

9   ***Pacaso's timeshares***."  Feb. 10, 2021 Letter.  City Attorney Walsh suggested that the City's

10  challenge was purportedly "[b]ased on the evidence that the City has received" about "the nature of

11  Pacaso's and its buyers' intended use" of Pacaso homes, yet did not provide or describe such

12  "evidence."  *Id*. at 1.

13      106.    Despite being unable to point to any alleged "evidence," and without any law or

14  authority supporting his latest conclusion (which directly contradicted the earlier, reasoned

15  analysis), the City Attorney improperly placed the burden on Pacaso, inviting it to "convince" the

16  City that it was not subject to the time-share ordinance: "If Pacaso convinces the City that

17  Pacaso's—and its buyers'—intended use of residential property in the City does not constitute a

18  timeshare under state law and regulations or the City's code, the City will not apply the timeshare-

19  prohibition."  *Id*.

20      107.    Meanwhile, to effectively foreclose any ability of Pacaso homeowners to become

21  part of the City of St. Helena community (and thereby eliminate the need for the City Council to

22  reconcile its elitist position with the plain language of the time-share ordinance), the City Attorney

23  sent a threatening letter regarding timeshare regulations to all City listing agents and brokers on

24  March 16, 2021 (the "March 2021 Letter") alleging that the City's timeshare regulations apply to

25  co-ownership.

26

27  ───────────────

28  [9]    *See* February 9, 2021 City Council Meeting at 14:11-14:42,
    https://www.youtube.com/watch?v=XUTsUdZ5wA8&t=759s&ab_channel=CityofSt.Helena.

108.    City Attorney Walsh expressly warned that his letter applied to "several properties that are currently listed for sale"—plainly linking his notice of purported zoning violations to listings for interests in Pacaso homes.  March 2021 Letter at 1.

109.    Thus, City Attorney Walsh's March 2021 Letter to all real estate agents and brokers in St. Helena is the manifestation of this very threat "to educate brokers and the public about the illegal nature of Pacaso's timeshare" (Feb. 10, 2021 Letter), and constituted the City's determination that it was "not convinced" that Pacaso's operations are permitted under Section 17.112.130.

110.    City Attorney Walsh's conduct violated Pacaso's rights, as it constituted unlawful selective enforcement against Pacaso and violated Pacaso's due process rights by applying Section 17.112.130 in a manner that directly conflicted with the earlier analysis of the scope of the ordinance.[10]

111.    These threats scared real estate agents and chilled their efforts to buy and sell ownership interests in Pacaso properties.  Likewise, Defendants' threats deterred prospective buyers from purchasing Pacaso properties.

112.    Indeed, as a direct result of the March 2021 Letter, individuals on NextDoor (a social networking service for neighborhoods) posted comments about Pacaso potentially being violative of the time-share ordinance, further reflecting the confusion created by the March 2021 Letter regarding Pacaso's legality.  One user wrote:

>           The [March 16, 2021] letter from the City of St. Helena didn't
>           specify any action but did say violators of the City's . . . timeshare
>           [ordinance] are subject to code violations and costly fines.  The

---

[10]    Moreover, "[s]tate law prohibits the [St. Helena City] Council from taking action on any item not listed on the agenda." *City Council Home, Public Participation*, St. Helena, Cal., https://www.cityofsthelena.org/bc-citycouncil (last visited May 27, 2022).  Following the July 14, 2020 meeting (which included on its agenda both the item for "Discussion Regarding Timeshare Issues" and an attachment to the July 2020 Report (*see* July 14, 2020 City Council Meeting, Agenda Item 11.2, https://sthelena.civicweb.net/document/42347?splitscreen=true&media=true&timestamp=11860)), City Attorney Walsh, acting at the direction of City Council, nevertheless took an action at odds with the conclusion reached in the July 2020 Report and the July 14, 2020 City Council discussion without re-adding this item to any subsequent agenda for further discussion—including the February 9, 2021 City Council meeting agenda.  Adopting the enforcement policy set out in the February 2021 Letter, without adding this item to an agenda for further City Council discussion and public commentary, was impermissible.

27

homes in St. Helena currently being offered for sale as fractional ownership purchases (8 separate owners per house) haven't closed yet. It's my understanding this Pacaso Fractional Ownership Management Company had a few months to find 8 buyers for each of these homes. If they were unable to do so, the listings would go back to the agents that initially listed these properties. I have no idea where they stand today. I haven't seen any reported sales of the properties in questions.

## VI.   Acknowledging That Section 17.112.130 Was Not A Viable Way To Regulate Pacaso, Defendants Amended The City's Time-Share Ordinance During The Pendency Of This Action

113.   On March 17, 2021, Pacaso wrote to the City Attorney and identified the myriad ways in which Defendants' challenge to Pacaso is flawed and unsupported by fact or law. Pacaso requested confirmation by April 1, 2021, confirming that the City would adhere to the analysis and conclusions from the July 2020 Report, and would drop its battle against Pacaso. The City and City Attorney failed to respond. Accordingly, Pacaso and PAC 6 CA 2021 LLC filed the current action.

114.   During the pendency of this action, on January 25, 2022, the City Council held a closed session regarding Pacaso, addressing public comments urging the City Council to pass legislation banning Pacaso. Such comments further revealed the animus towards Pacaso driving the City's enforcement efforts and amendment to the Municipal Code's time-share ordinance. *See*, *e.g.*, January 25, 2022 City Council Meeting Agenda, at 7, https://sthelena.civicweb.net/document/59183 (email from resident, stating: "StopPacasoNow.com has heard from allied communities across the west and as far away as Long Island. Residents want Pacaso out of their neighborhoods. St. Helenans want Pacaso out of our neighborhoods."). The public comments were an acknowledgement of the inapplicability of Section 17.112.130 and the need for the City to update the time-share ordinance if it were to regulate Pacaso. *See id.* at 3-10.

115.   Recognizing that Section 17.112.130 did not apply to Pacaso and that Defendants could not regulate Pacaso under this time-share ordinance, Defendants prepared a report (discussed below) and proposed an amendment to the City's Municipal Code in an attempt amend its previously inapplicable time-share ordinance to try and cover Pacaso's home ownership model. This report further confirmed that Section 17.112.130 could not be relied on by Defendants to

28

1  regulate Pacaso, and that Defendants' attempts to regulate Pacaso under the then in effect

2  ordinance had been unlawful, impermissible and discriminatory.

3  116.   On March 1, 2022, the City's Planning Commission held a meeting (the "March 1,

4  2022 Meeting") to address a report, prepared by City Attorney Ethan Walsh, under the color of

5  law, and reviewed and approved by Planning & Building Director Maya DeRosa, under the color

6  of law, which recommended proposed updates to the City's time-share ordinance (the "March 1,

7  2022 Report").  The March 1, 2022 Report proposed an ordinance adding Chapter 17.138 "Time

8  Share Uses" and Sections 17.138.060 to Title 17, Zoning, of the St. Helena Municipal Code, and

9  deleting Section 17.112.130 from the Municipal Code ("Chapter 17.138").  The text and substance

10 of the proposed Chapter 17.138 is discussed in the section below.

11 117.   During the March 1, 2022 Meeting, the City's Planning Commission held a public

12 hearing on the City staff's recommendation that the Planning Commission adopt the resolution

13 recommending that the City Council adopt the proposed ordinance adding Chapter 17.138 and

14 deleting Section 17.112.130 of the St. Helena Municipal Code.

15 118.   At the hearing, the Public Affairs Manager at Pacaso, Naseem Moeel, testified on

16 behalf of Pacaso raising challenges to the proposed ordinance, and urging the City Council not to

17 enact it.  *See* March 1, 2022 Planning Commission Meeting, at 25:10,

18 https://sthelena.civicweb.net/document/60600?splitscreen=true&media=true.  Nevertheless, the

19 Planning Commission voted to recommend the City Council approve the proposed ordinance.  *See*

20 March 1, 2022 Planning Commission Meeting Minutes, at 2-3,

21 https://sthelena.civicweb.net/document/61602.

22 119.   On March 22, 2022, the City Council held a public hearing on the motion to adopt

23 the proposed ordinance adding Chapter 17.138 and deleting Section 17.112.130 of the St. Helena

24 Municipal Code ("March 22, 2022 Meeting"), as laid out in the March 22, 2022 Report ("March

25 22, 2022 Report" or "March 2022 Report," attached as Ex. B hereto).  Like the March 1, 2022

26 Report, the March 22, 2022 Report proposed an ordinance adding Chapter 17.138 "Time Share

27 Uses" and Sections 17.138.060 to Title 17, Zoning, of the St. Helena Municipal Code, amending

28 sections 17.48.030 (Central Business) and 17.52.030 (Service Commercial) and deleting Section

29

1  17.112.130 from the Municipal Code.  The March 22, 2022 Report was prepared by City Attorney

2  Ethan Walsh, under the color of law, reviewed by Administrative Services Director April Mitts,

3  and approved by Interim City Manager James McCann.

4       120.    At the hearing, the Public Affair Manager at Pacaso, Naseem Moeel, again testified

5  on behalf of Pacaso raising challenges to the proposed ordinance and urging the City Council not to

6  enact it.  *See* March 22, 2022 Meeting, at 54:14,

7  https://sthelena.civicweb.net/document/61298?splitscreen=true&media=true&timestamp=2561.  A

8  Pacaso homeowner also testified, challenging the proposed ordinance and urging the City Council

9  not to enact it.  *See id*. at 1:03:30.  Nevertheless, the City Council voted to entertain a motion on

10  the recommended action.  *See id*. at 1:26:25.

11       121.    On April 12, 2022, the City Council held a second public hearing on the motion to

12  adopt the proposed ordinance adding Chapter 17.138 and deleting Section 17.112.130 of the St.

13  Helena Municipal Code ("April 12, 2022 Meeting").  *See* April 12, 2022 Meeting,

14  https://sthelena.civicweb.net/document/61947?splitscreen=true&media=true.  At the hearing,

15  several Pacaso homeowners testified, raising challenges to the proposed ordinance and urging the

16  City Council not to enact it.  *Id*.  Nevertheless, the City Council voted to adopt the proposed

17  ordinance.  *Id*.

18       122.    Thus, on April 12, 2022, the new time-share ordinance was adopted.  The proposed

19  ordinance went into effect 30 days after its adoption, i.e., on May 12, 2022.  *See* March 22, 2022

20  Report at 22.

21  **VII.**    **Chapter 17.138 Does Not Apply To Pacaso, As Confirmed**
          **By Its Definitions And The City's Stated Purposes Underlying The Ordinance**

22

23       123.    Like now-former Section 17.112.130, recently enacted Chapter 17.138 does not

24  apply to Pacaso or Pacaso homeowners.  Chapter 17.138 prohibits "[t]ime-share use, and/or

25  advertisement for time-share use, of an accommodation in violation of this chapter."  Section

26  17.138.060(B).  Chapter 17.138 subjects "[a]ny responsible person . . . who uses, or allows the use

27  of, or advertises or causes to be printed, published, advertised or disseminated in any way and

28  through any medium, the availability for sale or use of an accommodation in violation of this

FIRST AMENDED COMPLAINT               CASE NO. 3:21-cv-02493-WHO

1  chapter" to a misdemeanor, imprisonment and/or civil penalties.  Sections 17.138.060(A) and

2  17.138.060(C).  Under recently enacted Chapter 17.138:

3       124.    "Time-share use" is defined as "the use of one or more accommodations or any part

4  thereof, as a time-share property pursuant to a time-share plan."  Section 17.138.020.

5       125.    A "[t]ime-share property" is defined as "one or more accommodations subject to the

6  same time-share plan, together with any other property or rights to property appurtenant to those

7  accommodations."  *Id*.

8       126.    "Time-share plan" is defined as "any arrangement, plan, scheme, or similar device,

9  whether by membership agreement, bylaws, shareholder agreement, partnership agreement, sale,

10 lease, deed, license, right to use agreement, or by any other means, whereby a purchaser, in

11 exchange for consideration, receives the right to exclusive use of an accommodation or

12 accommodations, whether through the granting of ownership rights, possessory rights or otherwise,

13 for a period of time less than a full year during any given year, on a recurring basis for more than

14 one year, but not necessarily for consecutive years."  *Id*.

15      127.    "Time-share interest" is defined as "the right to exclusively occupy a time-share

16 property for a period of time on a recurring basis pursuant to a time-share plan, regardless of

17 whether or not such right is coupled with a property interest in the time-share property or a

18 specified portion thereof."

19      128.    However, a Pacaso homeowner and their use of their Pacaso home does not fall

20 within any of these definitions.  Under the relevant agreements governing Pacaso homeowners, a

21 Pacaso homeowner does not have "the right to exclusive use of [a Pacaso home], whether through

22 the granting of ownership rights, possessory rights or otherwise, for a period of time less than a full

23 year during any given year, on a recurring basis for more than one year, but not necessarily for

24 consecutive years."

25      129.    Further, Pacaso's small co-ownership model is starkly different from any "time-

26 share use" purportedly covered by Chapter 17.138, and thus does not apply to Pacaso.  *See also*

27 *supra* ¶¶ 69-92.  Pacaso homeowners do not merely own the "right to exclusive use of an

28 accommodation or accommodations . . . for a period of time less than a full year during any given

31

FIRST AMENDED COMPLAINT                                    CASE NO. 3:21-cv-02493-WHO

year, on a recurring basis for more than one year" (Section 17.138.020 (definition of "Time-share plan")), or "the right to exclusively occupy a time-share property for a period of time on a recurring basis pursuant to a time-share plan" (Section 17.138.020 (definition of "Time-share interest")). Instead, Pacaso homeowners fully own outright a real property asset in a single-family home that *includes* many real property interests, and rights and obligations shared among co-owners.

130.   Further, the legislative intent of Chapter 17.138 further confirms that it does not apply to Pacaso.  It is clear from the "Findings and Purpose" of Section 17.138.010 that Pacaso homes are not a covered "time-share use"—just like the now-deleted time-share ordinance 17.112.130, which recited many of the same purported findings and purposes.  Section 17.138.010 includes the following express purposes for the time-share ban:

> A. There is a critical shortage of permanent, long-term housing in the City of St. Helena.
>
> B. A limited supply of suitable vacant land, land values, and market demand for land for other uses, including but not limited to use of property for vineyards, have limited the construction of additional housing in the City of St. Helena.
>
> C. St. Helena is a popular tourist destination known for its scenic Napa Valley location, exceptional wineries and restaurants, historic Main Street and small town agricultural character.
>
> D. The City of St. Helena stands out in the Napa Valley for its ability to attract visitors while also supporting the needs of its resident population. Maintaining the balance between the quality of life for residents and those who work in the City and the visitors who help to sustain the City's tourist economy is key to maintaining a sustainable community and a stable economy.
>
> E. Time-share uses are not an appropriate land use in the City's residential districts due to the multiple occupancy of time-share properties, the short-term, tourist oriented use of such property and commercial management of time-share facilities, all of which create increased traffic generation, excessive noise, disruption to residential communities through commercial-level maintenance of the time-share facilities, and therefore are appropriately confined to commercial zoning districts.
>
> F. Conversion of permanent housing to time-share facilities removes existing housing units from the City's existing stock and exacerbates an already severe housing shortage.
>
> G. It is therefore in the public interest to prohibit conversions of existing housing units into time-share facilities, as to do so eliminates

FIRST AMENDED COMPLAINT                                          CASE NO. 3:21-cv-02493-WHO

needed housing stock by diverting those units to a tourist-oriented, commercial use.

131.    The City's attempt to obstruct Pacaso's (and *only* Pacaso's) operations lacks any rational connection to any of the stated purposes behind Section 17.138.010.

132.    Just like former Section 17.112.130 (*see supra* ¶¶ 80-81), targeting Pacaso does nothing to ensure homes are available for "long-term occupancies."  *See* Section 17.138.010(A). The City lacks all visibility and control into how much time homeowners intend to spend in their homes.  Preventing Pacaso from buying properties has no bearing on the likelihood that other prospective buyers are either buying the home as a second home, or anticipating the ability to use it for short-term rentals, among other non "long-term occupancy" uses.

133.    Further, as discussed above, Pacaso homeowners are long-term oriented (like most homeowners) and have materially different incentives with respect to their conduct, use and treatment of the home as compared to short-term renters, since Pacaso homeowners are directly invested in the home, its surrounding neighborhood and community, and the long-term maintenance and success of the property and community at large.  *See supra* ¶¶ 4-5, 82.  And, although the new ordinance does not define a "long-term occupancy," Pacaso homeowners are "long-term" occupants under the City's stated "six-month" standard used in the now-deleted Section 17.112.130(A), as Pacaso homeowners are strictly prohibited from selling their interest at any point before the *first year* of ownership or from renting out the property at any point to anyone. Likewise, short-term rentals are strictly prohibited in Pacaso homes.

134.    Nor does regulating Pacaso advance the City's stated purpose of banning "tourist-oriented, commercial use" or "short-term, tourist oriented use" in residential areas, which the City purports allegedly "create increased traffic generation, excessive noise, [and] disruption."  Sections 17.138.010(E) and 17.138.010(F).  Pacaso is a purely residential co-homeownership structure that lacks any resemblance to such "commercial," "tourist-oriented" or "short-term" uses.  Pacaso homeowners are true homeowners who own for their personal use and enjoyment, not for profit.

135.    Further, Pacaso's homes are subject to the same residential occupancy rules as other homes, and homeowners respect the same rules that other owners are expected to follow—

33

1    including all of the same noise and nuisance ordinances and parking standards that apply to other

2    single-family residences in St. Helena.  *See supra* ¶¶ 49, 85-86.

3         136.    In fact, not only do Pacaso co-owners use their homes in a way that is wholly

4    consistent with other single-family residences, but Pacaso co-owners additionally agree to a set of

5    rules and policies that make their use of the Pacaso homes even less likely to cause "traffic

6    generation, excessive noise, [and] disruption" than other St. Helena residents.  *See id.*  Pacaso

7    homeowners agree not to have large events or parties; co-owners adhere to a 9:00 p.m. to 7:00 a.m.

8    quiet hour policy; co-owners agree not to rent the home to third parties; and Pacaso encourages

9    homeowners to avoid parking on the street unless absolutely necessary.  *See id.*

10        137.    And, again, the City has already acknowledged that "if the concern is that part-time

11   owners may infrequently visit the property and have large parties, the City's noise ordinance

12   addresses noise and authorizes abatement and issuance of an infraction.  The City's Municipal

13   Code also addresses nuisances generally and has parking standards in place."  July 2020 Report at

14   4.

15        138.    Similarly, the City's stated reasons for why a Pacaso home is more "commercial"

16   than "residential" in nature cannot pass muster.  For example, the City likens "[l]iving next door to

17   a home where the residents turnover every 2-14 days, and professional cleaning and landscaping

18   crews come to the property between each visit" as akin to "living by a commercial lodging

19   project."  March 22, 2022 Report at 7.  However, having weekly visits by cleaners or landscapers is

20   not a feature that is unique to Pacaso homes and likely the vast majority of homes similar in value

21   to the Pacaso homes in St. Helena with multi-million values have such weekly or bi-weekly

22   cleaning and landscaping crews.

23        139.    Prohibiting Pacaso also does nothing to increase the "limited supply of suitable

24   vacant land" or "exacerbate[] an already severe housing shortage" in St. Helena.  Sections

25   17.138.010(B) and 17.138.010(F).  Rather, as discussed above, Pacaso has the exact opposite effect

26   by redirecting second homeowners who would have otherwise purchased affordable inventory

27   needed by the local workforce to homes at a higher price point, and helping relieve competition for

28   more affordable homes by giving second home buyers a better option.  *See supra* ¶¶ 45-47, 80-81.

FIRST AMENDED COMPLAINT                                          CASE NO. 3:21-cv-02493-WHO

1    Instead of competing for a whole home valued at $525,000, for example, Pacaso offers second

2    home buyers an option to be co-owners of a $4-5 million property for the same price.  Just one

3    Pacaso home can remove up to eight buyers from local competition, reducing competition for

4    housing inventory critically-needed by the local workforce. The average Pacaso home costs six

5    times more than the average second home and seven times more than the average year-round home,

6    meaning the company is unlikely to compete with middle-class or lower-income homebuyers.  *See*

7    EBP, *Pacaso: Pacaso Economic Impact Analysis* at 2 (2022),

8    https://downloads.ctfassets.net/n2ifzifcqscw/6xq482ojqUgEi5fxtMsHka/ab875d46f47db2b6936ccf

9    4d7d6b4b89/Economic_Data_Report.pdf.  Through co-ownership, Pacaso concentrates demand for

10   the most expensive homes in popular second home destinations, thereby shifting demand away

11   from the median-priced market.  *Id*. at 7.

12       140.    Nor does prohibiting Pacaso help "maintain[]" the alleged "balance between the

13   quality of life for residents and those who work in the City and the visitors who help to sustain the

14   City's tourist economy."  *See* Sections 17.138.010(C)-(D).  As described above, Pacaso

15   homeowners use their homes just like their neighbors and other St. Helena residents.  Just like their

16   neighbors, Pacaso homeowners make large financial investments in their homes and bring an

17   owner mentality, not a vacation or "tourist" mentality, to their use of the property.  Further, second

18   homes are notorious for sitting empty much of the year.  In contrast, Pacaso-managed homes are

19   fully utilized, which means that Pacaso homeowners engage in their community and support local

20   businesses year-round.

21       141.    Likewise, the supposed underlying purpose of "[m]aintaining the balance" between

22   "residents and those who work in the City" and visitors is not furthered by regulating Pacaso,

23   because other St. Helena residents can (and do) use their homes in the exact same way as Pacaso

24   homeowners (including as second homes or by hosting visitors).  Section 17.138.010(D); *see also*

25   March 22, 2022 Report at 12 (recitals).  For these same reasons, the City's stated purposes

26   underlying Chapter 17.138—such as "maintaining the authentic small-town quality of life" or

27   "preserving the rural, small town quality" of the City—cannot rationally pass muster and are not

28   furthered by preventing Pacaso homeowners from co-owning a Pacaso home.  March 22, 2022

35

1   Report at 3, 12.  Pacaso homeowners use their homes just as their neighbors and other St. Helena

2   residents do.

3       142.    In fact, some Pacaso homeowners, such as Plaintiff Simon Bull, even *work* in the

4   City of St. Helena and support and employ local staff in the City, further gutting the City's

5   supposed purposes underlying the ordinance.  As Pacaso homeowner Simon Bull testified, he and

6   his wife opened a gallery in St. Helena in 2019, and "supported all [their] local staff throughout the

7   first two years of opening the gallery" despite the COVID-19 pandemic and two catastrophic fire

8   seasons.  *See* April 12, 2022 Meeting, at 48:46,

9   https://sthelena.civicweb.net/document/61947?splitscreen=true&media=true.  The Pacaso

10  homeowner further testified that all of his employees live in St. Helena, including his daughter and

11  son-in-law, who own a home in St. Helena.  *Id.*  Mr. Bull is no "visitor" of St. Helena—he runs a

12  business in St. Helena, babysits his grandchildren (who live a fifteen-minute walk away from his

13  Pacaso home), employs not only staff who live in St. Helena but also local cleaners and contractors

14  in connection for the gallery in St. Helena, and meets with his staff and clients in the City to ensure

15  his business is operating smoothly.

16      143.    For similar reasons, prohibiting Pacaso also does not further the City's supposed

17  purpose of "maintaining housing stock in its residential districts for long-term residents who will

18  engage in the community . . . to the betterment of the entire community" and "participate in the

19  types of activities or build the relationships that create the fabric of a community."  *See* March 22,

20  2022 Report at 8.  Again, Pacaso homeowners are directly invested in the home, its surrounding

21  neighborhood and community, and the long-term maintenance and success of the property and

22  community at large.  *See supra* ¶¶ 4-5, 82.

23      144.    Contrary to the City's characterization, Pacaso homeowners do indeed "engag[e] in

24  the sort of activities that weld and strengthen a community."  March 22, 2022 Report at 4, 8.  As

25  the City even conceded, "several Pacaso homeowners spoke of their experiences in St. Helena,"

26  including "their affection for the community and the traditions they had established."  *See id*.

27  Pacaso homeowners, as invested homeowners, are active members of the community of St. Helena

28  and indeed motivated to "better" this community, including employing and supporting local St.

36

1  Helena residents, supporting local businesses, supporting and attending local churches, staying

2  involved in community issues and local governance, befriending neighbors, and volunteering in the

3  community.

4          145.    As mentioned above, Plaintiff Simon Bull ("Mr. Bull") opened and operates a

5  gallery in St. Helena since 2019, employs residents who live in St. Helena, and supports all of his

6  local staff who worked in St. Helena throughout the COVID-19 pandemic and fires in the City.

7  *See* April 12, 2022 Meeting, at 48:46,

8  https://sthelena.civicweb.net/document/61947?splitscreen=true&media=true.  Mr. Bull employs

9  seven individuals who live in St. Helena—five of whom are full-time employees—and has hosted

10 staff at his Pacaso home.  Mr. Bull not only employs staff in St. Helena, but also employs local

11 cleaners for cleaning the gallery, as well as local contractors who help with signage, printing,

12 advertising, and framing for his gallery, among other things.  Mr. Bull supports, donates to, and

13 attends Encounter Church in St. Helena, and has even hosted the pastor at his Pacaso home.

14 Mr. Bull donates to a numerous local organizations in St. Helena, including schools and liberal arts

15 organizations.  He also supports and donates his time and talent to local hotels, such as the Alila

16 Napa Valley hotel in St. Helena, by hosting and putting on pop-up galleries in the hotels.  Mr. Bull

17 watches his grandchildren—who live a fifteen-minute walk away from the Pacaso home—after

18 school before handing them back to their parents at the end of the day.  Mr. Bull enjoys babysitting

19 his grandchildren in his Pacaso home, where they enjoy using the pool, eating dinner at home, and

20 creating memories with their grandparents.  Mr. Bull also enjoys hosting his daughter and son-in-

21 law, and their friends—all of whom who live in St. Helena—at his Pacaso home, and spending

22 time and creating memories as a family at his home.  Mr. Bull has also been involved in the

23 political landscape of St. Helena, having applied for and been granted a use permit to continue

24 operating his gallery, the MEUSE Gallery, in one of the historic buildings in St. Helena, and

25 having testified before the City's Planning Commission in order to obtain the permit.  *See* April 19,

26 2022 Planning Commission Meeting Agenda, at

27 https://sthelena.civicweb.net/document/61954/?printPdf=true.  Other than spending time with his

28

FIRST AMENDED COMPLAINT                                    CASE NO. 3:21-cv-02493-WHO

1  family in St. Helena and making sure his St. Helena business runs smoothly, Mr. Bull also enjoys

2  visiting the local restaurants, wineries, spas, stores, and hiking trails that St. Helena has to offer.

3        146.    Like Mr. Bull, another Pacaso homeowner testified that she attends a Catholic

4  church in St. Helena, goes out and supports local stores and restaurants, says "hi to the neighbors,"

5  and generally "contribute[s] to the society."  April 12, 2022 Meeting, at 1:01.

6        147.    As another Pacaso homeowner testified at both the March 22, 2022 Meeting and

7  April 12, 2022 Meeting, in addition to enjoying the "glorious wineries, delightful boutiques, world-

8  class restaurants and friendly people" and supporting "accessible businesses, from Model Bakery

9  to the Le Boheme consignment store benefiting a local hospice to the cycling shop" in St. Helena,

10  she and her husband "follow closely the issues of pressing concern to its people including traffic,

11  water shortages and wild fires," "contribute [their] fair share of property taxes to the community

12  and have a true stake in its future," have "made a sizable financial investment" to own a home in

13  St. Helena, "take seriously the City's rules and regulations," and "welcome the opportunity to

14  assist wherever needed."  March 22, 2022 Meeting, at 1:03:30,

15  https://sthelena.civicweb.net/document/61298?splitscreen=true&media=true&timestamp=2561; *see*

16  *also* April 12, 2022 Meeting, at 45:15,

17  https://sthelena.civicweb.net/document/61947?splitscreen=true&media=true. This Pacaso

18  homeowner further testified that her husband and she "have met some of [their] St. Helena

19  neighbors while on walks and [they are] hoping to get to know them better over time," and "[t]here

20  is nothing [they would] like more than to have them over for a cup of coffee or brunch, to join

21  them in a local volunteer project or to gift them a jar of our homemade jam."  March 22, 2022

22  Meeting, at 1:04.

23        148.    Likewise, another Pacaso homeowner testified that "[he doesn't] come [to St.

24  Helena] as a tourist," but rather "spend[s the] days frequenting places like Crane Park, the Station,

25  the seasonal farmers' market, also at Crane's Park, Madrona's pumpkin patch."  April 12, 2022

26  Meeting, at 45:15.  This Pacaso homeowner testified that he and his wife "wave to every person

27  and talk to community members while at the park pushing [their] son on the swing."  *Id*.  This

28  Pacaso homeowner further testified that he has made friends with and "even had neighbors over to

38

1  [their Pacaso] house here on Valley View"—one of whom "even offered to show [him] some cool

2  mountain bike trails next time [he's] in town." *Id*. He testified that he "[is] no different than

3  anyone else here." *Id*.

4        149.    Plaintiff Taylor Lopez, as the son of a Guatemalan immigrant, "take[s] to heart the

5  support of those in St. Helena who welcome others into the fold who were not as fortunate to be

6  born there among the vineyards." April 12, 2022 Meeting, at 52:30. For Taylor Lopez, who works

7  in Houston as a corporate attorney, and his wife, Plaintiff Chelsea Lopez, who works as an ICU

8  pharmacist, St. Helena has already become an integral part of their lives, and they plan to continue

9  to share this special place with their family for decades to come. *Id*. With his ability to work

10 remotely, some of Mr. Lopez's favorite time in St. Helena is spent without guests and as any full-

11 time resident might spend their time: jogging alongside vineyards in the morning, grabbing

12 breakfast from the Station, or having a bottle of wine at Cook over a quiet dinner. *Id*. Mr. Lopez is

13 a member of four wineries in Napa County, including Hall, which is within St. Helena. The

14 serenity that Mr. and Mrs. Lopez find in the St. Helena neighborhood is peace that they do not have

15 in Houston and absolutely cherish. *Id*. Their co-ownership with other like-minded families in the

16 Pacaso home allows all of them to ensure that their second home is maintained to the highest

17 standards and utilized nearly as much as any single-family home in the neighborhood. *Id*. Rather

18 than visiting their second home once every few years, Mr. and Mrs. Lopez visit St. Helena as often

19 as life allows, and spend liberally and happily at the restaurants, shops and wineries supporting the

20 livelihoods of local workers and proprietors. *Id*. Mr. and Mrs. Lopez view their ownership

21 through Pacaso not just as an investment in a piece of property, but rather an investment in a home

22 and community that they hope is enriched through their presence.

23       150.    Plaintiffs Chad Ammon and Jonathan Young, who both work at a business-to-

24 business company providing meetings and events solutions, are married with a young daughter,

25 and enjoy the ability to have a second home (their Pacaso home) near their primary residence in

26 Orinda, California. They enjoy creating new memories with their family in St. Helena. While at

27 their Pacaso home, they shop at local stores like the local grocery store Sunshine Foods, visit

28 wineries and restaurants, go for walks in the neighborhood, visit the Farmer's Market, and take

FIRST AMENDED COMPLAINT                          CASE NO. 3:21-cv-02493-WHO

1    their daughter to the local parks and playgrounds in St. Helena.  They are wine club members of

2    Prisoners Wine Company, located in St. Helena.  They have met some of their neighbors and

3    residents in St. Helena, some of whom have welcomed them with open arms.  They contribute to

4    the community just like any other St. Helena resident, and use and enjoy their Pacaso home just as

5    any other St. Helena resident enjoys their own homes.

6         151.    Plaintiffs Tony and Mary Athans, who run a small security installation business in

7    Chicago, likewise enjoy creating memories at their second home in St. Helena.  Among other

8    activities, they enjoy visiting vineyards, going for walks in the neighborhood, going to restaurants

9    and cafés like the Farmstead at the Long Meadow Ranch in St. Helena, going to bakeries like the

10   Model Bakery, visiting gastropubs like Goose & Gander, and going to local movie theaters.  They

11   have met their neighbors in St. Helena and made friends with other St. Helena residents.  They

12   have hosted their parents and cousins in the Pacaso home, plan to host their children at the home,

13   and have enjoyed creating memories in St. Helena as a family.

14        152.    Plaintiff William Trevor Gillespie, who is an accountant and partner at an

15   accounting firm, enjoys living in in his second home (his Pacaso home) in St. Helena, and

16   contributes to the community just as any other St. Helena resident.  He enjoys eating at local

17   restaurants in St. Helena, going on walks in the neighborhood, visiting wineries and wine tasting,

18   and shopping at local stores, including Sunshine Foods, where he gets his groceries.

19        153.    Another Pacaso homeowner who testified before the City Council—a first

20   generation American, from Latin American decent, who came to the United States thirty years ago

21   in order to go to college and who has undergraduate degrees from MIT, and graduate degrees from

22   NYU and Stanford University, founded around four companies, and has given jobs to hundreds of

23   people—explained that he "deeply believe[s] in the importance of contributing and giving back to

24   society," and in part decided to purchase his second home in St. Helena because the "co-owners

25   were like-minded, valuing a safe and healthy environment, and sharing the understanding that this

26   was their home, and they would invest in it."  April 12, 2022 Meeting, at 1:07.  He further testified

27   that when purchasing his Pacaso home, he was "looking for a place where [his] daughter could

28   enjoy time and meet new people in a safe and healthy environment," and that, while staying at their

40

1   Pacaso home in St. Helena, his daughter "typically takes walks, rides her bike, and enjoys the

2   pool," and he and his wife "like to run and take longer bike rides" and "love walking down Main

3   Street and supporting local restaurants, wineries, and other businesses." *Id*.

4        154.    In light of the major disconnects between the stated goals underpinning Chapter

5   17.138 and Pacaso's model, the City's adoption of and reliance on Chapter 17.138 to regulate

6   Pacaso is nothing more than a pretext to deny homeownership to new, diverse residents.

7   **VIII.**   **Because Pacaso Homes Were Permissible Under The Previous**
         **Section 17.112.130 Time-Share Ordinance, Existing Pacaso Homes**

8            **Are Permitted To Continue Indefinitely Under the New Chapter 17.138**

9        155.    Even if Chapter 17.138 applied to Pacaso and its homeowners (it does not), the four

10   homes that Pacaso owned and/or managed at the time that Chapter 17.138 was enacted, located at

11   (1) 1242 Madrona Ave., St. Helena, CA 94574; (2) 1629 Hillview Pl., St. Helena, CA 94574; (3)

12   1005 Valley View, St. Helena, CA 94574; and (4) 1509 Riesling Way, St. Helena, CA 94574 (the

13   "Existing Pacaso Homes"), must be allowed to nevertheless "continue indefinitely" under the St.

14   Helena Municipal Code.

15        156.    As explained above in Paragraphs 231 through 266, the "use" of the Existing Pacaso

16   Homes is a "nonconforming use" that was indisputably "established prior to the . . . change in the

17   regulations of the zoning ordinance" (i.e., prior to the enactment of Chapter 17.138), and thus may

18   be "continued indefinitely." *See* Section 17.140.020.

19        157.    The Existing Pacaso Homes constitute a "[l]egally established existing use[]."

20   Section 17.140.010.  The "use" of the Existing Pacaso Homes lawfully existed prior to and on the

21   date that Chapter 17.138 became effective, and has continued since that time.  The Existing Pacaso

22   Homes were in compliance with all laws, rules, regulations, and ordinances, including the St.

23   Helena Municipal Code, on the date that Chapter 17.138 became effective.  As explained above,

24   now-deleted Section 17.112.130 never applied to Pacaso or the Existing Pacaso Homes and the

25   City could not at any time legally enforce this ordinance against Pacaso for the reasons described

26   above, and thus the Existing Pacaso Homes constitute a legal nonconforming use that existed

27   lawfully before Chapter 17.138 became effective.

28

FIRST AMENDED COMPLAINT                      CASE NO. 3:21-cv-02493-WHO

1      158.    Section 17.140.010 states: "Legally established existing uses, structures, lots and

2   signs which do not conform to the regulations of the zoning district in which they are located are

3   nonconforming.  Nonconforming uses, structures, lots and signs shall be subject to these specific

4   regulations in addition to general regulations contained in the zoning ordinance in order to permit

5   the continued operation of such uses, structures, lots and signs while providing for their gradual

6   elimination and/or compliance with the policies of the general plan and zoning ordinance."

7      159.    Section 17.140.020, which governs "nonconforming uses," provides: "A

8   nonconforming use is a legally established use of land which is not permitted in the zoning district

9   in which it is located, or a use which is permitted by use permit but for which no use permit has

10   been obtained, because the use was established prior to the application of the existing district due

11   to rezoning, annexation or change in the regulations of the zoning ordinance."  Section

12   17.140.020(A) further provides that "[n]onconforming uses may be continued indefinitely, subject

13   to the provisions of this chapter."

14      160.    Prior to the enactment of Chapter 17.138, Pacaso created a property-specific LLC

15   for each home, which owned deeded title to the real property.  Pacaso then organized and vetted

16   co-owners, who purchased partial interests in the property-specific LLC prior to the enactment of

17   Chapter 17.138.  Prior to (and continuing since) the enactment of Chapter 17.138, Pacaso

18   homeowners have owned and used their Pacaso home, including residing at the home, suggesting

19   improvements to the home, enjoying the benefits of the home and broader St. Helena community,

20   and even lobbying for their property rights in their Pacaso home at St. Helena City Council

21   meetings.

22      161.    Because Section 17.112.130 never applied to Pacaso and the City could not legally

23   enforce this section against Pacaso, the Existing Pacaso Homes and the Pacaso homeowners at

24   such Existing Pacaso Home are exempt from the application of Chapter 17.138 under Sections

25   17.140.010 and 17.140.020 of the Municipal Code as a "nonconforming use" that may be

26   "continue indefinitely."  Therefore, the four Existing Pacaso Homes can "continue indefinitely"

27   under the St. Helena Municipal Code.

28

FIRST AMENDED COMPLAINT                                    CASE NO. 3:21-cv-02493-WHO

162.     Thus, the homeowners—whose rights were, prior to the new ordinance, well recognized and have always been protected—are entitled to continue using their homes as they did before enactment of the new ordinance.

**IX.     Defendants Intend To Enforce Chapter 17.138, Which Imposes Draconian
         Fines and Criminal Penalties, Against Plaintiffs, Including St. Helena Homeowners**

163.     The new time-share ordinance, codified at Chapter 17.138, went into effect thirty days after its adoption (*see* March 22, 2022 Report at 26), meaning that Chapter 17.138 becomes effective and Section 17.112.130 is deleted from the St. Helena Municipal Code on May 12, 2022.

164.     The City's conclusions in the March 2022 Report confirm Defendants' intent to ban Pacaso under the new time-share ordinance once it becomes effective on May 12, 2022. Specifically, the March 22, 2022 Report provides the City's "conclusion that the homes that have been marketed by Pacaso constitute time share projects" and "that the Time Share Ordinance, both in its ***original form*** and ***as proposed*** to be amended, is intended to protect against the impacts that these [Pacaso] homes and similar uses could have on the City's housing supply and the character of the City's residential districts."  March 2022 Report at 2 (emphasis added).

165.     Given the serious financial and criminal penalties associated with an alleged violation of Chapter 17.138, as well as the above-mentioned conclusions reached by the City in the March 2022 Report, Pacaso sent a letter to the City on April 13, 2022, seeking clarification as to whether the City intended to enforce the new ordinance against the owners of the four Existing Pacaso Homes in St. Helena that were purchased through Pacaso prior to the enactment of Chapter 17.138 and Pacaso in connection with their use of the Existing Pacaso Homes, pending review by the Court as to its validity.

166.     In the April 13, 2022 Letter, Pacaso noted that the homeowners at the Existing Pacaso Homes had purchased their homes at a time when the original ordinance was in effect. They did so with the intention of enjoying a secondary home in the beautiful St. Helena community—with zero concern about their purchase or use of the homes later being deemed illegal (and, indeed, subject to massive fines or imprisonment).  Pacaso pointed to the fact that at the time of their purchases, the then-acting City Attorney Kara Ueda had opined that the original ordinance

FIRST AMENDED COMPLAINT                                    CASE NO. 3:21-cv-02493-WHO

1   could not be read to prohibit their purchase or enjoyment of the homes (*see supra* ¶¶ 54-65), and

2   that City Council members, during the July 14, 2020, Meeting, had suggested that regulating

3   Pacaso under the time-share ordinance would be against "case law and civil rights" and would be

4   "overreaching what [the City] can do legally" (*see supra* ¶¶ 67-68).  April 13, 2022 Letter at 1-2.

5        167.    Pacaso explained that, having purchased their homes with the expectation of

6   continued legality, and having enjoyed use of their homes ever since, the homeowners at the

7   Existing Pacaso Homes would now be faced with the prospect of being imprisoned and/or subject

8   to massive daily fines or misdemeanors under Chapter 17.138 just for stepping foot in the homes.

9   Pacaso further explained that, as a matter of both equity and law, that is not right, as these innocent

10  bystanders are caught in the middle of a political fight between the City Council (fueled by the

11  exuberance of a small number of constituents) and Pacaso.  Pacaso also pointed out that, during the

12  April 12 City Council meeting where Chapter 17.138 was adopted, a St. Helena resident who did

13  not support Pacaso and encouraged the City Council to adopt the new ordinance stated her view

14  that the new ordinance would not be applied against the Existing Pacaso Homes.  She expressed

15  solace in the fact that the City would not be "criminalizing" or "run[ning] . . . out of town" the

16  homeowners already at the four existing Pacaso homes.  April 12, 2022, City Council Meeting at

17  1:11:27, https://sthelena.civicweb.net/document/61947?splitscreen=true&media=true ("I do want

18  to also point out [that] you're not criminalizing people who have already bought into this model.

19  They did not know that this was going to happen.  How could they?  And I don't think you're

20  going to [] issue warrants and run them out of town. I mean, they're here.  My understanding is the

21  idea [of the New Ordinance] is to stop this from going further.").

22       168.    Finally, in the April 13, 2020 Letter, Pacaso noted that, absent an express

23  commitment by the City by April 20, 2022, that it will refrain from enforcing the New Ordinance

24  pending a judicial decision as to its validity and enforceability, Pacaso would be left no choice but

25  to petition the Court for a stay of enforcement.

26       169.    On April 21, 2022, the City responded to the April 13, 2022 Letter providing that

27  while it would not "undertake any enforcement action against members who purchased their

28  interest in an LLC prior to the passage of [Chapter 17.138] ***while this litigation is pending***," the

FIRST AMENDED COMPLAINT                    CASE NO. 3:21-cv-02493-WHO

City "disagree[s]" with Pacaso's "position that enforcement against [the Pacaso homeowners at the Existing Pacaso Homes] would be unlawful." April 21, 2022 Letter at 1 (emphasis added). Specifically, the City stated: "We disagree that members who purchased and used their interests prior to the passage of the New Ordinance are allowed to continue to use their interests in violation of the New Ordinance. A requirement for a nonconforming use is that the prior use was *lawful.* The City maintains that members' prior use was unlawful under the previous ordinance. However, . . . the City does not intend to pursue enforcement against these members *at this time*." *Id.* at 1, n.1 (second emphasis added). Thus, the City provided its decision that Pacaso and the Pacaso homeowners at such Existing Pacaso Homes are subject to violations under Chapter 17.138 and face violations under the ordinance and enforcement following litigation. And, even during the pending litigation, the City maintains the ability to "subsequently take[] a different position than that set forth in [its April 21, 2022] letter." *Id.* at 2.

170.    Pacaso and its homeowners face significant damage and harm beyond just a violation of their rights as the ordinance went into effect on May 12, 2022.

171.    Violations of Chapter 17.138 carry with it enormous penalties, including a misdemeanor punishable by a fine of up to $1,000 per day, or by imprisonment up to six months, or by both such fine and imprisonment. *See* Section 17.138.060. Each day a violation of the ordinance occurs constitutes a separate offense, and the remedies under the ordinance are cumulative. *See* Sections 17.138.060(E)-(F). There is no cap to the number of violations a person or entity can accumulate under the ordinance—it is an indefinite, cumulative penalty. Put another way, if a Pacaso homeowner lives in their own home for a week, under Chapter 17.138 and the City's stated intention to enforce Chapter 17.138 against Pacaso homeowners, that one homeowner staying in their own home for one week could face up to 3.5 years imprisonment and $7,000 in fines.

172.    In addition to such penalties, Section 17.138.060 declares uses of a time-share as a "public nuisance" and cites to Chapter 1.12 (Enforcement Procedures), which provides that an enforcement official can arrest someone for causing a "public nuisance" without a warrant, and can "enter the premises" if they believe a public nuisance exists. Sections 1.12.050 and 1.12.090. And

45

1 | persons "who permit a public nuisance to continue to exist after an abatement notice has been
2 | served . . . may be prosecuted" by the city attorney or District Attorney.  Section 1.12.110.

3 |      173.    If that was not enough, violations under the ordinance expose homeowners to the
4 | risk of losing their property if they are unable to pay the civil penalty for a violation under the
5 | ordinance.  *See* Section 17.138.060(C)(2)(e).  The ordinance provides that if the owner of the
6 | property is unable to pay the civil penalty with 45 days of the notice of the final determination that
7 | he or she is responsible for that civil penalty, such penalty becomes "a lien to be recorded against
8 | the property on which the violation occurred," where costs are collected in the same manner as
9 | county taxes, and thereafter the property is sold in the same manner as property is sold for
10 | delinquent taxes.  *Id.*

11 |      174.    Accordingly, once Chapter 17.138 is effective, each day that Pacaso manages its
12 | four homes in St. Helena exposes Pacaso to massive daily fines of up to $4,000 and the threat of
13 | imprisonment, among other penalties.  Likewise, Pacaso homeowners face massive daily fines of
14 | up to $1,000 and the threat of imprisonment, among other penalties, for merely staying in or using
15 | the very home that they own.  Pacaso homeowners also face the possibility of losing their home if
16 | the enormous civil penalties cannot be paid.  Countless other citizens may face similar harm under
17 | Chapter 17.138 if it is not stricken.

18 | **X.    Defendants' Selective And Arbitrary Enforcement Of**
19 | **       The Previous Time-Share Ordinance Against Pacaso,**
20 | **       Followed By The March 2022 Report And Proposed Ordinance**
        **Which Targets Pacaso And Was Enacted Solely To Ban Pacaso, Is Impermissible**

21 |      175.    Defendants have deliberately and selectively singled out Pacaso.

22 |      176.    First, Defendants deliberately singled out Pacaso by attempting to enforce Section
23 | 17.112.130 (the now-deleted time-share ordinance) against Pacaso but not against those entities or
24 | individuals who are similarly situated or functionally the same as Pacaso.

25 |      177.    The City's selective enforcement of Section 17.112.130 against Pacaso highlights
26 | the very concerns that the City itself recognized in its July 2020 Report.  The City conceded that
27 | one of the "significant practical challenges to implementing and enforcing the existing timeshare
28 | regulations" is that "[a]bsent a proposed new development to specifically construct a timeshare

project, the City does not know when a residence becomes a timeshare, since the ownership change is a private transaction between private parties." July 2020 Report at 3. The City conceded that it "does not have an easily available means to scrutinize such agreements or monitor the terms of particular ownership arrangements." *Id.*

178. City Attorney Ueda further highlighted these concerns during discussions of the July 2020 Report:

> [W]e also would have practical challenges implementing and enforcing timeshare regulations and that City generally doesn't know when a residence becomes a timeshare. Those are typically private transactions between private parties and the city doesn't monitor real estate sales, and . . . **some types of fractional or partial ownership interests may not necessarily trigger any concerns as more commercial uses would** because, for example, multiple members of one family could decide to purchase a residence together, they may not stay there all at the same time, but they wouldn't necessarily be having interest like a timeshare either.

July 14, 2020, Meeting at 3:21-22 (emphasis added).

179. City Attorney Ueda further confirmed the selective and arbitrary approach the City was taking by pursuing enforcement against Pacaso properties only, but not fractional co-ownership structures among multiple friends who wish to purchase and co-own property (which is functionally the same as Pacaso's co-ownership structure):

> [I]f we're getting at multiple ownership of one piece of property, it's really challenging to figure out a way to define that. That doesn't preclude people who really do need to go buy a piece of property for financial reasons. They all want to have a piece of it. They may all be friends or family members, and I don't think that's the type of activity that the city would want to preclude, and that's the challenge that we have in trying to figure out how to define this in a way that would work.

July 14, 2020, Meeting at 3:33-34.

180. In fact, in St. Helena, 666 second homes[11] are owned by an LLC, trust, or similar mechanism which facilitates multiple owner arrangements. This represents 27% of all second homes and 18% of the entire housing stock. However, these non-Pacaso LLCs are still in existence, and do not differ from Pacaso with respect to the use of the residential single-family

---

[11]     "Second home" refers to homes that did not take the owner occupant exemption.

47

1   home.  Nonetheless, Defendants never pursued a similar enforcement agenda against them as

2   against Pacaso.

3          181.   Defendants' attempts to enforce Section 17.112.130 against Pacaso, where other co-

4   owned residences (through LLCs or otherwise) did not face similar challenges, was selective and

5   arbitrary, and based on invidious criteria—namely, to deny homeownership to new diverse and/or

6   less affluent residents who hope to purchase property in St. Helena through a co-ownership

7   structure.

8          182.   Then, during the pendant litigation, when it became clear that Section 17.112.130

9   was not a viable option for regulating Pacaso, Defendants tried to craft a new way to deliberately

10  single out and attempt to ban Pacaso.  Defendants prepared the March 2022 Report, and drafted,

11  proposed, and enacted the accompanying new time-share ordinance, codified at Chapter 17.138, for

12  the very purpose of regulating and targeting Pacaso and its homeowner—not only confirming that

13  Section 17.112.130 could not be relied on by Defendants to regulate Pacaso and that Defendants

14  had been attempting to apply it against Pacaso in an unlawful, impermissible and discriminatory

15  manner, but also confirming that Defendants were indeed targeting Pacaso and planned to continue

16  its impermissible enforcement efforts against Pacaso but not against those entities or individuals

17  who are similarly situated or functionally the same as Pacaso.

18         183.   The March 2022 Report singles out Pacaso, mentioning Pacaso and referencing

19  Pacaso homeowners sixty-five times.  The March 2022 Report includes the City's conclusion that

20  the homes that have been marketed by Pacaso constitute time-share projects, public complaints

21  made about Pacaso, and the reasons why Pacaso should be regulated.

22         184.   The "Background" of the March 2022 Report confirms (1) that Pacaso was being

23  unlawfully and impermissibly regulated under Section 17.112.130, noting the "challenges" the City

24  had faced in doing so, and (2) that the proposed new time-share ordinance was drafted, prepared

25  and proposed for the sole purpose of regulating Pacaso and to "address the concerns raised by

26  members of the community in response to the listing of the [Pacaso] home at issue," given Pacaso

27  could still operate under Section 17.112.130.  March 22, 2022 Report at 1.

28

FIRST AMENDED COMPLAINT                                                CASE NO. 3:21-cv-02493-WHO

Over the past two years, there has been significant discussion in the community regarding Section 17.112.130 . . . . The City Council discussed the Time Share Ordinance at its July 14, 2020 meeting in response to concerns raised regarding a real estate listing for a fractional or partial ownership interest in a residential home in the City. The prior City Attorney discussed this issue with the City, focusing on the question of the extent to which the City Council could regulate an ownership structure through the City's zoning authority, and noted the challenges of doing so. At the conclusion of the Council's discussion of this issue, Council directed the City Attorney and staff to continue to research its options to address the concerns raised by members of the community in response to the listing of the home at issue.

In the months following the July 2020 Council meeting, the company that had been marketing that original home, now known as Pacaso, began marketing other homes in the City, and the City received additional complaints from members of the community.

March 22, 2022 Report at 1-2.

185.    The March 2022 Report does not mention or reference any other entity or individuals who would potentially be subject to the new ordinance, including home-swap or exchange companies like HomeExchange, ThirdHome, or Love Home Swap, which advertise second homes in St. Helena and, under the City's interpretation, would likely fall within the ordinance's scheme.[12]

186.    The recitals of Chapter 17.138 further confirm that the new time-share ordinance specifically targets Pacaso and no other similarly situated entity or individual, and that the purpose underlying the ordinance was to target and ban Pacaso alone due to public animus and complaints about Pacaso and its homeowners. The recitals specifically reference Pacaso's business model,

---

[12]    *See Wine Country Retreat*, ThirdHome, https://exchange.thirdhome.com/properties/26439-st-helena-california-wine-country-retreat-country (last visited May 27, 2022); *Modern Barn with Vineyard Views*, ThirdHome, https://exchange.thirdhome.com/properties/5953-st-helena-california-modern-barn-with-vineyard (last visited May 27, 2022); *St Helena Farmhouse*, ThirdHome, https://exchange.thirdhome.com/properties/26654-st-helena-california-st-helena-farmhouse-city (last visited May 27, 2022); *St. Helena Villa*, ThirdHome, https://exchange.thirdhome.com/properties/2401-st-helena-california-st-helena-villa-country (last visited May 27, 2022); *Exchange homes and apartments St. Helena - United States*, HomeExchange, https://www.homeexchange.com/home-exchange-united-states/california/napa-county/st-helena (last visited May 27, 2022); *Gorgeous spa-like house in Napa's best town*, Love Home Swap, https://www.lovehomeswap.com/home-exchanges/united-states/saint-helena-gorgeous-spa-like-house-in-napas-best-town?from=United-Kingdom&to=St.-Helena--California--United-States&type=vacation&rooms=6+ (last visited May 27, 2022).

49

reference the complaints received about Pacaso homes, and link such complaints regarding Pacaso to the purpose and reasons underlying the ordinance:

> **WHEREAS,** the City has historically not received complaints about time-sharing uses in residential neighborhoods. Commencing in 2020, however, the City began receiving complaints regarding single family homes in the City that were being sold and/or marketed as "fractional ownership" or "co-ownership" homes, wherein each buyer may acquire a one-eighth interest in a limited liability company that will own the home. Under the structure pursuant to which these dwelling units are marketed and sold, each owner gets a one-eighth share along with the right to use the home for one-eighth of each year indefinitely. During each owner's usage period, that owner has exclusive use of the entire house. All rentals are prohibited; only owners and their guests are permitted to use the house. Each owner pays regular assessments to fund the operating costs of the home and maintenance reserves; and

> **WHEREAS,** the City has received numerous complaints regarding these properties, including parking impacts from large numbers of people staying at these properties; excessive noise late into the evening due to frequent outdoor parties; traffic due to frequent visitor turnover; traffic, noise and parking concerns due to frequent visits from cleaning, landscape maintenance and pool cleaning services that come to the properties in between each stay to prepare the home for the next guest; and an inability to maintain lines of communication to set community expectations with the users of the unit, as visitors only frequent the homes for short term stays of 2 to 14 days; and

> **WHEREAS**, the complaints received by the City are reflective of the reasons that the City prohibited time-share projects within residential areas of the City. The timeshare uses provide a short-term, high impact vacation oriented use of the property, where those that buy into the time-share use the home for entertaining and short term stays while visiting restaurants, wineries and other tourist oriented locations in St. Helena and the surrounding Napa Valley . . . .

March 22, 2022 Report at 14.

187.   Discussion among St. Helena's City Council members and public comments concerning the enactment of Chapter 17.138 during the March 22, 2022 Meeting (where a public meeting was held regarding its passage) exclusively revolved around banning Pacaso and further confirm the selective, arbitrary, and invidious nature of the new ordinance.[13]

---

[13]   *See* March 22, 2022 Meeting,
https://sthelena.civicweb.net/document/61298?splitscreen=true&media=true.

FIRST AMENDED COMPLAINT                                    CASE NO. 3:21-cv-02493-WHO

188.   At the March 2022 Meeting, Defendants' animus towards Pacaso and true purpose for the ordinance (i.e., to target and prohibit Pacaso, and to deny homeownership to new diverse and/or less affluent residents who hope to purchase property in St. Helena through a co-ownership structure) was further exposed.

189.   For example, Vice Mayor Paul Dohring addressed Pacaso *directly* during the City Council meeting, labeled Pacaso's outreach or lawsuit as a "disinformation" campaign that is "really sad" and "not something this community is going to tolerate," and sarcastically "thanked" Pacaso for its "invasion" into the St. Helena community:

> I would just end by saying I was extremely disheartened by the last couple of days of the Pacaso disinformation campaign.  Extremely disheartened.  That is not reflective of hopefully what you stand for, Pacaso, and it's not something this community is going to tolerate.  First, you start with sort of an invasion into our communities and then you talk about folks here being xenophobic and that you're coming to bring democracy to us.  We need to be saved somehow by Pacaso.  That's the message that's being received by me and many others.  Well, I don't need to be saved.  Thank you very much for your invasion.  Your disinformation campaign frankly is really a sad campaign and whoever thought of that, whoever came up with that campaign, wow, unbelievable.

March 22, 2022 Meeting, at 1:21.

190.   Likewise, at the April 12, 2022 Meeting, City Council Member Lester Hardy conceded that the ordinance is specifically about Pacaso, stating: "The ordinance is ***about a particular business enterprise***, or form of business, and it's specifically about timeshares.  So I am, I'm not surprised, but I am troubled by the persistent effort of Pacaso to confuse the public . . . ."  April 12, 2022 Meeting, at 1:15:40.  Mr. Hardy went on to specifically disparage Pacaso, calling its marketing campaign "deceptive and manipulative," and disclaiming "any responsibility" the City Council has for how the ordinance would affect Pacaso homeowners' lives:

> This ordinance doesn't prohibit, regulate, or effect any of the many LLCs that own homes in St. Helena that are not operating time shares, it's that simple.  And this, and for all those individual Pacaso owners who have spoken, and for those who haven't who may feel the same way, you know also sad and distressed that your lives are affected by the deceptive and manipulative marketing campaign that's been part of Pacaso from the beginning, but I don't think the City Council has any responsibility for that.

*Id.* at 1:16.

51

191.     Defendants' enactment of Chapter 17.138 and enforcement against Pacaso, where other co-owned residences (through LLCs or otherwise) do not face similar challenges, is selective and arbitrary, and based on invidious criteria.

**XI.     Chapter 17.138 Is Vague, Ambiguous, And Overbroad, And Chills Free Speech**

192.     Chapter 17.138 fails for being vague, ambiguous and overly broad on its face and as applied to Pacaso.  Chapter 17.138 fails to provide individuals and entities—including Pacaso, homeowners, real estate agents, brokers, and persons of ordinary intelligence, among others—a reasonable opportunity to know what conduct, speech, or uses are prohibited, or any guidance as to how to determine whether their conduct, use of a home, or speech with regard to time-share uses falls within the prohibited conduct.

193.     Chapter 17.138 uses circuitous definitions to define terms, which are vague, confusing and difficult to follow.  For example, "time share use" is defined as "the use of one or more accommodations or any part thereof, as a ***time-share property*** pursuant to a ***time-share plan***." March 22, 2022 Report at 18 (emphasis added).  Those latter terms carry their own vague definitions.  For instance, "time-share property" is defined as "one or more accommodations subject to the same time-share plan, together with any other property or rights to property appurtenant to those accommodations."  *Id.*  And "time-share plan" is defined as "any arrangement, plan, scheme, or similar device, whether by membership agreement, bylaws, shareholder agreement, partnership agreement, sale, lease, deed, license, right to use agreement, or by any other means, whereby a purchaser, in exchange for consideration, receives the right to exclusive use of an accommodation or accommodations, whether through the granting of ownership rights, possessory rights or otherwise, for a period of time less than a full year during any given year, on a recurring basis for more than one year, but not necessarily for consecutive years."  *Id.* at 17-18.  The City acknowledged the circuitous nature of these definitions, stating, "The new ordinance includes a number of definitions that work in concert to define a time-share use."  *Id.* at 9.

194.     However, the ordinance provides no guidance or criteria as to how its vague definitions apply in many circumstances, such as when ordinary co-owners make arrangements concerning when or how they can use the property.  The ordinance thus fails to provide people of

52

1 ordinary intelligence a reasonable opportunity to understand what conduct it prohibits, on the one

2 hand, and authorizes, on the other, and as a result, encourages arbitrary and discriminatory

3 enforcement.

4        195.    For example, the City blithely stated that the definitions in Chapter 17.138 "focus

5 on the ***manner*** in which the accommodation is used, not how it is owned," and that "not all

6 properties with multiple owners or owned by business entities (such as LLCs) would constitute a

7 time-share use under these definitions."  March 22, 2022 Report at 10 (emphasis added).  The City

8 further noted that "[a] property that is owned by a group of friends or extended family members,

9 whether through a separate business entity or otherwise, ***will not necessarily mandate*** that only one

10 owner will be able to use the property at a time."  *Id.* (emphasis added).  The City purports to

11 distinguish those scenarios from the "***more formal arrangement*** found in time-share uses."  *Id.*

12 (emphasis added).

13        196.    It is entirely unclear how to interpret Chapter 17.138's definitions with regard to co-

14 owners who have arrangements as to when or how to use the property, and leaves citizens guessing

15 as to how to comport their conduct to comply with the ordinance.  *See* March 22, 2022 Report at

16 10.  It is unclear what constitutes a "formal arrangement," and Chapter 17.138 fails to provide any

17 clarity, guidance, or criteria as to what constitutes "a more formal arrangement" that the City

18 apparently wants to target, or the less formal (seemingly non-Pacaso) arrangement the City

19 presumably does not want to target.  And the level of "formality" associated with any such

20 arrangement is found nowhere in the statute.

21        197.    This potentially prohibits, for example, a family that co-owns a house among

22 cousins who use a Google spreadsheet allotting times in which certain members are intending to

23 use the house.  Likewise, Chapter 17.138 potentially prohibits siblings who own a home who have

24 allotted times in which they can each enjoy using the home.  Chapter 17.138 also potentially

25 implicates friends who share a home but who stagger the periods of the year that they enjoy that

26 home.  Likewise, Chapter 17.138 potentially prohibits domestic partners, or divorced or separated

27 spouses, who wish to alternate usage of a home at different times of year for whatever personal

28 reasons—none of which are the concern of the City.  Again, this leaves ordinary citizens guessing

FIRST AMENDED COMPLAINT                              CASE NO. 3:21-cv-02493-WHO

1   as to what kind of arrangements are or aren't permissible under the ordinance, with no clarity as to

2   how to determine this.

3      198.   Chapter 17.138 not only prohibits the use of accommodations for time-share use,

4   but also punishes "[a]ny responsible person" who "uses, or allows the use of, or advertises or

5   causes to be printed, published, advertised or disseminated in any way and through any medium the

6   availability for sale or use of an accommodation in violation of [Chapter 17.138]."  Section

7   17.138.060(A).

8      199.   However, the ordinance fails to clarify or define an "advertisement" or what

9   constitutes "advertis[ing]," or whether this prohibition extends to someone reposting a time-share

10  listing on their social media page or merely sending a link of the listing via email to another friend.

11  This prohibition potentially implicates brokers, agents, printing companies, and even individuals

12  reposting listings on social media or via private email exchanges.

13     200.   Likewise, the ordinance fails to clarify, define, or set any bounds on who qualifies

14  as "responsible" for "us[ing], or allow[ing] the use of, or advertis[ing] or caus[ing] to be printed,

15  published, advertised or disseminated in any way and through any medium" the use of a time-

16  share.  The lack of clarity leaves citizens guessing as to what kind of speech is impermissible.  For

17  example, this phrase potentially extends to and implicates individuals merely conversing with a

18  friend about a time-share use or listing in the City, a printing company publishing an opinion piece

19  about time-share uses in the City, individuals reposting a time-share listing on Facebook, or an

20  individual sending a link of a time-share listing to another friend via private email, among

21  potentially many others.

22     201.   The cloud of threatened criminal prosecution and massive, indefinite and

23  cumulative fines for violations of Chapter 17.138 makes this draconian ordinance even more

24  troubling, since the vague ordinance may trap innocent and honest brokers, agents, printing

25  companies, and ordinary citizens who merely repost, print or even discuss time-share uses or

26  listings in the City, by not providing fair warning.

27     202.   Chapter 17.138 not only fails to give persons of ordinary intelligence a reasonable

28  opportunity to know what conduct is prohibited, but also clearly impairs and chills free speech.  As

54

1  discussed above, the ordinance not only punishes commercial advertising or speech, but also
2  implicates anyone who merely "disseminate[s] in any way and through any medium" the use of a
3  time-share, which broadly prohibits *all* speech about the availability of time-share uses in the
4  City—including non-commercial and political speech.  For example, social communications
5  among friends, co-workers, family members or spouses merely relaying news, gossip, or
6  information about time-share uses or listings in the City may be stifled under this ordinance as on
7  its face the ordinance appears to apply to them.  Likewise, this ordinance implicates Tweets or
8  Facebook posts expressing an opinion about a known time-share use in the City.  These are just
9  some examples of the overbroad nature of the ordinance and chilling effect the ordinance will have
10  on free speech.  Such an unnecessarily overbroad prohibition on protected speech—which extends
11  to all speech, whether commercial or non-commercial, regarding time-share uses in St. Helena—
12  renders the ordinance unconstitutionally vague and void on its face.

13  203.   Chapter 17.138 is further vague, ambiguous and confusing as applied by Defendants
14  against Pacaso.  Chapter 17.138 has no "grandfather" clause or clause specifically addressing how
15  Existing Pacaso Homes that are either being currently marketed or have been sold (and are being
16  managed by Pacaso) are to be treated under the new ordinance.  Given the ongoing litigation with
17  Pacaso, in which it was never established whether Existing Pacaso Homes were subject to Section
18  17.112.130, there is an open dispute regarding whether Existing Pacaso Homes constitute a
19  "nonconforming use" that may "continue indefinitely" under the Municipal Code—which adds
20  further confusion about who or what is regulated and at what point such regulations take effect.

21  204.   This confusion is confirmed by other non-Pacaso residents of St. Helena.  In fact,
22  during the April 12, 2022 City Council Meeting where Chapter 17.138 was adopted, a St. Helena
23  resident who supported the ordinance's adoption stated her view that the New Ordinance would not
24  be applied against the existing Pacaso homes, but rather would be forward-looking.  Even though
25  she did not support Pacaso, she expressed solace in the fact that the City would not be
26  "criminalizing" or "running out of town" the homeowners already at the four existing Pacaso
27  homes.  *See* April 12, 2022, City Council Meeting at 1:11:27,
28  https://sthelena.civicweb.net/document/61947?splitscreen=true&media=true ("I do want to also

55

1    point out [that] you're not criminalizing people who have already bought into this model.  They did

2    not know that this was going to happen.  How could they?  And I don't think you're going to []

3    issue warrants and run them out of town. I mean, they're here.  My understanding is the idea [of the

4    New Ordinance] is to stop this from going further.").  The City, following this public testimony,

5    failed to correct or clarify this view.  *Id.*

6           205.    Because the ordinance is vague, ambiguous, confusing, and overbroad, both on its

7    face and as applied to Pacaso, coupled with the enormous penalties that ordinary, law-abiding

8    citizens face for violations of the ordinance, it should be stricken.

9    **XII.    Chapter 17.138 Exceeds The Scope Of Permissible Zoning Ordinances Under
             Government Code § 65850 And Violates Homeowners' Right Of Privacy And
10           Freedom Of Association, And Should Also Be Stricken On That Basis**

11          206.    Chapter 17.138, and Defendants' attempt to regulate Pacaso under Chapter 17.138,

12   exceed the scope of a municipality's zoning authority and police power under California

13   Government Code § 65850(a), and is outside the scope of its authority to regulate permissible

14   zoning subject matters.

15          207.    A local legislative body may only adopt ordinances that regulate "the ***use*** of

16   buildings, structures, and land as between industry, business, residences, open space, including

17   agriculture, recreation, enjoyment of scenic beauty, use of natural resources, and other purposes."

18   Cal. Gov't Code § 65850(a).

19          208.    The City has already acknowledged the limits on its power in this regard, and

20   conceded that zoning ordinances "must focus on the use of land":

21                  The most fundamental challenge to amending the Zoning Code to
                    regulate fractional or partial ownership in single-family residences is
22                  that by ***law zoning regulations must focus on the use of land.*** (See,
                    e.g., O'Loane v. O'Rourke, 231 Cal.App.2d 774, 780 (1965) [zoning
23                  is "the regulation of buildings and structures, according to their
                    construction, and the nature and extent of their use, and the nature
24                  and extent of the uses of land."].) State law enumerates the specific
                    types of permissible zoning regulations, ***which are likewise focused
25                  on "the use of buildings, structures, and land" and related physical
                    requirements, such as the location and size of signs, buildings and
26                  structures.*** (Gov. Code, § 65850.)

27   July 2020 Report at 3 (alteration in original) (emphasis added).

28

209.     The City's new Chapter 17.138 time-share ordinance regulates beyond the mere "use" of buildings, structures, or land, as permitted in Gov. Code 65850(a).  Chapter 17.138, and Defendants' application of this new ordinance against Pacaso and its homeowners, regulates the individuals and persons who can reside in a residential residence, and targets individuals "based on the identity of a tenant or where a particular resident permanently resides."  July 2020 Report at 325.

210.     The City itself acknowledged this very concern by stating that zoning regulations may only regulate the *types* of uses, and cannot target individuals or adopt regulations "based on the identity of a tenant or where a particular resident permanently resides," and described the "concern that *non-permanent City residents* are purchasing property in St. Helena as a second home(s)":

> While there may be a concern that non-permanent City residents are purchasing property in St. Helena as a second home(s) either for themselves or their guests, ***zoning regulations may not target individuals***. In other words, the City ***may not adopt a zoning regulation based on the identity of a tenant or where a particular resident permanently resides***. (See, e.g., Friends of Davis v. City of Davis, 83 Cal.App.4th 1004, 1013 (2000) ["a city does not have carte blanche to exclude a retail merchant that it, or some of its residents, do not like"].) City ordinances ***also may not regulate or define what constitutes a "family" for purposes of limiting the number of unrelated people who live together in a dwelling***. (City of Santa Barbara v. Adamson, 27 Cal.3d 123 (1980).)

July 2020 Report at 3 (emphasis added).

211.     Instead of focusing on the "use" of land as between residential and other purposes, Chapter 17.138, by its terms, and Defendants, in their application against Pacaso and its homeowners, regulates and targets individuals based on *who* the owners are and *how they use* their property.

212.     Defendants apparently try to get around this issue by stating in the City's March 2022 Report that the definitions in Chapter 17.138 "focus on the *manner* in which the accommodation is used, not how it is owned," and that "not all properties with multiple owners or owned by business entities (such as LLCs) would constitute a time-share use under these definitions."  March 22, 2022 Report at 10.  This is lip service that is factually untrue.  In fact, the

57

next paragraph actually confirms the relevance of the co-owners' relationship and those co-owners' arrangements as to when or how to use the property they co-own together:

> A property that is ***owned by a group of friends or extended family members***, whether through a separate business entity or otherwise, will not necessarily mandate that only one owner will be able to use the property at a time. The ***more formal arrangement*** found in time-share uses increases the intensity of use, in that ***each individual time-share owner cycles through the property, whereas families or friends are more likely to use the property together or in groups leading to less transition in the residential neighborhood***. The more formal relationship, use of professional property managers and rights to exclusive use found in time-share uses contributes to the commercial character of the property, with added traffic due to the more frequent turnover of visitors and more frequent cleaning and inspection between each user, which is common for a commercial vacation property, but not for a home owned by family or friends.

*Id.*

213.    In fact, in connection with the previous time-share ordinance, City Attorney Ueda confirmed that the City would ideally not want to prohibit *certain types of owners* based on family or friend relationships, noting that regulating "friends or family members" is not "the type of activity that the City would want to preclude":

> I do think the hardest part is really figuring out how to define the issue and the scope, right, because if we're getting at multiple ownership of one piece of property, it's really challenging to figure out a way to define that that doesn't preclude people who really do need to go buy a piece of property for financial reasons. . . . ***They may all be friends or family members, and I don't think that's the type of activity that the City would want to preclude***, and that's the challenge that we have in trying to figure out how to define this in a way that would work.

July 14, 2020, Meeting at 3:33-34.

214.    Likewise, as one City Council member acknowledged, the City is "not in the business of regulating families and how people come together to buy properties." *Id.* at 3:32.

215.    But Chapter 17.138 does exactly that, on its face enabling (and in fact requiring) the City to peer within co-owned homes into the relationships and manner of use of such co-owners. Chapter 17.138 regulates how people come together to own and use property, requiring the City to assess and make determinations about intimately private engagements and arrangements among friends, family members, co-workers, spouses, and separated or divorced spouses.  The ordinance

58

1  also invades, interferes with, and restricts individuals' ability to make intimate personal decisions

2  about their living arrangements, including who they want to co-own property with, how they want

3  to allocate the time spent within that home, and how they can use and share a home together.  This

4  is a violation of the privacy rights of homeowners, and not within the City's power or scope to

5  regulate.

6  216.    Likewise, Defendants attempt to distinguish between "property that is owned by a

7  group of friends or extended family members" versus "through a separate business entity or

8  otherwise," by stating that "each individual time-share owner cycles through the property, whereas

9  families or friends are more likely to use the property together or in groups leading to less

10  transition in the residential neighborhood."  March 22, 2022 Report at 10.  However, the City

11  Council already acknowledged that this is an improper, irrational basis for invoking a time-share

12  ordinance.  *See supra* ¶ 60-61.  Notably, the City Attorney acknowledged that "[i]f the issue is

13  primarily that there are different people coming in and out of the unit or house, then I'm not

14  entirely sure what can be done about that . . . . The direction that it's gone in, in terms of potential

15  regulation, is that *if there's a concern about impacts that are caused from having too many*

16  *people basically at a particular residence, [then] those impacts can be addressed by current*

17  *standards in place for noise and parking standards and that type of thing*."  July 14, 2020,

18  Meeting at 3:25-26.  This purported "reason" clearly targets individuals and "the identity of a

19  tenant or where a particular resident permanently resides"—which is strictly impermissible.  *See*

20  *supra* ¶¶ 59-61.

21  217.    A land use ordinance also exceeds municipal authority under the police power

22  where it has no substantial relation to the public health, safety, morals or general welfare.

23  Defendants' enforcement of the time-share ordinance against Pacaso is arbitrary and unreasonable,

24  and has no substantial relation to the public health, safety, morals, or general welfare, let alone any

25  of the other stated purposes underlying Chapter 17.138, as propounded against Pacaso.  *See supra*

26  ¶¶ 130-154; *see also* ¶¶ 186-191.

27  218.    In fact, the City itself stated to Pacaso in its May 22, 2020 letter that its property

28  "came to the City's attention because neighbors in the surrounding area are concerned about [the]

FIRST AMENDED COMPLAINT                                                CASE NO. 3:21-cv-02493-WHO

types of impacts" created by "loud parties, amplified sound, and increased traffic."  May 22, 2020

Letter.  However, the City previously admitted that "[i]f the City Council is concerned about the

potential neighborhood impacts timeshare uses may create"—listing "large parties" as an

example—"the City **has existing regulations in place to address such impacts**."  July 2020 Report

at 4 (emphasis added).  Specifically, "if the concern is that part-time owners may infrequently visit

the property and have large parties, the City's noise ordinance addresses noise and authorizes

abatement and issuance of an infraction."  *Id.*  "The City's Municipal Code also addresses

nuisances generally and has parking standards in place."  *Id.*

219.    In fact, a City Council member confirmed that the primary "concern" with fractional

co-ownership structures like Pacaso's stemmed from neighbors raising their gripe that "instead of

having one family living next door to you, you have maybe six" that are "alternat[ing]."  July 14,

2020, Meeting at 3:24.

220.    However, City Attorney Ueda in July 2020 herself conceded that this stated concern

was not a rational basis to apply a time-share ordinance against Pacaso:

> [I]f the issue is primarily that there are different people coming in
> and out of the unit or house, I'm not entirely sure what can be done
> about that, right, because different people could be at a house at any
> given time for whatever reason.  They could be guests, or they could
> be people who own the house and their siblings or whatever.  The
> direction that it's gone in in terms of potential regulation is that if
> there's a concern about impacts that are caused from having too
> many people basically at a particular residence and those impacts can
> be addressed by current standards in place for noise and parking
> standards and that type of thing.  So I think it's one thing to talk
> about people versus the potential impacts that could result, and if
> there are specific impacts, we can look at what we have in place or if
> there are additional changes that could be made to perhaps is the
> nuisance abatement procedures and the nuisance, what we define as a
> nuisance, for sort of having a more quiet neighborhood.

July 14, 2020, Meeting at 3:25-26.

221.    Given the many other existing regulations and policies in place to address the

supposed "concerns" the City had with Pacaso's properties and that supposedly underly the

purpose and intent of Chapter 17.138, Defendants' attempt to apply this newly enacted time-share

FIRST AMENDED COMPLAINT                                                   CASE NO. 3:21-cv-02493-WHO

ordinance against Pacaso is unreasonable, unwarranted, and an invalid land use ordinance under

California Government Code § 65850(a).

222.    Further, given the City's regulation of the manner of use of co-owners based on

relationships, intimate and private engagements and arrangements among friends, family members,

co-workers, spouses, and separated or divorced spouses, coupled with the draconian fines and

criminal penalties that a violation of the time-share ordinance carries, Chapter 17.138 exceeds the

scope of the City's zoning authority and police power under California Government Code

§ 65850(a), and is an invasion of homeowner's privacy rights.

**XIII.    Defendants' Enforcement Agenda**
**Against Pacaso Is The Latest Chapter In The City's Long History Of Exclusion**

223.    The City's arbitrary, selective, and pretextual enforcement of its invalid time-share

ban against Pacaso—whose mission is to enrich the lives of diverse individuals by democratizing

the ownership of second homes—and subsequent passage of its new time-share ordinance that is

specifically targeted at banning Pacaso and its homeowners from the City, is the latest chapter in a

long history of the City of St. Helena erecting barriers to home ownership for people of diverse and

less affluent backgrounds.

224.    Several Pacaso homeowners testified that they could not afford to outright buy and

own a second home in St. Helena, and that the only way they could afford a second home was

through the Pacaso model.  *See* April 12, 2022 Meeting,

https://sthelena.civicweb.net/document/61947?splitscreen=true&media=true.

225.    Notably, in St. Helena, second home ownership is typically accessible only to elite

and predominantly white buyers.  This is no "accident."  The City has enshrined anti-growth

principles into law, residents have filed lawsuits against affordable housing projects, and unelected

neighborhood vigilantes have made it difficult for diverse individuals to move into the City.

226.    For example, in 1993, the City of St. Helena adopted a long-term policy document

that acts as a guide for future land use decisions called "The General Plan."  *See* City of St. Helena,

*General Plan Update* 4 (Apr. 2, 2018),

https://www.cityofsthelena.org/sites/default/files/fileattachments/planning_resources/page/6501/st_

FIRST AMENDED COMPLAINT                                        CASE NO. 3:21-cv-02493-WHO

1  helena_general_pan_nop_033018.pdf.  The "primary goal of this General Plan is to preserve the

2  rural, small town quality and agricultural character of St. Helena."  City of St. Helena, *General*

3  *Plan Introduction* 1-1 (1993),

4  https://www.cityofsthelena.org/sites/default/files/fileattachments/planning/page/881/e_1_intro_1.p

5  df.  The plan explicitly called for "growth management."  *Id.* at 1-3.

6      227.  Over the years, as the plan was updated, the City made it more and more difficult

7  for affordable housing to be built on City property under the guise of managing growth.  The latest

8  plan, titled "the 2040 General Plan," was approved in 2019 by the St. Helena Housing Commission

9  after nearly a decade of entanglements over environmental concerns, among other issues.  *See* Uzo

10  Ehi, *Legal Settlement Enables St. Helena to Embrace Density in General Plan*, Cal. Planning &

11  Dev. Rep. (June 3, 2019), https://www.cp-dr.com/articles/20190603_1.

12      228.  Underpinning all the debates, however, is a general reluctance for progress and

13  innovation in the City of St. Helena.  Members of the City Council communicated to Pacaso

14  representatives that they do not want things to change from how they have always been.  In fact,

15  St. Helena City Council Member and former Planning Commission Chair, Lester Hardy, stated that

16  "the rise of anti-growth 'hopes' in St. Helena is not a recent development."  *Id.*  In fact, he went on

17  to state that "[c]omparing the 2040 General Plan Update with the 1993 General Plan . . . I would

18  say that anti-growth sentiment has as much influence today as it did then."  *Id.* (alteration in

19  original).  He further went on to say that the efforts to limit "population growth ha[ve] been a

20  priority for many residents and voters in St. Helena for the last 30 years or more; this sentiment is

21  always a factor in the city's land use policy decisions, of varying significance depending on the

22  particulars."  *Id.*  This reality is in tension with St. Helena's stated legislative purpose behind the

23  time-share ordinance, which purports to preserve "affordable housing in the city for long-term

24  occupancies."  Section 17.112.130(A)(1).

25      229.  Discussions during City Council meetings regarding the previous time-share

26  ordinance and the newly enacted ordinance confirm this exclusionary sentiment among City

27  Council members and residents alike.

28

FIRST AMENDED COMPLAINT        CASE NO. 3:21-cv-02493-WHO

230.     These exclusionary sentiments are felt by Pacaso homeowners and everyone in the community.  One Pacaso homeowner—a first generation American, from Latin American decent, who came to the United States thirty years ago—testified before the City Council regarding the new ordinance and asked: "Why would my daughter not be able to enjoy St. Helena, a right afforded to many other children no different from her.  How is she and my family different from other families in the area that are able to co-own property?  What will happen to other families like mine that co-own properties in St. Helena but do not use the Pacaso service.  How will this ordinance be enforced?"  April 12, 2022 Meeting, at 1:07.  Another Pacaso homeowner, who is originally from the Philippines and has lived in the United States for over thirty-five years, testified about a time she was harassed in St. Helena as a Pacaso homeowner, explaining that "now everybody is still scared" and she is "afraid to walk by houses" with Anti-Pacaso signage.  *See id.* at 1:01. The Anti-Pacaso signage littering lawns and homes in St. Helena are evidence of this xenophobic and exclusionary sentiment among City Council members and residents alike.  *See supra* ¶¶ 223-30.

## **CLAIM 1**

### **DECLARATORY RELIEF: EXEMPTION FROM CHAPTER 17.138 UNDER SECTIONS 17.140.010 AND 17.140.020, CALIFORNIA CONSTITUTION, AND COMMON LAW**

### **(AGAINST THE CITY)**

231.     Plaintiffs adopt and reassert the allegations contained in Paragraphs 1-230 as if fully set forth herein.

232.     Zoning ordinances have been held invalid and unreasonable as applied to particular property where the zoning ordinance attempts to exclude and prohibit existing and established uses that are not nuisances.

233.     There is an actual controversy now existing between Plaintiffs and the City concerning the application of Chapter 17.138 against Pacaso and the Existing Pacaso Homeowners concerning Plaintiffs' exemption from the application of Chapter 17.138 under Sections 17.140.010 and 17.140.020 of the Municipal Code.

234.     Pacaso and Pacaso homeowners purchased the Pacaso homes in reliance on the City's representations in the July 2020 Report, which permitted their use in the home and set their expectations for its continued legality.  *See e.g.*, April 12, 2022, City Council Meeting, at 44:50, https://sthelena.civicweb.net/document/61947?splitscreen=true&media=true (Pacaso homeowner testifying that "when purchasing [their] Pacaso home, [they] relied on the official guidance of [the City's] former City Attorney," who "advised [the City] that as to housing, the City's role is limited to regulating conduct, not categories of ownership").

235.     Before Chapter 17.138 was proposed, adopted or enacted, Pacaso and PAC 6 CA 2021 LLC had filed the current action and brought a claim for declaratory relief and a permanent injunction barring enforcement of Section 17.112.130 against Pacaso on the basis that Section 17.112.130 did not apply to Pacaso, and thus the City could not lawfully enforce this section against Pacaso.  However, during the pendency of this action and before this claim regarding the applicability of Section 17.112.130 to Pacaso could be resolved on the merits, the City adopted a new time-share ordinance, codified at Chapter 17.138, and deleted Section 17.112.130 from the St. Helena Municipal Code.

236.     Following the enactment of Chapter 17.138, Pacaso wrote to the City on April 13, 2022, seeking confirmation that the City and its employees would not apply Chapter 17.138 to the Existing Pacaso Homes, and that neither Pacaso nor the homeowners at such Existing Pacaso Homes would be subject to any violations or penalties (including fines and/or imprisonment) under the new ordinance in connection with the Existing Pacaso Homes, pending review by the Court as to its validity.  *See supra* ¶¶ 165-74.

237.     However, the City refused to confirm this, and instead provided its conclusion that the Existing Pacaso Homes are not exempt from Chapter 17.138 under Sections 17.140.010 and 17.140.020 of the Municipal Code.  *See id*.  On April 21, 2022, the City provided that it disagrees with Pacaso's position that Pacaso homeowners "who purchased and used their interests prior to the passage of [Chapter 17.138] are allowed to continue to use their interests in violation of [the ordinance]" because "[a] requirement for a nonconforming use is that the prior use was *lawful*" and

1   "[t]he City maintains that [homeowners'] prior use was unlawful under the previous ordinance."

2   April 21, 2022 Letter at 1 n.1.

3       238.    The City has therefore definitively concluded that Chapter 17.138 is enforceable

4   against Pacaso and the Pacaso homeowners at the Existing Pacaso Homes, and has indicated its

5   ability and intention to enforce the ordinance against Pacaso and the Pacaso homeowners at such

6   Existing Pacaso Homes following the pending litigation.

7       239.    Section 17.140.010 states: "Legally established existing uses, structures, lots and

8   signs which do not conform to the regulations of the zoning district in which they are located are

9   nonconforming.  Nonconforming uses, structures, lots and signs shall be subject to these specific

10  regulations in addition to general regulations contained in the zoning ordinance in order to permit

11  the continued operation of such uses, structures, lots and signs while providing for their gradual

12  elimination and/or compliance with the policies of the general plan and zoning ordinance."

13      240.    Section 17.140.020, which governs "nonconforming uses," provides: "A

14  nonconforming use is a legally established use of land which is not permitted in the zoning district

15  in which it is located, or a use which is permitted by use permit but for which no use permit has

16  been obtained, because the use was established prior to the application of the existing district due

17  to rezoning, annexation or change in the regulations of the zoning ordinance."

18      241.    Section 17.140.020(A) further provides that "[n]onconforming uses may be

19  continued indefinitely, subject to the provisions of this chapter."

20      242.    The "use" of the Existing Pacaso Homes is a "nonconforming use" that was

21  indisputably "established prior to the . . . change in the regulations of the zoning ordinance" (i.e.,

22  prior to the enactment of Chapter 17.138), and thus may be "continued indefinitely."

23      243.    Before Chapter 17.138 was enacted, Plaintiffs owned and/or managed four homes

24  located in St. Helena with the following addresses: (1) 1242 Madrona Ave., St. Helena, CA 94574;

25  (2) 1629 Hillview Pl., St. Helena, CA 94574; (3) 1005 Valley View, St. Helena, CA 94574; and (4)

26  1509 Riesling Way, St. Helena, CA 94574 (again, the "Existing Pacaso Homes").  Prior to the

27  enactment of Chapter 17.138, Pacaso created a property-specific LLC for each home, which owned

28  deeded title to the real property. Pacaso then organized and vetted co-owners, who purchased

65

    

1    partial interests in the property-specific LLC and co-owned the home prior to the enactment of

2    Chapter 17.138, and continue to own the home and use the home following the enactment of

3    Chapter 17.138.

4           244.    Prior to the enactment of Chapter 17.138, Pacaso homeowners owned and used their

5    Existing Pacaso Home, including residing at the home, suggesting improvements to the home,

6    enjoying the benefits of the home and broader St. Helena community, and lobbying for their

7    property rights in their Pacaso home at St. Helena City Council meetings, and have continued this

8    ownership and use of their home since the enactment of Chapter 17.138.  There has never been an

9    abandonment or interruption of the Pacaso homeowners' use of the Existing Pacaso Homes.

10          245.    The Existing Pacaso Homes also constitute a "legally established existing use"

11   under the Municipal Code.  The Existing Pacaso Homes existed as a lawful use prior to the

12   enactment of Chapter 17.138 because now-deleted Section 17.112.130 was never applicable to

13   Plaintiffs or the Existing Pacaso Homes.

14          246.    As described above in Paragraphs 50 through 92, now-deleted Section 17.112.130

15   did not apply to co-ownership of real property like the Existing Pacaso Homes.  Section 17.112.130

16   prohibited "[t]he creation of a time-share project as a means of ownership."  A "time-sharing

17   project" is defined as "any real property that is subject to a time-share program."  Section

18   17.112.130(B).  A "time-share program" was defined to mean "any arrangement for time-share

19   intervals [which is later defined as either a time-share estate or a time-share use] in a time-sharing

20   project whereby the use, occupancy or possession of real property has been made subject to either a

21   time-share estate or time-share use whereby such use, occupancy or possession circulates among

22   purchasers of the time-share intervals."  *Id*.  A "time-share estate" was defined as ownership in a

23   "property devoted to a time-share fee" and "time-share use" means "any contractual right of

24   exclusive occupancy."  *Id*.

25          247.    Pacaso's small co-ownership model is starkly different from any "time-share"

26   project purportedly covered by Section 17.112.130, and thus never applied to Pacaso.  *See supra*

27   ¶¶ 78-92.  Pacaso homeowners do not merely own the "right of exclusive occupancy," or a "use,

28   occupancy or possession" right that "circulates among purchasers . . . according to a fixed or

                                                 66

floating time schedule on a periodic basis for a specific period of time during any given year."
Section 17.112.130(B) (definition of "Time-Share program").  Rather, Pacaso homeowners own a
real property asset in a single-family home that includes real property interests, and rights and
obligations shared among co-owners.

248.    Section 17.112.130 prohibited "[t]he creation of a time-share project as a means of
ownership."  Pacaso creates a property-specific LLC for each home, which owns deeded title to the
property.  The LLC which holds the Pacaso property does not constitute "[t]he creation of a time-
share project as a means of ownership."  Rather, it serves as a structure for homeowners to co-own
a home and facilitates a collaborative ownership experience with diverse individuals of their
choosing.

249.    Further, the legislative intent of the Section 17.112.130 further confirms that it did
not apply to Pacaso.  The City's prior attempts to enforce Section 17.112.130 are wholly
inconsistent with its stated "Findings And Purpose."  Targeting Pacaso does nothing to ensure
homes are available for long-term occupancies.  The City lacks all visibility and control into how
much time homeowners intend to spend in their homes.  Preventing Pacaso from buying properties
has no bearing on the likelihood that other prospective buyers are either buying such homes as a
second home, or anticipating the ability to use it for short-term rentals, among other non "long-
term occupancy" uses.  Nor is there a rational relation between the City's stated purpose of banning
"commercial or quasi-commercial like use" in residential areas, as results from "commercial hotels,
motels and other transient occupancy uses" and any enforcement measures taken against Pacaso.
Pacaso is a purely residential co-homeownership structure that lacks any resemblance to such
"commercial or quasi-commercial like use."

250.    Further, there was no reference in Section 17.112.130 or its definitions to fractional
or partial co-ownership structures like Pacaso's.  The City, City Council, City Attorney and
DeRosa confirmed this interpretation of Section 17.112.130 in the City's July 2020 Report, finding
that the ordinance regulates commercial use only and that "a timeshare use differs from a fractional
or partial ownership of a property."  July 2020 Report at 1.  Not only that, the City conceded that
any attempted regulation of this type of ownership would run afoul of a basic premise of the limits

67

1   on zoning authority: "[B]y law zoning regulations must focus on the *use* of the land."  *Id.* at 3

2   (emphasis added).  The July 2020 Report acknowledged that this "fundamental challenge" could

3   not be cured by amendment to Section 17.112.130, because "zoning based solely on ownership, as

4   opposed to the use of the land, is impermissible."  *Id.* at 3-4.

5          251.    In addition, any attempts to apply Section 17.112.130 against Pacaso would have

6   been a violation of the due process guarantees of the Fourteenth Amendment to the United States

7   Constitution and California Constitution because if the City's interpretation of Section 17.112.130

8   as covering Pacaso was accepted, it would have been based on terms that were unconstitutionally

9   vague and ambiguous.  Section 17.112.130 failed to provide Pacaso and its homeowners a

10   reasonable opportunity to know what conduct was prohibited under the ordinance, or any guidance

11   as to how to determine whether the activities fall within the prohibited conduct.

12          252.    In particular, the City exploited definitions in Section 17.112.130 that were

13   unclearly circuitous and incomplete, in its attempt to claim that Pacaso was a "timeshare project"

14   within its meaning.  For example, under Section 17.112. 130, a "[t]ime-sharing project" was

15   defined as "any real property that is subject to a time-share program."  Section 17.112.130(B).  In

16   turn, "[t]ime-share program" was defined to mean "any arrangement for time-share intervals in a

17   time-sharing project whereby the use, occupancy or possession of real property has been made

18   subject to either a time-share estate or time-share use whereby such use, occupancy or possession

19   circulates among purchasers of the time-share intervals."  *Id*.  The Code then defined "[t]ime-share

20   interval" as "*a* time-share estate or a time-share use."  *Id*. (emphasis added).  The Code then

21   circuitously defined "[t]ime-share use" as "any contractual right of exclusive occupancy which

22   does not fall within the definition of a time-share estate, including, without limitation, a vacation

23   license, prepaid hotel reservation, club membership, limited partnership or vacation bond," and

24   defined "time-share estate" as ownership in a "property devoted to a time-share fee . . . or a time-

25   share lease" (without further defining either of those terms).  *Id*.  Further, the prohibited conduct

26   under Section 17.112.130 was "[t]he creation of a time-share project as a means of ownership."

27   Neither "creation" nor "means of ownership" were defined in the ordinance.  And "means of

28   ownership" did not specify the type of ownership interest held.  This in turn conflicted with the

FIRST AMENDED COMPLAINT                                    CASE NO. 3:21-cv-02493-WHO

1   definition of "[t]ime-share program," which focused on "any ***arrangement*** for time-share

2   intervals," and "[t]ime-share use" which focused on a "contractual right of exclusive occupancy,"

3   both of which differed from "ownership" in the abstract.  Section 17.112.130(B) (emphasis added).

4   The City even admitted that under Section 17.112.130, it was difficult to determine whether

5   conduct was prohibited, stating that it "has a fairly circuitous definition to determine if a project is

6   a prohibited timeshare or not."  *See* July 2020 Report at 2.

7         253.     Further, there was no reference in Section 17.112.130 or its definitions to fractional

8   or partial co-ownership structures like Pacaso's, and thus it could not reasonably be applied against

9   Pacaso.  The City, City Council, City Attorney and DeRosa confirmed this interpretation of Section

10   17.112.130 in the July 2020 Report, finding that the time-share ordinance only regulates

11   commercial use and that time-shares are distinct from fractional or partial ownership structures.

12   The City's abandonment of its previous position in the July 2020 Report, and subsequent

13   interpretation of the ordinance to apply to Pacaso, a fractional co-ownership structure, highlights

14   the City's inconsistent interpretation and shows how the City's application of the ordinance over

15   the course of time failed to give Pacaso fair notice that the time-share ordinance regulates partial or

16   fractional ownership structures.  This also further highlights the City's arbitrary, capricious and

17   unjustified standard of interpretation and enforcement of the ordinance.

18         254.     Further, the City's pattern of selective and arbitrary enforcement of Section

19   17.112.130 against Pacaso was further violative of Pacaso's constitutional rights because Pacaso

20   was treated differently from entities or persons similarly situated, and thus impermissible.  The

21   City deliberately singled out Pacaso, attempting to enforce Section 17.112.130 against Pacaso, but

22   not against those entities or individuals who are similarly situated or functionally the same as

23   Pacaso.

24         255.     The City's unequal treatment of Pacaso (i.e., its enforcement of Section 17.112.130

25   against Pacaso, where other co-owned residences, through LLCs, tenancy in common, or

26   otherwise, have not faced similar challenges) was intentional, deliberate, and based on invidious

27   criteria—namely, that Pacaso serves diverse individuals who, in the eyes of Defendants, are non-

28   resident transients—and was also not rationally related to a legitimate governmental purpose.  *See*

69

FIRST AMENDED COMPLAINT                                     CASE NO. 3:21-cv-02493-WHO

*supra* ¶¶ 78-92; *see also* ¶¶ 223-30. The City's stated reasons for enforcement of Section

17.112.130 against Pacaso could not pass muster.  The City stated to Pacaso in the May 22, 2020

letter that its property "came to the City's attention because neighbors in the surrounding area are

concerned about [the] types of impacts" created by "loud parties, amplified sound, and increased

traffic."  However, the City itself conceded that such stated reasons for enforcement were

pretextual.  For example, the City admitted that "[i]f the City Council is concerned about the

potential neighborhood impacts timeshare uses may create" —listing "large parties" as an

example—"the City *has existing regulations in place to address such impacts*."  July 2020 Report

at 4 (emphasis added).  The City stated, "[I]f the concern is that part-time owners may infrequently

visit the property and have large parties, the City's noise ordinance addresses noise and authorizes

abatement and issuance of an infraction."  *Id.*  "The City's Municipal Code also addresses

nuisances generally and has parking standards in place."  *Id.*  Given the many other existing

regulations in place to address the supposed "concerns" the City has stated with regard to Pacaso,

the City's enforcement agenda against Pacaso is suspect and appears to be nothing but a pretext to

deny homeownership to new diverse residents.  Further, Pacaso co-owners agree to several

additional restrictions that ensure their use promotes the City's stated goals.  *See supra* ¶ 86.  And

discussions regarding the July 2020 Report confirmed that Defendants were unable to state one

purpose, goal or non-suspect "basis" to justify application of the time-share ordinance against

Pacaso, and that the primary "concern" identified (i.e., "different people coming in and out of the

unit or house") is not a permissible (let alone rational) basis for enforcing the time-share ordinance

against Pacaso.  *See supra* ¶¶ 59-62, 90.

256.    The City's enforcement efforts against Pacaso under Section 17.112.130 were but a

pretext for its improper motive and discriminatory design of exclusion and actions designed to

stifle diversity and housing opportunities for underrepresented communities.  The City itself

conceded that one of the "significant practical challenges to implementing and enforcing the

existing timeshare regulations" is that "[a]bsent a proposed new development to specifically

construct a timeshare project, the City does not know when a residence becomes a timeshare, since

the ownership change is a private transaction between private parties."  July 2020 Report at 3.  The

FIRST AMENDED COMPLAINT                                    CASE NO. 3:21-cv-02493-WHO

1   City conceded that it "does not have an easily available means to scrutinize such agreements or

2   monitor the terms of particular ownership arrangements." *Id*.  The City's selective enforcement of

3   Section 17.112.130 against Pacaso highlights the very concerns that the City itself recognized.

4          257.   Lastly, Section 17.112.130 was further inapplicable against Pacaso for the separate

5   and independent reason that it represented an invalid use of legislative authority, and exceeded the

6   scope of a municipality's zoning authority and police power under California Government Code

7   § 65850(a).  The City's attempts to apply Section 17.112.130 against Pacaso regulated beyond the

8   mere "use" of buildings, structures, or land, as permitted in California Government Code

9   § 65850(a), and instead targeted and regulated individuals "based on the identity of a tenant or

10  where a particular resident permanently resides." July 2020 Report at 3. The plain language of

11  Section 17.112.130 regulated the "means of ownership" in its prohibition of the "creation of a

12  time-share project as a means of ownership."  Instead of focusing on the "use" of land as between

13  residential and other purposes, Section 17.112.130 focused on *who* the owners are rather than the

14  use of land as between residential and other purposes, which was improper.  Further, Section

15  17.112.130 was arbitrary and unreasonable, having no substantial relation to the public health,

16  safety, morals, or general welfare. *See supra* ¶¶ 78-92.

17         258.   The City's stated reasons for Section 17.112.130 and its enforcement against Pacaso

18  have no rational basis or substantial relation to its legislative purpose and findings. *See id.*  Given

19  the many other existing regulations and policies in place to address the supposed "concerns" the

20  City had with Pacaso's properties and that supposedly underly the purpose and intent of Section

21  17.112.130, the City's prior attempts to apply this section against Pacaso was unreasonable,

22  unwarranted, and an invalid land use ordinance under California Government Code § 65850(a).

23         259.   Recognizing that Section 17.112.130 did not apply to Pacaso and that the City could

24  not regulate Pacaso under this time-share ordinance, the City amended the City's Municipal Code

25  to enact Chapter 17.138 in an attempt fix its previously inapplicable time-share ordinance,

26  confirming that Section 17.112.130 could not be relied on by the City to regulate Pacaso.

27         260.   Because Section 17.112.130 never applied to Pacaso and the City could not legally

28  enforce this section against Pacaso, the Existing Pacaso Homes and the Pacaso homeowners at

FIRST AMENDED COMPLAINT                                    CASE NO. 3:21-cv-02493-WHO

1   such Existing Pacaso Home are exempt from the application of Chapter 17.138 under Sections

2   17.140.010 and 17.140.020 of the Municipal Code as a "non-conforming use" that may be

3   "continued indefinitely."

4        261.    Under common law, a zoning ordinance which requires the discontinuance of a

5   nonconforming use existing when the ordinance was adopted is a deprivation of property without

6   due process of law unless the use is a public nuisance.

7        262.    Likewise, the California Constitution prohibits the government from taking private

8   property for the public use unless just compensation is paid.  California courts have interpreted

9   Article I, Section 19 to require that, when a government entity eliminates an otherwise lawful

10  nonconforming use, it may only do so by providing just compensation or a reasonable amortization

11  period.

12       263.    Pacaso and the homeowners of the Existing Pacaso Homes have a vested property

13  right in the use of their property of which they cannot not be constitutionally deprived without due

14  process of law.

15       264.    The ordinance purports to take from Pacaso and the homeowners who co-own the

16  Existing Pacaso Homes a valuable property right inherent in the ownership of such property.  *See*

17  *supra* ¶¶ 72-73.

18       265.    The Existing Homes and homeowners who resided in such homes have, at all times,

19  been (and continue to be) lawful and in compliance with property and nuisance principles.  The

20  Existing Pacaso Homes and the homeowners' use of such homes have never impaired the public

21  health, safety, morals or general welfare, and have never constituted a public nuisance. Pacaso

22  homes have, at all times, been (and continue to be) subject to all of the same noise and nuisance

23  ordinances that apply to other single-family residences in St. Helena, and have never been found to

24  be a nuisance.

25       266.    Plaintiffs seeks declaratory judgment and a permanent injunction barring

26  enforcement of Chapter 17.138 against the Existing Pacaso Homes and the Pacaso homeowners at

27  such Existing Pacaso Home as those homes and homeowners were acting lawfully prior to Chapter

28

17.138 went into effect and the Existing Pacaso Homes, and nothing about the continuing use of the Existing Pacaso Homes, would constitute a nuisance or ever did constitute a nuisance.

## CLAIM 2

## DECLARATORY RELIEF: INAPPLICABILITY OF CHAPTER 17.138
## (AGAINST THE CITY)

267. Plaintiffs adopt and reassert the allegations contained in Paragraphs 1-266 as if fully set forth herein.

268. There is an actual controversy now existing between Plaintiffs and the City concerning the application of Chapter 17.138 against Pacaso and Pacaso homeowners, including the Pacaso Homeowners that own Existing Pacaso Homes.

269. The City has definitively concluded that Chapter 17.138 is applicable to Pacaso and Pacaso homeowners, and has stated in its April 21, 2022 letter its intent to enforce the ordinance against Pacaso and Pacaso homeowners at the Existing Pacaso Homes following the pending litigation, and its intent to enforce the ordinance against new Pacaso homeowners and Pacaso "if [Pacaso] continues to market and sell time share interests in violation of [Chapter 17.138]." *See* April 21, 2022 Letter.

270. Further, Chapter 17.138 was proposed and enacted for the sole purpose of regulating Pacaso. The March 2022 Report, which proposed the adoption of Chapter 17.138, stated the City's "conclusion that the homes that have been marketed by Pacaso constitute time share projects" and "that the Time Share Ordinance, both in its ***original form*** and ***as proposed*** to be amended, is intended to protect against the impacts that these [Pacaso] homes and similar uses could have on the City's housing supply and the character of the City's residential districts." *See* March 2022 Report at 2 (emphasis added). Further, the March 2022 Report singled out Pacaso, mentioning Pacaso by name sixty-five times, focusing on the City's conclusion that the homes that have been marketed by Pacaso constitute time-shares, complaints made about Pacaso, and the reasons why Pacaso should be regulated. Indeed, the recitals of Chapter 17.138 even reference Pacaso. *See* March 2022 Report at 19. The City's April 21, 2022 Letter further confirms its conclusion that Pacaso and the Pacaso homeowners are subject to Chapter 17.138. *See supra* ¶ 169.

FIRST AMENDED COMPLAINT                                      CASE NO. 3:21-cv-02493-WHO

271.     However, Chapter 17.138 does not apply to Pacaso and its homeowners.  Chapter 17.138 prohibits "[t]ime-share use, and/or advertisement for time-share use, of an accommodation in violation of this chapter."  Section 17.138.060(B).  A "time share use" is defined as "the use of one or more accommodations or any part thereof, as a time-share property pursuant to a time-share plan." Section 17.138.020.  A "time-share property" is defined as "one or more accommodations subject to the same time-share plan, together with any other property or rights to property appurtenant to those accommodations."  *Id.*  And "time-share plan" is defined as "any arrangement, plan, scheme, or similar device, whether by membership agreement, bylaws, shareholder agreement, partnership agreement, sale, lease, deed, license, right to use agreement, or by any other means, whereby a purchaser, in exchange for consideration, receives the right to exclusive use of an accommodation or accommodations, whether through the granting of ownership rights, possessory rights or otherwise, for a period of time less than a full year during any given year, on a recurring basis for more than one year, but not necessarily for consecutive years."  *Id.*

272.     However, a Pacaso homeowner and their use of their Pacaso home does not fall within any of these definitions.  Under the relevant agreements governing Pacaso homeowners, a Pacaso homeowner does not have "the right to exclusive use of [a Pacaso home], whether through the granting of ownership rights, possessory rights or otherwise, for a period of time less than a full year during any given year, on a recurring basis for more than one year, but not necessarily for consecutive years"—as set out in the ordinance.  Accordingly, a Pacaso home does not "mandate that only one owner will be able to use the property at a time"—which is how the City is interpreting the scope and breadth of its ordinance.  March 2022 Report at 10.  Indeed, Pacaso homeowners' ability to spend time in their home is fluid, flexible and uncapped.

273.     Further, Pacaso's small co-ownership model is starkly different from any "time-share use" or "plan" purportedly covered by Chapter 17.138, and thus does not apply to Pacaso.  *See supra* ¶¶ 123-154; *see also* ¶¶ 56-92.  Putting aside that Pacaso homeowners are not granted the "right of exclusive use" or the "right to exclusively occupy" a property under their agreements with Pacaso, Pacaso homeowners are actually true owners with complete control of their home and

1    expansive rights, who own a real property asset in a single-family home that includes real property

2    interests, and rights and obligations shared among co-owners.

3        274.    Indeed, Pacaso homeowners have inherent and inalienable rights inherent to owning

4    property, which include the right to possession, to control, to use and quiet enjoyment, to privacy

5    and to exclude others, to sell the property, to physically be on the property, to leave the property, to

6    choose who else can be on the property, to build or alter the property, to make improvements or

7    refurbish the property, and to sell or dispose of the property, among many other rights. *See supra*

8    ¶¶ 72-73.  For example, Pacaso homeowners store their personal possessions on the property year

9    round, are heavily involved in all levels of management and decision-making regarding the

10   property, and vote on matters such as selecting and replacing the program manager, renovations on

11   the home or other changes to the interior or exterior design, and various other fundamental

12   homeownership matters.  Pacaso homeowners can also sell the home outright, and choose to not

13   work with Pacaso if they wish.  Ultimately, Pacaso homeowners have complete control. These real

14   property interests, rights and obligations of possession, control, exclusion, and disposition are

15   distinct from and different than the "right to exclusive use" of a home as set out in the ordinance.

16       275.    Further, the legislative intent enumerated within Chapter 17.138 further confirms

17   that it does not apply to Pacaso.  The application of Chapter 17.138 against Pacaso is wholly

18   inconsistent with its stated "Purpose and Findings." *See* Section 17.138.010.  Targeting Pacaso

19   does nothing to ensure homes are available for "long-term" occupancies.  Section 17.138.010(A).

20   The City lacks all visibility and control into how much time homeowners intend to spend in their

21   homes.  Preventing Pacaso from buying properties has no bearing on the likelihood that other

22   prospective buyers are either buying the home as a second home, or anticipating the ability to use it

23   for short-term rentals, among other non "long-term occupancy" uses.

24       276.    Prohibiting Pacaso also does nothing to increase the "limited supply of suitable

25   vacant land" or "exacerbate[] an already severe housing shortage" in St. Helena.  Sections

26   17.138.010(B) and 17.138.010(F).  Rather, Pacaso helps relieve competition for more affordable

27   homes by giving second home buyers a better option.  Instead of competing for a whole home

28   valued at $525,000, for example, Pacaso offers up to eight second home buyers an option to be co-

75

1    owners of a $4-5 million property for the same price.  Just one Pacaso home can remove up to eight

2    buyers from local competition.

3        277.    Nor does prohibiting Pacaso help "[m]aintain[]" the alleged "balance between the

4    quality of life for residents and those who work in the City and the visitors who help sustain the

5    City's tourist economy."  Section 17.138.010(C)-(D).  Pacaso homeowners use their homes just

6    like their neighbors.  Just like their neighbors, Pacaso homeowners make large financial

7    investments in their homes and bring an owner mentality, not a vacation or "tourist" mentality, to

8    their use of the property.  Further, second homes are notorious for sitting empty much of the year.

9    In contrast, Pacaso-managed homes are fully utilized, which means that Pacaso homeowners

10   engage in their community and support local businesses year-round.

11       278.    Nor does regulating Pacaso advance the City's stated purpose of banning "tourist-

12   oriented," "commercial" use or "short-term, tourist oriented use" in residential areas, which

13   allegedly "create increased traffic generation, excessive noise, [and] disruption."  Section

14   17.138.010(E)-(F).  Pacaso is a purely residential co-homeownership structure that lacks any

15   resemblance to such "commercial," "tourist-oriented" or "short-term" uses.  Short-term rentals are

16   strictly prohibited in Pacaso homes, and all owners agree to Pacaso's policies, which prohibit large

17   events or parties.  Further, Pacaso homes are subject to all of the same noise and nuisance

18   ordinances that apply to other single-family residences in St. Helena, and Pacaso homeowners

19   adhere to a 9:00 p.m. to 7:00 a.m. quiet hour policy.  The City has already acknowledged that "[i]f

20   the City Council is concerned about the potential neighborhood impacts timeshare uses may create,

21   the City has existing regulations in place to address such impacts."  July 2020 Report at 4.  The

22   City noted: "For example, if the concern is that part-time owners may infrequently visit the

23   property and have large parties, the City's noise ordinance addresses noise and authorizes

24   abatement and issuance of an infraction.  The City's Municipal Code also addresses nuisances

25   generally and has parking standards in place."  *Id.*

26       279.    Because Chapter 17.138 does not apply to Pacaso, the City cannot enforce this

27   chapter against Pacaso.  Pacaso seeks declaratory judgment and a permanent injunction barring

28   enforcement of Chapter 17.138 against Pacaso or homeowners using Pacaso homes.

76

FIRST AMENDED COMPLAINT                                    CASE NO. 3:21-cv-02493-WHO

**CLAIM 3**

**SELECTIVE AND DISCRIMINATORY ENFORCEMENT**

**(AGAINST ALL DEFENDANTS)**

280.     Plaintiffs adopt and reassert the allegations contained in Paragraphs 1-279 as if fully set forth herein.

281.     Defendants intentionally and arbitrarily discriminated against Plaintiffs in violation of the Fourteenth Amendment to the United States Constitution and Article I, Section 7, of the California Constitution.

282.     Pacaso was and is treated differently from entities or persons similarly situated. Defendants, acting under the color of law, deliberately and intentionally singled out Pacaso.  First, attempting to enforce Section 17.112.130 against Pacaso, but not against those entities or individuals who are similarly situated or functionally the same as Pacaso.  And then, recognizing that Section 17.112.130 was not a viable way to regulate Pacaso, Defendants, acting under the color of law, amended the City's Municipal Code to enact Chapter 17.138, which deliberately singled out Pacaso and was enacted for the sole purpose of regulating Pacaso and its homeowners.

283.     Chapter 17.138 was proposed and enacted for the specific purpose of regulating Pacaso.  Indeed, the March 2022 Report singles out Pacaso, mentioning Pacaso sixty-five times. The March 2022 Report focuses on the City's conclusion that the homes that have been marketed by Pacaso constitute time-share projects, and it includes public complaints made about Pacaso and the reasons why Pacaso should be regulated.  In fact, the March 2022 Report includes an entire section providing an "explanation for the City's conclusion that the homes that have been marketed by Pacaso constitute time share projects" and "that the Time Share Ordinance, both in its *original form* and *as proposed* to be amended, is intended to protect against the impacts that *these homes* and similar uses could have on the City's housing supply and the character of the City's residential districts."  March 2022 Report at 2 (emphasis added).

284.     Likewise, discussion among St. Helena's City Council members and public comments concerning the enactment of Chapter 17.138 during Planning Commission meetings, City Council meetings and public hearings exclusively revolved around banning Pacaso.

77

285.    For example, during the March 22, 2022 City Council meeting (where a public hearing was held regarding Chapter 17.138), Vice Mayor Paul Dohring suggested that Pacaso homeowners do not "give" to the St. Helena community, and addressed Pacaso directly, labeling its outreach as a "sad" "disinformation" campaign and calling Pacaso out for its "invasions" into the City.  March 22, 2022 Meeting, at 1:21.  No other individual or entity (other than Pacaso) was mentioned or referenced at the March 22, 2022 Meeting.

286.    As another example, at the April 12, 2022 Meeting (where another public hearing was held regarding Chapter 17.138), City Council Member Lester Hardy conceded that the ordinance is specifically about Pacaso, stating that "[t]he ordinance is about a particular business enterprise," and then went to on disparage Pacaso—calling its "marketing campaign" both "deceptive and manipulative"—and disclaim "any responsibility" the City Council has for how the ordinance would affect Pacaso homeowners' lives.  April 12, 2022 Meeting, at 1:15-16.  No other entity or individual (other than Pacaso and Pacaso homeowners) were mentioned or referenced at the April 12, 2022 Meeting.

287.    The March 2022 Report does not mention any other entity or individuals who would potentially be subject to the new ordinance, including home-swap or exchange companies like HomeExchange, ThirdHome, or Love Home Swap, which likewise advertise second homes in St. Helena.

288.    Further, the recitals of Chapter 17.138 specifically target Pacaso, referencing Pacaso's business model, mentioning the complaints received about Pacaso homes, and linking such complaints to the reasons underlying the ordinance.  *See supra* ¶ 186.  No other individual or entity (other than Pacaso) was mentioned or referenced in the recitals of Chapter 17.138.

289.    In fact, in St. Helena, 666 second homes[14] are owned by an LLC, trust, or similar mechanism which facilitates multiple owner arrangements.  This represents 27% of all second homes and 18% of the entire housing stock.  These homes include single-family residences that are co-owned by multiple owners, and which not differ in any respect from how a Pacaso home is used by its co-owners.

---

[14]    "Second home" refers to homes that did not take the owner occupant exemption.

FIRST AMENDED COMPLAINT                                                          CASE NO. 3:21-cv-02493-WHO

1      290.    These non-Pacaso LLCs are still in existence, and Defendants have not pursued a

2  similar enforcement agenda against them as it has against Pacaso.

3      291.    Defendants' selective and unequal treatment of Pacaso (i.e., enforcement of Section

4  17.112.130 against Pacaso, where other co-owned residences, through LLCs, tenancy in common,

5  or otherwise, did not face similar challenges, and then its enactment of Chapter 17.138 which

6  singles out and exclusively targets Pacaso) was intentional.  Defendants have intentionally and

7  deliberately singled out Pacaso on the basis of invidious criteria—namely, that Pacaso serves

8  diverse individuals who, in the eyes of Defendants, are non-resident transients, and that vocal St.

9  Helena detractors have strong feelings about Pacaso and want to ban and oust them from the City.

10  Defendants' arbitrary and selective enforcement against Pacaso is the latest chapter in a long

11  history of the City erecting barriers to home ownership for people of diverse backgrounds, and is a

12  pretext to deny homeownership to new diverse residents who hope to purchase property in St.

13  Helena through a co-ownership structure.

14      292.    Defendants' unequal treatment of Pacaso is selective, arbitrary, and not rationally

15  related to a legitimate governmental purpose.  The City's initial stated reasons for enforcement

16  against Pacaso—under the now-deleted Section 17.112.130—could not pass muster.  The City

17  stated to Pacaso in the May 22, 2020 letter that its property "came to the City's attention because

18  neighbors in the surrounding area are concerned about [the] types of impacts" created by "loud

19  parties, amplified sound, and increased traffic."  However, the City itself previously conceded that

20  such stated reasons for prohibiting Pacaso were pretextual.  For example, the City admitted that

21  "[i]f the City Council is concerned about the potential neighborhood impacts timeshare uses may

22  create"—listing "large parties" as an example—"the City ***has existing regulations in place to***

23  ***address such impacts***."  July 2020 Report at 4 (emphasis added).  The City stated, "[I]f the concern

24  is that part-time owners may infrequently visit the property and have large parties, the City's noise

25  ordinance addresses noise and authorizes abatement and issuance of an infraction."  *Id.*  "The

26  City's Municipal Code also addresses nuisances generally and has parking standards in place."  *Id*.

27      293.    Given the many other existing regulations in place to address the supposed

28  "concerns" the City has stated with regard to Pacaso, the City's enforcement agenda against

FIRST AMENDED COMPLAINT                                    CASE NO. 3:21-cv-02493-WHO

1  Pacaso, from the very beginning, has been suspect and appears to be nothing but a pretext to deny

2  homeownership to new diverse residents.

3  294.    Further, Pacaso co-owners agree to several additional restrictions that ensure their

4  use promotes the City's stated goals.  For example, there is a maximum of eight co-owners for any

5  home, with only one family using the property at a time; co-owners agree not to have large events

6  or parties; co-owners adhere to a 9:00 p.m. to 7:00 a.m. quiet hour policy; co-owners are prohibited

7  from renting the home; and Pacaso encourages homeowners to avoid parking on the street.  Pacaso

8  homeowners are no different from other homeowners in St. Helena, thus, efforts to preclude their

9  homeownership does nothing to advance the City's stated goals for enforcement against Pacaso

10  (and not other residential co-ownership structures).

11  295.    Discussions regarding the July 2020 Report confirmed that Defendants were unable

12  to state one purpose, goal or non-suspect "basis" to justify application of the previous time-share

13  ordinance against Pacaso, and that the primary "concern" identified (i.e., "different people coming

14  in and out of the unit or house") is not a permissible (let alone rational) basis for enforcing the

15  time-share ordinance against Pacaso.

16  296.    Recognizing they were unable to regulate Pacaso under the previous time-share

17  ordinance and were attempting to do so illegally, Defendants drafted, proposed and enacted

18  Chapter 17.138 for the sole purpose of regulating and prohibiting Pacaso.  However, just like the

19  now-deleted time-share ordinance, Chapter 17.138 further confirms that the City's stated purposes,

20  goals and findings are pretextual and selective, arbitrary, and not rationally related to a legitimate

21  governmental purpose.  The application of Chapter 17.138 against Pacaso is wholly inconsistent

22  with its stated "Purpose and Findings."  *See* Section 17.138.010.  Targeting Pacaso does nothing to

23  ensure homes are available for "long-term" occupancies.  Section 17.138.010(A).  The City lacks

24  all visibility and control into how much time homeowners intend to spend in their homes.

25  Preventing Pacaso from buying properties has no bearing on the likelihood that other prospective

26  buyers are either buying the home as a second home, or anticipating the ability to use it for short-

27  term rentals, among other non "long-term occupancy" uses.

28

FIRST AMENDED COMPLAINT                                           CASE NO. 3:21-cv-02493-WHO

1    297.    Prohibiting Pacaso also does nothing to increase the "limited supply of suitable

2    vacant land" or "exacerbate[] an already severe housing shortage" in St. Helena.  Sections

3    17.138.010(B) and 17.138.010(F).  Rather, Pacaso's approach helps relieve competition for more

4    affordable homes by giving second home buyers a better option.  Instead of competing for a whole

5    home valued at $525,000, for example, Pacaso offers second home buyers an option to be co-

6    owners of a $4-5 million property for the same price.  Just one Pacaso home can remove up to eight

7    buyers from local competition.  The average Pacaso home costs six times more than the average

8    second home and seven times more than the average year-round home, meaning the company is

9    unlikely to compete with middle-class or lower-income homebuyers.  *See* EBP, *Pacaso: Pacaso*

10   *Economic Impact Analysis* at 2 (2022),

11   https://downloads.ctfassets.net/n2ifzifcqscw/6xq482ojqUgEi5fxtMsHka/ab875d46f47db2b6936ccf

12   4d7d6b4b89/Economic_Data_Report.pdf.  Through co-ownership, Pacaso concentrates demand for

13   the most expensive homes in popular second home destinations, thereby shifting demand away

14   from the median-priced market.  *Id*. at 7.

15   298.    Nor does prohibiting Pacaso help "[m]aintain[]" the alleged "balance between the

16   quality of life for residents and those who work in the City and the visitors who help sustain the

17   City's tourist economy."  Section 17.138.010(C)-(D).  Pacaso homeowners use their homes just

18   like their neighbors.  Like their neighbors, Pacaso homeowners make large financial investments in

19   their homes and bring an owner mentality, not a vacation or "tourist" mentality, to their use of the

20   property.  Further, second homes are notorious for sitting empty much of the year.  In contrast,

21   Pacaso-managed homes are fully utilized, which means that Pacaso homeowners engage in their

22   community and support local businesses year-round.

23   299.    Likewise, the supposed underlying purpose of "[m]aintaining the balance" between

24   "residents and those who work in the City" and visitors is not furthered by regulating Pacaso,

25   because other St. Helena residents can (and do) use their homes in the same way as Pacaso

26   homeowners (including hosting visitors).  Section 17.138.010(D); *see also* March 2022 Report at

27   12 (recitals).  For these same reasons, the City's stated purposes underlying Chapter 17.138—such

28   as "maintaining the authentic small-town quality of life" or "preserving the rural, small town

81

1  quality" of the City—cannot pass muster and are not furthered by preventing Pacaso homeowners

2  from co-owning a Pacaso home.  March 2022 Report at 3, 12.  Pacaso homeowners use their homes

3  just as their neighbors and other St. Helena residents do.

4        300.    Nor does regulating Pacaso advance the City's stated purpose of banning "tourist-

5  oriented," "commercial" use or "short-term, tourist oriented use" in residential areas, which

6  allegedly "create[s] increased traffic generation, excessive noise, [and] disruption."  Section

7  17.138.010(E)-(F).  Pacaso is a purely residential co-homeownership structure that lacks any

8  resemblance to such "commercial," "tourist-oriented" or "short-term" uses.  Short-term rentals are

9  strictly prohibited in Pacaso homes, and all owners agree to Pacaso's policies, which prohibit large

10  events or parties.  Further, Pacaso homes are subject to all of the same noise and nuisance

11  ordinances that apply to other single-family residences in St. Helena, and Pacaso homeowners

12  adhere to a 9:00 p.m. to 7:00 a.m. quiet hour policy.  And the City has already acknowledged that

13  "[i]f the City Council is concerned about the potential neighborhood impacts timeshare uses may

14  create, the City has existing regulations in place to address such impacts."  July 2020 Report at 4.

15  The City noted: "For example, if the concern is that part-time owners may infrequently visit the

16  property and have large parties, the City's noise ordinance addresses noise and authorizes

17  abatement and issuance of an infraction.  The City's Municipal Code also addresses nuisances

18  generally and has parking standards in place."  *Id.*

19        301.    Similarly, the City's stated reasons for why a Pacaso home is more "commercial"

20  than "residential" in nature cannot pass muster.  For example, the City likens "[l]iving next door to

21  a home where the residents turnover every 2-14 days, and a professional cleaning and landscaping

22  crews come to the property between each visit" as akin to "living by a commercial lodging

23  project."  March 2022 Report at 7.  However, having weekly visits by cleaners or landscapers is not

24  a feature that is unique to Pacaso homes.

25        302.    At the March 2022 Meeting, Defendants' animus towards Pacaso and true purpose

26  for the ordinance (i.e., to target and prohibit Pacaso) was further revealed.  Vice Mayor Paul

27  Dohring spoke directly to Pacaso, calling its alleged "disinformation campaign . . . really . . . sad"

28

FIRST AMENDED COMPLAINT                                    CASE NO. 3:21-cv-02493-WHO

1   and "not something this community is going to tolerate," and sarcastically "thanked" Pacaso for its

2   "invasion" into the St. Helena community.  March 22, 2022 Meeting, at 1:21.  *See supra* ¶ 189.

3         303.    Further, during the March 2022 Meeting, Vice Mayor Paul Dohring stated that the

4   purpose of the ordinance and the "missing piece" in the Pacaso model is "who you can rely on [in a

5   neighborhood] and that important social contact you have with your neighbors."  March 22, 2022

6   Meeting at 1:19-21.  However, Dohring quickly acknowledged the flaw in this stated purpose:

7   "Some argue that we've already lost that with second home ownership . . . ."  *Id.*

8         304.    Defendants' enforcement efforts against Pacaso and passage of legislation that

9   specifically targets Pacaso are but a pretext for Defendants' improper motive and discriminatory

10   design of exclusion and actions designed to stifle diversity and housing opportunities for

11   underrepresented communities.  Before enacting Chapter 17.138, the City itself concedes that one

12   of the "significant practical challenges to implementing and enforcing the existing timeshare

13   regulations" is that "[a]bsent a proposed new development to specifically construct a timeshare

14   project, the City does not know when a residence becomes a timeshare, since the ownership change

15   is a private transaction between private parties."  July 2020 Report at 3.  The City conceded that it

16   "does not have an easily available means to scrutinize such agreements or monitor the terms of

17   particular ownership arrangements."  *Id.*  The City's selective enforcement of the previous time-

18   share ordinance against Pacaso, and passage of the new time-share ordinance for the sole purpose

19   of regulating Pacaso, highlights the very concerns that the City itself recognized.

20         305.    The City's selective and arbitrary enforcement against Pacaso has been carried out

21   through City Attorney Walsh's, DeRosa's, and Ellsworth's conduct, acting under the color of law,

22   including enforcement of Section 17.112.130 even when it appeared to be an unviable route to

23   regulating Pacaso, and then amending the time-share ordinance and adopting Chapter 17.138 for

24   the sole purpose of regulating and prohibiting Pacaso, while failing to carry out an enforcement

25   regime against similarly situated or functionally equivalent individuals or entities.  Through such a

26   selective and discriminatory enforcement, DeRosa, Ellsworth and City Attorney Walsh, acting

27   under the color of law, deprived Pacaso of its rights under the United States Constitution, by

28   unlawfully targeting Pacaso without any rational basis for enforcing the laws against Pacaso, but

FIRST AMENDED COMPLAINT                                              CASE NO. 3:21-cv-02493-WHO

1  no other co-owners of homes within St. Helena.  DeRosa's, Ellsworth's and City Attorney Walsh's

2  actions were a direct cause of Pacaso's injuries, because their conduct directly caused a violation of

3  Pacaso's rights.  DeRosa, Ellsworth and City Attorney Walsh are authorized to enforce Section

4  17.112.130 and Chapter 17.138 and they did so in an unlawful manner.

5       306.    Defendants' enforcement of the time-share ordinance against Pacaso, which caused

6  Pacaso to suffer a constitutional violation, was carried out pursuant to St. Helena's long history of

7  exclusion, discrimination and anti-growth principles, which include actions designed to stifle

8  diversity and housing opportunities for underrepresented communities.  *See supra* ¶¶ 223-30.  The

9  City's long-standing policy and practice of exclusion, outsider bias, and erecting barriers to home

10  ownership for people of diverse and underrepresented backgrounds is so closely related to and

11  coheres with the City's enforcement efforts against Pacaso as to be the moving force that caused it.

12  *See id.*

13       307.    The City of St. Helena is a government entity acting pursuant to Chapter 17.138,

14  which is an expressly adopted official policy that causes violations of the Fourteenth Amendment.

15  The City of St. Helena and its governing officials were, and are, acting under the color of law and

16  authority in adopting and enforcing the ordinance.  The enforcement and threatened enforcement of

17  the ordinance against Plaintiffs is an action taken under the color of law.

18       308.    Pursuant to 42 U.S.C. § 1983 and the Court's equitable powers, Plaintiffs seeks

19  injunctive relief against Defendants, whose selective and discriminatory enforcement of the time-

20  share ordinance against Pacaso and Pacaso homeowners conflicts with and violates the Fourteenth

21  Amendment and California Constitution.

22  **CLAIM 4**

23  **DECLARATORY RELIEF: INVALID USE OF MUNICIPAL AUTHORITY**

24  **(AGAINST THE CITY)**

25       309.    Plaintiffs adopt and reassert the allegations contained in Paragraphs 1-308 as if fully

26  set forth herein.

27

28

310.    Chapter 17.138 is inapplicable against Plaintiffs for the separate and independent reason that it represents an invalid use of legislative authority, and exceeds the scope of a municipality's zoning authority and police power under California Government Code § 65850(a).

311.    The City's adoption and application of the ordinance against Pacaso regulates beyond the mere "use" of buildings, structures, or land, as permitted in California Government Code § 65850(a).  Instead, the City's adoption and application of Chapter 17.138 against Pacaso targets individuals "based on the identity of a tenant or where a particular resident permanently resides" and tries to regulate the individuals and persons who can reside in a residential residence.

312.    Instead of regulating only the "use" of land, Chapter 17.138, by its plain terms, and Defendants, in their application against Pacaso and its homeowners, also regulate and target enforcement of the ordinance based on *who* the owners are.

313.    By applying Chapter 17.138 against Pacaso and its homeowners, the City is targeting individuals and regulating "based on the identity of a tenant or where a particular resident permanently resides." July 2020 Report at 3.

314.    Chapter 17.138 regulates how people come together to own and use property, and requires the City to peer within co-owned homes into the relationships and manner of use of such co-owners, invading intimate and private engagements and arrangements among family members, friends, co-workers, spouses, and separated or divorced spouses.

315.    The City even concedes that the ordinance intrudes on living arrangements of "extended family members" and "group[s] of friends."  March 22, 2020 Report at 10.  Further, the City concedes that its focus is on the *identities* of owners and the *manner* of use of the property—stating that the extent to how "formal" an "arrangement" or "relationship" among co-owners is, or the identities of the co-owners, is indeed relevant to the inquiry.  *See id.*

316.    Further, the definitions of the ordinance incorporate the concept of ownership for the *very purpose* of being able to regulate and invade such personal, intimate living arrangements. For example, the definition of a "time-share use"—defined as "the use of one or more accommodations or any part thereof, as a time-share property pursuant to a ***time-share plan***" (Section 17.138.020 (definition of "Time-share use") (emphasis added))—necessarily incorporates

85

1  the concept of ownership through its reference to a "time-share plan."  A "time-share plan," in turn,

2  is defined as "any arrangement, plan, scheme, or similar device, ***whether by membership***

3  ***agreement, bylaws, shareholder agreement, partnership agreement, sale, lease, deed, license,***

4  ***right to use agreement, or by any other means***" (*id.* (definition of "Time-share plan") (emphasis

5  added))—which regulates ownership and spells out different "means" of ownership.

6       317.    Chapter 17.138 is arbitrary and unreasonable, having no substantial relation to the

7  public health, safety, morals, or general welfare.  *See supra* ¶¶ 130-54; *see also* ¶¶ 186-191.

8       318.    The City's stated reasons for Chapter 17.138 and its enforcement against Pacaso and

9  its homeowners have no rational basis or substantial relation to its legislative purpose and findings.

10  *See id.*

11       319.    The City itself stated to Pacaso in its May 22, 2020 letter that its property "came to

12  the City's attention because neighbors in the surrounding area are concerned about [the] types of

13  impacts" created by "loud parties, amplified sound, and increased traffic."  However, the City

14  previously admitted that "[i]f the City Council is concerned about the potential neighborhood

15  impacts timeshare uses may create"—listing "large parties" as an example—"the City ***has existing***

16  ***regulations in place to address such impacts***."  July 2020 Report at 4 (emphasis added).  The City

17  stated "if the concern is that part-time owners may infrequently visit the property and have large

18  parties, the City's noise ordinance addresses noise and authorizes abatement and issuance of an

19  infraction.  The City's Municipal Code also addresses nuisances generally and has parking

20  standards in place."  *Id.*  Further, Pacaso strictly prohibits short-term rentals, and all Pacaso

21  homeowners agree to Pacaso's policies, which prohibit large events or parties.

22       320.    Further, the City states that "[t]he more formal arrangement found in time-share

23  uses increases the intensity of use, in that each individual time-share owner cycles through the

24  property, whereas families or friends are more likely to use the property together or in groups

25  leading to less transition in the residential neighborhood."  March 22, 2022 Report at 10.  However,

26  regulating Pacaso does nothing to lessen the "transition in residential neighborhoods," because

27  other St. Helena residents (including primary residents and second home owners alike) cycle within

28  and in and out of the City, just as Pacaso homeowners.  Further, the City's stated finding that "[t]he

86

more formal arrangement found in time-share uses increases the intensity of use" and leads to more "transition in the residential neighborhood," *id.*, cannot pass muster.  For example, two sisters who co-own a home, who split time in the home such that one sister lives there for the first six months, and the other lives there for the next six months, would likely be considered a "time-share use" under the City's interpretation, yet this arrangement in no way *increases* the "intensity of use" or leads to *more* "transition" in the neighborhood.  In fact, just the opposite.

321.    Given the many other existing regulations and policies in place to address the supposed "concerns" the City had with Pacaso's properties and that underly the purpose and intent of Chapter 17.138, the ordinance, and the City's attempt to apply this section against Pacaso based on *ownership*, is unreasonable and unwarranted, and an invalid land use ordinance under California Government Code § 65850(a).

## CLAIM 5

### DECLARATORY RELIEF: CHAPTER 17.138 IS PREEMPTED

### (AGAINST THE CITY)

322.    Plaintiffs adopt and reassert the allegations contained in Paragraphs 1-321 as if fully set forth herein.

323.    Article XI, Section 7, of the California Constitution states "[a] county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws."

324.    Chapter 17.138 is preempted by state law through express and implied field preemption and thus is invalid under the California Constitution.

325.    Field preemption applies where local law regulates a particular area that the state has intended to occupy, or where the issue has been so completely covered by state law as to indicate that the issue is now exclusively a state concern, or where the issue has been only partially covered by state law, but the language of the state law indicates that the state interest will not tolerate additional local input.

326.    Chapter 17.138 fits squarely within the scope of the Vacation Ownership and Time-share Act of 2004, Cal. Bus. & Prof. Code §§ 11210-11288 ("VOTA"), and regulates in the very field that the California legislature has reserved to itself and intended to fully occupy.

327.    Under VOTA, the California legislature has explicitly reserved the regulation of time-share plans for the State, stating that "the regulation of time-share plans and exchange programs is an exclusive power and function of the state."  Cal. Bus. & Prof. Code § 11280(a).

328.    The California legislature could not be clearer in its intent that this is exclusively a state concern: "A unit of local government may not regulate time-share plans or exchange programs."  Cal. Bus. & Prof. Code § 11280(a).  This is exactly what the City seeks to do through Chapter 17.138.

329.    Further, the California legislature has clearly intended to regulate time-shares broadly:

> In order to protect the quality of California time-share plans and the consumers who purchase them, it is the intent of the legislature that this chapter be interpreted broadly in order to encompass all forms of time-share plans with a duration of at least three years that are created with respect to accommodations that are located in the state or that are offered for sale in the state, including, but not limited to, condominiums, cooperatives, vacation clubs, and multisite vacation plans.

Cal. Bus. & Prof. Code § 11211(d).

330.    Further, the comprehensive nature of VOTA in regulating time-shares and certain registration or advertising requirements for time-share plans, including the information and terms that must be included in a sale to protect potential consumers, is so thorough and detailed as to manifest the legislature's intent to preclude local regulation of advertising of time-shares and indicate that the issue is now exclusively a state concern.  VOTA's regulation of time-share advertising as part of the state interest is what Chapter 17.138, a local ordinance, improperly regulates and prohibits.

331.    VOTA accordingly occupies the field of the regulation of time-shares (including the advertisement of time-shares), thus preempting Chapter 17.138.

88

332.    Plaintiffs seek a judgment declaring the ordinance declared invalid because it is preempted by state law.

## CLAIM 6

**DUE PROCESS VIOLATION: CHAPTER 17.138 IS UNCONSTITUTIONALLY VAGUE AND AMBIGUOUS ON ITS FACE AND AS APPLIED TO PLAINTIFFS**

**(AGAINST ALL DEFENDANTS)**

333.    Plaintiffs adopt and reassert the allegations contained in Paragraphs 1-332 as if fully set forth herein.

334.    Chapter 17.138 violates the due process guarantees of the Fourteenth Amendment to the United States Constitution and Article I, Section 7, of the California Constitution because it is unconstitutionally vague and ambiguous on its face and as applied to Plaintiffs.

335.    Chapter 17.138 fails to provide individuals and entities—including Pacaso, homeowners, real estate agents, brokers, and persons of ordinary intelligence, among others—a reasonable opportunity to know what conduct, speech, or uses are prohibited, or any guidance as to how to determine whether their conduct, use of a home, or speech with regard to time-share uses falls within the prohibited conduct.

336.    In addition, the vague prohibition on all "advertisement" or "dissemination of any kind and through any medium" of any time-share use in the City, *see* Section 17.138.060(A), without defining or limiting the scope of such conduct or speech, implicates and chills free speech, thus rendering the ordinance unconstitutionally void for vagueness.

337.    Chapter 17.138 uses circuitous definitions to define terms, which are vague, confusing and difficult to follow.  For example, "time share use" is defined as "the use of one or more accommodations or any part thereof, as a *time-share property* pursuant to a *time-share plan*." Section 17.138.020 (definition of "Time-share use") (emphasis added).  Those latter terms carry their own vague definitions.  For instance, "time-share property" is defined as "one or more accommodations subject to the same time-share plan, together with any other property or rights to property appurtenant to those accommodations." *Id.* (definition of "Time-share property").  And "time-share plan" is defined as "any arrangement, plan, scheme, or similar device, whether by

89

1  membership agreement, bylaws, shareholder agreement, partnership agreement, sale, lease, deed,

2  license, right to use agreement, or by any other means, whereby a purchaser, in exchange for

3  consideration, receives the right to exclusive use of an accommodation or accommodations,

4  whether through the granting of ownership rights, possessory rights or otherwise, for a period of

5  time less than a full year during any given year, on a recurring basis for more than one year, but not

6  necessarily for consecutive years." *Id.* (definition of "Time-share plan").  The City acknowledged

7  the circuitous nature of these definitions, stating, "The new ordinance includes a number of

8  definitions that work in concert to define a time-share use."  March 22, 2022 Report at 9.

9      338.    The ordinance provides no guidance or criteria as to how its vague definitions apply

10  in many circumstances, such as when ordinary co-owners make arrangements concerning when or

11  how they can use the property.  The ordinance thus fails to provide people of ordinary intelligence

12  a reasonable opportunity to understand what conduct it prohibits, on the one hand, and authorizes,

13  on the other.  As a result, the ordinance encourages arbitrary and discriminatory enforcement.  For

14  example, the City stated that "not all properties with multiple owners or owned by business entities

15  (such as LLCs) would constitute a time-share use under these definitions." March 22, 2022 Report

16  at 10.  The City further noted that "[a] property that is owned by a group of friends or extended

17  family members, whether through a separate business entity or otherwise, will not necessarily

18  mandate that only one owner will be able to use the property at a time." *Id.*  The City purports to

19  distinguish those scenarios from the "more ***formal*** arrangement found in time-share uses." *Id.*

20  (emphasis added).

21      339.    However, it is unclear what constitutes a "formal arrangement," and Defendants fail

22  to provide *any* clarity, guidance, or criteria as to what "a *more* formal arrangement" is.  This

23  potentially prohibits, for example, a family that co-owns a house among cousins who use a Google

24  spreadsheet allotting times in which certain members are intending to use the house.  Likewise,

25  Chapter 17.138 potentially prohibits siblings who own a home who have allotted times in which

26  they can each enjoy using the home.  Chapter 17.138 also potentially implicates friends who share

27  a home but who stagger the periods of the year that they enjoy that home.  Likewise, Chapter

28  17.138 potentially prohibits domestic partners, or divorced or separated spouses, who wish to

90

FIRST AMENDED COMPLAINT                                    CASE NO. 3:21-cv-02493-WHO

1   alternate usage of a home at different times of year for whatever personal reasons—none of which

2   are the concern of the City.  In this regard, the City fails to provide examples, criteria, or guidance

3   of what constitutes a "more formal arrangement" with regard to properties "owned by a group of

4   friends or extended family members," leaving persons to guess as to whether their use of a property

5   is prohibited.  Chapter 17.138 thus fails to provide adequate notice and sufficient guidance, which

6   would allow an individual to ascertain beyond mere speculation as to whether the use of their

7   property constitutes a time-share plan or use.

8          340.   The vague ordinance also traps the innocent by not providing fair warning of or

9   sufficient guidance as to what expressive conduct or speech is prohibited.  Chapter 17.138 punishes

10  "[a]ny responsible person" who "uses, or allows the use of, or advertises or causes to be printed,

11  published, advertised or disseminated in any way and through any medium" the use of time-shares.

12  Section 17.138.060(A).  However, the ordinance fails to clarify, define, or set any bounds on, or

13  provide guidance as to what or who qualifies as a "responsible person . . . who . . . causes to be . . .

14  disseminated in any way and through any medium the availability for sale or use of an

15  accommodation in violation of [Chapter 17.138]."  Section 17.138.060(A).  That vague prohibition

16  potentially extends to and implicates individuals merely conversing with a friend about a time-

17  share use in the City, printing companies publishing an opinion piece about time-share uses in the

18  City, and even individuals reposting listings on social media or via private email exchanges, among

19  potentially many others.  But those are just guesses, because the ordinance's scope is unclear at

20  best.  Likewise, the ordinance fails to define, clarify or provide guidance as to what it means to

21  "cause[] to be . . . disseminated in any way and through any medium," *id.*, and whether this

22  prohibition extends to someone reposting a time-share listing on their social media page, having a

23  private conversation with a friend about a time-share use in the City, or merely sending a link of

24  the listing via email to another friend.

25         341.   A person of ordinary intelligence is left guessing whether, for example, they become

26  a "responsible person" for merely forwarding an online advertisement to another along with his or

27  her commentary about Pacaso.  Or, as another example, whether "disseminat[ion] in any way and

28  through any medium" of a time-share use extends to social communications among friends, co-

91

1   workers, family members or spouses merely relaying news, gossip, or information about time-share

2   uses or listings in the City may be stifled under this ordinance.  Likewise, a person of ordinary

3   intelligence is left guessing whether they "caused to be . . . disseminated" the use of a time-share

4   by posting a Tweet or Facebook post expressing an opinion about or providing information about a

5   known time-share use in the City.  These are just some examples of the vague and confusing

6   language in the ordinance for which the City provides no guidance, criteria, or examples as to how

7   to interpret.  Not only does the "disseminat[ion]" prohibition fail to provide people of ordinary

8   intelligence a reasonable opportunity to understand what conduct it prohibits, but it also authorizes

9   and even encourages arbitrary and discriminatory enforcement. Moreover, the vague ordinance has

10  a chilling effect by causing people to steer a wider course than necessary in order to avoid

11  violations of the ordinance (including steering away from discussions about time-share uses in the

12  City), rendering the ordinance unconstitutionally vague and ambiguous, and therefore void on its

13  face.

14        342.    Further, because the ordinance prohibits a person from disseminating "the

15  availability for sale or use of an accommodation in violation of [Chapter 17.138]," Section

16  17.138.060(A), persons of ordinary intelligence can be trapped into a violation if they discuss, post

17  or share information about a home which they are not aware is being used as a time-share under

18  Chapter 17.138 or rendered illegal by the ordinance's terms.  This also requires individuals to make

19  their own assessments, with no guidance, about what may or may not be considered a time-share

20  use under the Chapter—an assessment which most likely requires an invasion into the private

21  living arrangements of co-owners, which ordinary citizens may not have access to.  Thus, this

22  prohibition chills speech and stifles individuals' ability to share or discuss information, for fear of

23  violating the ordinance.

24        343.    Chapter 17.138 is further vague, ambiguous and confusing as applied by Defendants

25  against Pacaso.  Chapter 17.138 has no "grandfather" clause or clause specifically addressing how

26  Existing Pacaso Homes that are either being marketed or have been sold (and are being managed

27  by Pacaso) are to be treated under the new ordinance.  Given the ongoing litigation with Pacaso, in

28  which it was never established whether Existing Pacaso Homes were subject to Section 17.112.130

92

1    (the now-deleted time-share ordinance), there is an open question regarding whether Existing

2    Pacaso Homes constitute a "nonconforming use" that may "continue indefinitely" under the

3    Municipal Code—which adds further confusion about who or what is regulated and at what point

4    such regulations take effect. And this confusion prevents Plaintiffs from knowing what the law

5    allows them to do and what it does not allow.  This confusion is confirmed by others in the City.

6    During the April 12, 2022 City Council meeting where Chapter 17.138 was adopted, a St. Helena

7    resident who did not support Pacaso and encouraged the City Council to adopt the new ordinance

8    stated her view that the new ordinance would not be applied against the Existing Pacaso Homes.

9    She expressed solace in the fact that the City would not be "criminalizing" or "running out of

10   town" the homeowners already at the four existing Pacaso homes.  *See* April 12, 2022, City

11   Council Meeting at 1:11:27,

12   https://sthelena.civicweb.net/document/61947?splitscreen=true&media=true ("I do want to also

13   point out [that] you're not criminalizing people who have already bought into this model.  They did

14   not know that this was going to happen.  How could they?  And I don't think you're going to []

15   issue warrants and run them out of town. I mean, they're here.  My understanding is the idea [of the

16   New Ordinance] is to stop this from going further.").

17        344.    The City's enactment and enforcement of an unconstitutionally vague ordinance

18   against Pacaso has been carried out through City Attorney Walsh's, DeRosa's, and Ellsworth's

19   conduct, acting under the color of law.

20        345.    In adopting an unconstitutionally vague ordinance, DeRosa, Ellsworth and City

21   Attorney Walsh, acting under the color of law, deprived Pacaso, Pacaso homeowners, and citizens

22   of St. Helena of their rights under the United States Constitution, by depriving Pacaso, Pacaso

23   homeowners, and citizens of St. Helena of fair notice of the conduct and speech that the

24   unconstitutionally vague time-share ordinance regulates.  DeRosa's, Ellsworth's and City Attorney

25   Walsh's actions were a direct cause of Pacaso's injuries, because their conduct directly caused a

26   violation of Pacaso's rights.  DeRosa, Ellsworth and City Attorney Walsh are authorized to enact

27   and enforce Chapter 17.138, and they did so in an unlawful and unconstitutional manner.  As a

28

1  result, Pacaso, its homeowners and citizens of St. Helena lacked fair notice of the conduct and

2  speech that the unconstitutionally vague time-share ordinance regulates.

3       346.    Defendants' enactment and enforcement of Chapter 17.138 against Pacaso, which

4  caused Pacaso to suffer a constitutional violation, is carried out pursuant to St. Helena's long

5  history of exclusion, discrimination and anti-growth principles, which include actions designed to

6  stifle diversity and housing opportunities for underrepresented communities.  *See supra* ¶¶ 223-30.

7  The City's long-standing policy and practice of exclusion, outsider bias, and erecting barriers to

8  home ownership for people of diverse and underrepresented backgrounds is so closely related to

9  and coheres with the City's enforcement efforts against Pacaso as to be the moving force that

10  caused it.  *See id.*

11       347.    The City of St. Helena is a government entity acting pursuant to Chapter 17.138,

12  which is an expressly adopted official policy that causes violations of the Fourteenth Amendment.

13  The City of St. Helena and its governing officials were, and are, acting under the color of law and

14  authority in adopting and enforcing the ordinance.  The enforcement and threatened enforcement of

15  the ordinance against Plaintiffs is an action taken under the color of law.

16       348.    Pursuant to 42 U.S.C. § 1983 and the Court's equitable powers, Plaintiffs seeks

17  injunctive relief against Defendants, whose enforcement of the vague and ambiguous time-share

18  ordinance against Pacaso and the Pacaso homeowners conflicts with and violates the Fourteenth

19  Amendment and California Constitution.

20       349.    Further, pursuant to 42 U.S.C. § 1983 and the Court's equitable powers, Plaintiffs

21  seek to have the ordinance declared void on its face and void as applied to Plaintiffs, as such a

22  vague and ambiguous ordinance conflicts with and violates the Fourteenth Amendment and

23  California Constitution.

24

25

26

27

28

FIRST AMENDED COMPLAINT                             CASE NO. 3:21-cv-02493-WHO

1

**CLAIM 7**

2

**CHAPTER 17.138 IS UNCONSTITUTIONALLY OVERBROAD ON ITS FACE**

3

**(AGAINST THE CITY)**

4

350.     Plaintiffs adopt and reassert the allegations contained in Paragraphs 1-349 as if fully

5

set forth herein.

6

7

351.     Chapter 17.138 violates the First Amendment because it is unconstitutionally

8

overbroad on its face by reaching a substantial number of impermissible applications in relation to

9

the ordinance's plainly legitimate sweep.

10

352.     The ordinance provides: "***Any responsible person***, including but not limited to an

11

owner of a time-share interest, management entity, agent, or broker ***who uses, or allows the use of,***

12

***or advertises or causes to be printed, published, advertised or disseminated in any way and***

13

***through any medium, the availability for sale or use of an accommodation*** in violation of this

14

chapter is guilty of a misdemeanor for each day in which such accommodation is used, allowed to

15

be used, or advertised for sale or use in violation of this chapter. Such violation shall be punishable

16

pursuant to Chapter 1.20."  Section 17.138.060(A) (emphasis added).  Thus, the ordinance, under

17

the penalty of fines, misdemeanors or imprisonment, prohibits any "dissemination" of the "use of

18

an accommodation" as a time-share in the City.

19

353.     By prohibiting a person from "disseminat[ing] in any way and through any

20

medium" the use of a time-share in the City, the ordinance broadly prohibits ***all*** speech on time-

21

share use in the City ***without exception***—including non-commercial and political speech.  The

22

ordinance also applies to ***all*** "responsible" people who, ***without exception***, disseminate information

23

about a time-share use in the City.

24

354.     This prohibits many different forms of protected speech—including an individual's

25

forwarding of an online advertisement to another along with his or her commentary about Pacaso—

26

and also extends to any and every individual who is "responsible" for such speech.  As another

27

example, social communications among friends, co-workers, family members or spouses merely

28

relaying news, gossip, or information about time-share uses or listings in the City are prohibited

95

under this ordinance.  The ordinance also extends to Tweets or Facebook posts expressing an opinion about or providing information about a known time-share use in the City.  Indeed, a public comment or email to the City pointing out an improper time-share use would a literal violation of this ordinance.  These are just a handful of examples of the overbroad nature of the ordinance.

355.  Such an overbroad prohibition on protected speech—which extends to all speech, whether commercial or non-commercial, on time-share uses in St. Helena—renders the ordinance unconstitutionally overbroad.

356.  The City of St. Helena is a government entity acting pursuant to Chapter 17.138, which is an expressly adopted official policy that causes violations of the First Amendment. The City of St. Helena and its governing officials were, and are, acting under the color of law and authority in adopting and enforcing the ordinance.  The enforcement and threatened enforcement of the ordinance against Plaintiffs is an action taken under the color of law.

357.  Thus, pursuant to 42 U.S.C. § 1983 and the Court's equitable powers, Plaintiffs seek the ordinance declared void on its face as an unconstitutionally overbroad speech restriction in violation of the First Amendment.

## CLAIM 8

### VIOLATION OF THE RIGHT OF PRIVACY

### (AGAINST THE CITY)

358.  Plaintiffs adopt and reassert the allegations contained in Paragraphs 1-357 as if fully set forth herein.

359.  Chapter 17.138, and its enforcement against Pacaso homeowners, violates their state constitutional rights of due process and equal protection by infringing upon their fundamental right of privacy under Article I, Section 1, of the California Constitution.  These privacy rights enshrined in the California Constitution are extraordinarily broad.

360.  There is a recognized autonomy privacy interest in choosing the persons with whom a person will reside, and in excluding others from one's private residence.  Pacaso homeowners have a privacy interest in coming together with co-owners to own and use a home together.

96

1   Likewise, Pacaso homeowners have a privacy interest in choosing with whom to live, in excluding

2   others from their home, and in their private living arrangements.

3       361.    Pacaso homeowners have a reasonable expectation of privacy in their own home,

4   including in their living arrangements, in how they can come together to own and use property, in

5   choosing with whom to live, and in excluding others from their home.

6       362.    Chapter 17.138 seriously violates these privacy rights.  Chapter 17.138 regulates

7   and invades how Pacaso homeowners can come together to own and use property together, and

8   restricts homeowners from being able to exclude others from their home.  The ordinance intrudes

9   into, interferes with, and restricts individuals' ability to make intimate personal decisions about

10  their living arrangements, including who they want to co-own property with, how they want to

11  allocate the time spent within that home, how they can use and share a home with others, and their

12  ability to exclude others from the home.

13      363.    The ordinance also regulates and invades intimate and private engagements and

14  living arrangements, including assessing the identity of co-owners, relationships of co-owners, and

15  manner of use of co-owners.  The City even concedes that the ordinance intrudes on living

16  arrangements of "extended family members" and "group[s] of friends."  March 22, 2020 Report at

17  10.  Further, the City concedes that its focus is on the identities of owners and the manner of use of

18  the property—stating that the extent to how "formal" an "arrangement" or "relationship" among

19  co-owners is, or the identities of the co-owners, is indeed relevant to the City's analysis as to

20  whether Chapter 17.138 is being violated by a homeowner.  *See* March 22, 2020 Report at 10.  In

21  doing so, the City impermissibly intrudes upon living arrangements—including family living

22  arrangements, and other intimate and private arrangements.

23      364.    The City's intrusion on the Pacaso homeowners' privacy interest is not justified by

24  any governmental interests underlying the local zoning ordinance.  Additionally, as noted above,

25  the City's stated purposes, goals and findings underlying the ordinance are pretextual and selective,

26  arbitrary, and not rationally related to a legitimate governmental purpose.  *See supra* ¶¶ 123-54; *see*

27  *also* ¶¶ 186-191.

28

97

1   365.   The City cannot show a narrowly tailored means to achieve their stated goals or

2  purposes.  Instead, as the City conceded, there are many other existing regulations and policies in

3  place to address the supposed "concerns" the City had with Pacaso's properties that underly the

4  purpose and intent of Chapter 17.138.  *See supra* ¶ 218-20.

5   366.   Pacaso Homeowners seek declaratory judgment and a permanent injunction barring

6  the City from enforcing Chapter 17.138 against them in violation of their right of privacy under

7  Article I, Section 1, of the California Constitution.

8  ## **PRAYER FOR RELIEF**

9  **WHEREFORE, Plaintiffs respectfully pray for relief as follows:**

10   a)   For judgment in favor of Pacaso and Pacaso homeowners against Defendants on all
          Causes of Action;

11
12   b)   For a judgment declaring that Chapter 17.138 is void on its face and therefore
          stricken;

13   c)   For a judgment declaring that Chapter 17.138 is preempted and therefore stricken;

14   d)   For a judgment declaring that Chapter 17.138 does not apply to Pacaso and Pacaso
          homeowners;

15
16   e)   For a judgment declaring that Defendants do not have the authority to enforce
          Chapter 17.138 against Pacaso and Pacaso homeowners;

17   f)   For a judgment barring the City from enforcing Chapter 17.138 against Pacaso and
          Pacaso homeowners;

18
19   g)   For a judgment declaring that the Existing Pacaso Homes are exempt from Chapter
          17.138 and can continue indefinitely;

20   h)   For attorneys' fees pursuant to 42 U.S.C. § 1988(b) and California Code of Civil
          Procedure § 1021.5; and

21
22   i)   For such other and further relief as this Court may deem proper.

23  DATED: July 21, 2022                SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

24                                      By: _____*/s/ Lance A. Etcheverry*_____
                                             LANCE A. ETCHEVERRY
25                                           Attorneys for Plaintiffs
                                        PACASO INC., PAC 6 CA 2021 LLC, PAC 5 CA 2021 LLC,
26                                         PAC 2 CA 2021 LLC, Napa 120 LLC, and PACASO
                                                      HOMEOWNERS
27

28                                      SKAGGS FAUCETTE LLP

FIRST AMENDED COMPLAINT                              CASE NO. 3:21-cv-02493-WHO

By: _____/s/ Jason M. Skaggs_____
JASON M. SKAGGS
Attorneys for Pacaso Homeowners
SIMON BULL and THE BULL FAMILY TRUST, TONY
ATHANS, MARY ATHANS, and THE ANTONY JOHN
ATHANS REVOCABLE TRUST & MARY LIAPIS
ATHANS REVOCABLE TRUST, CHAD AMMON,
JONATHAN YOUNG, and AMMON-YOUNG REVOCABLE
TRUST, DATED 8/12/16, TAYLOR LOPEZ, CHELSEA
LOPEZ, and WILLIAM TREVOR GILLESPIE

FIRST AMENDED COMPLAINT                                    CASE NO. 3:21-cv-02493-WHO

1

## **DEMAND FOR JURY TRIAL**

2

Pacaso respectfully requests a trial by jury on all issues so triable.

3

4    DATED: July 21, 2022          SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

5                                  By: _____ */s/ Lance A. Etcheverry* _____
                                            LANCE A. ETCHEVERRY
6                                           Attorneys for Pacaso
                                   PACASO INC., PAC 6 CA 2021 LLC, PAC 5 CA 2021 LLC,
7                                        PAC 2 CA 2021 LLC, Napa 120 LLC

8

9                                  SKAGGS FAUCETTE LLP

10
                                   By: _____ */s/ Jason M. Skaggs* _____
11                                          JASON M. SKAGGS
                                          Attorneys for Pacaso Homeowners
12                                 SIMON BULL and THE BULL FAMILY TRUST, TONY
                                   ATHANS, MARY ATHANS, and THE ANTONY JOHN
13                                 ATHANS REVOCABLE TRUST & MARY LIAPIS
                                   ATHANS REVOCABLE TRUST, CHAD AMMON,
14                                 JONATHAN YOUNG, and AMMON-YOUNG
                                   REVOCABLE TRUST, DATED 8/12/16, TAYLOR LOPEZ,
15                                 CHELSEA LOPEZ, and WILLIAM TREVOR GILLESPIE

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT                                    CASE NO. 3:21-cv-02493-WHO

**<u>FILER'S ATTESTATION</u>**

Pursuant to Civil L.R. 5-1(h)(3), I hereby attest that I have obtained the concurrence in the filing of this document from all the signatories for whom a signature is indicated by a "conformed" signature /s/ within this e-filed document, and I have on file records to support this concurrence for subsequent production for the Court if so ordered or for inspection upon request.

DATED: July 21, 2022

By: _____ */s/ Lance A. Etcheverry* _____
LANCE A. ETCHEVERRY

FIRST AMENDED COMPLAINT                              CASE NO. 3:21-cv-02493-WHO